1 | ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

2

MARTHA BOERSCH (CABN 126569)
3 | Chief, Criminal Division

4 | SAILAJA M. PAIDIPATY (NYBN 5160007)
CHRISTIAAN H. HIGHSMITH (CABN 296282)
5 | Assistant United States Attorney

6     450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
7     Telephone: (415) 436-7200
    FAX: (415) 436-7027
8     christiaan.highsmith@usdoj.gov

9 | Attorneys for United States of America

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                        SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 21-CR-397 EMC |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | Hearing Date: September 12, 2024 |
| ALAN ANDERSON, | Time: 9:00 AM |
| Defendant. | Court: Hon. Edward M. Chen |

0

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................................3

II. RELEVANT OFFENSE CONDUCT .........................................................................................3

    A. Anderson Takes Control of Imbee ....................................................................................4

    B. Anderson Defrauds Investors ............................................................................................4

    C. Anderson Twists Truth into Falsehood to Solicit Investment & Placate Investors ..........................................................................................................................6

    D. Anderson Creates Fraudulent Contracts to Placate Investors ...........................................7

    E. Anderson Defrauds the Brother of Imbee's Deceased Founder .......................................8

    F. Anderson Defrauded More than 40 Victims Out of Nearly $11 Million ..........................8

III. GUIDELINES CALCULATIONS .............................................................................................9

    A. Guidelines Calculation, Criminal History, and Advisory Sentencing Range ...................9

    B. Relevant Conduct & Loss of Nearly $11 Million .............................................................9

IV. SENTENCING RECOMMENDATION ...................................................................................10

    A. Nature and Circumstances of the Offense ......................................................................11

    B. History and Characteristics of the Defendant .................................................................12

    C. Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence ......................................................................................................................13

    D. Need to Avoid Unwarranted Sentencing Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct .............................14

V. CONCLUSION .........................................................................................................................15

# TABLE OF AUTHORITIES

**Federal Cases**

*United States v. Booth*, 309 F.3d 566 (9th Cir. 2002) .................................................................. 10

*United States v. Crandall*, 525 F.3d 907 (9th Cir. 2008) .............................................................. 10

*United States v. Fine*, 975 F.2d 596 (9th Cir.1992) ...................................................................... 11

*United States v. Lawrence*, 189 F.3d 838 (9th Cir. 1999) ....................................................... 10, 11

*United States v. Lucas*, 101 F.4th 1158 (9th Cir. 2024) ................................................................ 10

*United States v. Martin*, 455 F.3d 1227 (11th Cir. 2006) ............................................................. 14

**Federal Statutes**

18 U.S.C. § 1348 ............................................................................................................................ 10

18 U.S.C. § 3553(a) ....................................................................................................................... 15

**Federal Rules**

U.S.S.G. § 1B1.3 ....................................................................................................... 10, 11, 12, 14

U.S.S.G. § 2B1.1(a)(1) ..................................................................................................................... 9

U.S.S.G. § 2B1.1(b) ...................................................................................................................... 10

U.S.S.G. § 2B1.1(b)(1)(K) ............................................................................................................... 9

U.S.S.G. § 2B1.1(b)(2)(A) ............................................................................................................. 10

U.S.S.G. § 3B1.3 ........................................................................................................................... 10

## I. INTRODUCTION

Alan Anderson is no stranger to this Court. In 2005, the Honorable Vaughn Walker sentenced Anderson to one year and one day for securities fraud stemming from his role in falsifying accounting records at a company where he served as Chairman of the Board. But only a few short years later, Anderson was at it again. This time, Anderson defrauded more than 40 friends, neighbors, and associates of almost $11 million. This stolen money represented hard-earned retirement savings for many victims. Unable to turn to institutional investors after his first federal conviction, Anderson targeted unsophisticated investors in this case. He targeted people who trusted him. Anderson continuously lied to these victims to get their money, keep their money, and, after many years, to stop them from taking legal action against him. Anderson forged signatures and business contracts, created fake profit and loss and bank statements, and used those fraudulent documents to deceive his victims.

Anderson knew exactly what he was doing because he had done it before. But the prior conviction and sentence did not deter Anderson. An extraordinary prison sentence is necessary here.

As set forth in more detail below, the United States recommends that the Court sentence Anderson to nine years (108 months) in prison. This falls near the middle of the advisory Guidelines range and should be followed by a three-year term of supervised release. The Court should also enter restitution orders of $10,947,374.16 to the victims of Anderson's fraud, as well as a special assessment of $200.

The United States agrees with Probation that Anderson is Offense Level 29 and Criminal History Category II and that he faces an advisory Guidelines range of 97-121 months in prison. However, the United States strongly disagrees with Probation's sentencing recommendation of 42 months in prison. A downward variance is not appropriate here given Anderson's criminal conduct, which extended for almost a decade, the huge losses caused by Anderson's conduct, the financial hardship caused by his conduct, his very limited acceptance of responsibility, and his prior federal felony conviction for substantially similar conduct.

## II. RELEVANT OFFENSE CONDUCT

As described in the PSR, ¶¶ 5-57, the attached victim declarations, and Victim Impact Statements, from 2010 through 2019, Anderson used a series of deceptions, half-truths, and con man

3

tactics to convince neighbors, friends, and acquaintances to invest in his various companies. He was able to run his scheme for so long by (i) blending truth and fiction, (ii) repeatedly claiming that he was on the verge of selling the companies for multi-million dollars; (iii) promising repayments only to provide bounced checks; and (iv) providing forged documents purportedly showing the companies' success and imminent acquisitions or deals with prominent companies.

### A.   Anderson Takes Control of Imbee

Imbee was originally founded in 2005 by J.S., a successful technology entrepreneur and the sister of G.S., the only person that Anderson has admitted to defrauding in this case. In 2008, J.S. tragically passed away in a plane crash, leaving Imbee to her family. The family trust that controlled Imbee hired Anderson to be the company's President and CEO, but the trust sought to terminate Anderson after learning that he had previously been convicted of fraud while running another company. Anderson sued and wrestled control of Imbee during a mediated settlement. In April 2010, Anderson incorporated Imbee and opened a slew of bank accounts (that he controlled) for the company.

Anderson claimed that Imbee and a slate of other companies he controlled – including Fanlala, Inc. and Fruit Punch, Inc. – focused on producing internet and social media content that was safe and appropriate for children. This was not all a sham. Yet Anderson mixed falsehoods with small truths about his companies, and he exploited these truths to make exaggerated and false claims about his companies to induce investment. Anderson then continually told investors about impending multi-million-dollar acquisitions by major companies. These purported deals did not exist; they were completely false.

### B.   Anderson Defrauds Investors

Starting in 2010, Anderson began soliciting investments from friends, neighbors, and acquaintances. Victims 1 and 2 were Anderson's neighbors, and their children played on the same sports teams. Anderson manipulated their personal relationship to induce Victims 1 and 2 to invest approximately $1 million between 2010 and 2016. This represented their retirement fund and personal savings. They received almost none of their money back.

Anderson continually lied to and misled his investor-victims. Anderson repeatedly told Victims 1 and 2 (as well as numerous other victims) that Imbee was under contract to be purchased by, at

different times, a number of different companies. But Imbee was never under contract to be acquired. And Anderson converted his victims' loans to worthless shares in Imbee. In January 2011, Victims 1 and 2 loaned Anderson $73,000 pursuant to a written agreement stating that Anderson would repay them within 90 days or when Anderson "secures funding ($500,000) from the named strategic partner …, whichever occurs first." Anderson never secured funding from a strategic partner and he never repaid the loan; instead, he converted the loan to 30,000 worthless shares of Imbee.

Victims 3 and 4 were also Anderson's friend and neighbors. Their families shared close bonds. As with Victims 1 and 2, Anderson repeatedly returned to Victims 3 and 4 for money, slowly bleeding them dry. *See* Declaration of M.D. In 2010, Anderson first approached Victims 3 and 4 for a loan. "From that point on every few months [Anderson] would bombard us with lies and deceits in order to get more money…." *See* Victim Impact Statement of M.D. & S.D. Approximately one year later, Anderson returned to Victims 3 and 4 for additional investment. Later, Anderson returned for yet another investment. "We kept on trusting [Anderson] since we never thought that he could possibly have had any bad intentions, especially since we were such close friends." *Id.*

In October 2010, Anderson pitched Imbee to a separate group of potential investors. According to Victim 5, a member of that group, Anderson spoke regularly about new purchase or licensing agreements that promised to deliver large profits for Imbee. Those purported deals were false; they never came to fruition. Another member of the group, Victim 6, reported that Anderson represented that Imbee had a relationship with Disney. This was not true. But several members of the group invested a total of $166,000 for a 13% stake in Imbee.

In September 2011, Anderson reached out via email to another neighbor, Victim 8, whose son attended high school and played football with Anderson's son. Anderson's email falsely reported that Imbee had a business deal with Google/YouTube: "we are all very, very excited about the YouTube/Google deal. We have worked very hard for this. We feel this will definitely put imbee over the top. There are so many value points to the relationship." PSR ¶ 37. Among numerous other false and misleading statements, Anderson's email indicated that "Google/YouTube [would] have first right of refusal on acquiring imbee, with a floor price set at $62,500,000 (epic!)." In connection with Anderson's false and deceptive email, Victim 8 invested with Anderson.

5

Anderson met victim R.M. in 2011 and pitched him on Imbee. That year, R.M. invested approximately $365,000 with Anderson. *See* Declaration of R.M. In 2012, Anderson told R.M. that Mattel was one of the entities looking to purchase Imbee and that R.M. had a 30% ownership stake in Imbee. Based on these false statements, R.M. invested another $250,000 with Anderson that year. R.M. continually made incremental investments in Imbee based on false information provided by Anderson, who would call R.M. indicating that he needed money quickly to help close a deal. Anderson would also represent that without additional financial support from R.M. the deal would fall apart. R.M. provided additional funds based on Anderson's statements.

In approximately 2013, Victim 9 met Anderson in Newport Beach, California, and became Anderson's single largest investor. Anderson falsely told Victim 9 that he had a pending offer to buy Imbee but was planning to take the company public prior to the sale. Later, Anderson provided Victim 9 with false profit and loss statements and a false letter of intent from Google to buy Imbee for $60 million. Anderson told Victim 9 that his investment would fund tasks associated with the purported sale to Google. From 2013 through 2016, Anderson repeatedly told Victim 9 that Imbee had purchase offers, partnership deals, and licensing agreements with a number of different companies, including Mattel, Universal Studios, the City of Los Angeles, Google, and others. These purported deals did not exist. Anderson even claimed to have an impending deal with a non-existent company, F.2.

Anderson made false statements similar to those described above to numerous additional investors. Between 2010 and 2018, Anderson solicited nearly $11 million in investments from approximately 40 investor-victims. Anderson also returned to his early investors for additional money. Anderson repeated similar versions of the same lies – that he had impending multi-million-dollar acquisition offers, partnership deals, or licensing agreements with major corporations. These statements were false. It was these purported deals – that remarkably were always on the verge of closing – that Anderson used to lure in some investors and to stave off other investors from withdrawing their funds or filing civil suits to recoup losses.

**C.      Anderson Twists Truth into Falsehood to Solicit Investment & Placate Investors**

Anderson used the minimal portions of the companies' legitimate business to substantiate his fanciful claims of success and induce investment. For example, Fanlala had a music streaming product

6

that was found on a "Nabi," an electronic tablet manufactured by Fuhu, Inc. In 2013, Anderson signed a legitimate licensing agreement with Fuhu for music streaming. While this produced some revenue for Fanlala, the revenue was extremely limited. Fuhu's September 2016 quarterly payment, which covered the prior three months, was just $324. In total, between 2013 and 2018, Fanlala received less than $50,000 from the agreement. In dealing with investors, Anderson twisted the relationship with Fuhu. As early as 2013, Anderson showed a group of investors several different versions of the Fanlala-Fuhu contract, including falsified version of the contract. When the investors noticed that the copies of the contracts that they received were slightly different from each other Anderson provided an excuse for the differences. Even in the early days of the scheme, Anderson relied on false documents to prop up his story.

The Fuhu relationship was crucial, and Anderson repeatedly told investors that Fuhu would likely acquire his companies. But Fuhu went bankrupt in 2015. Mattel acquired Fuhu in 2016 but phased out the Nabi tablet. Further, Anderson took the legitimate 2013 contract with Fuhu and created fraudulent contracts showing wildly inflated revenue numbers for the Fanlala-Fuhu revenue sharing agreement in order to induce investment or to placate existing investors who had seen no return on their investments with Anderson.

### D. Anderson Creates Fraudulent Contracts to Placate Investors

Anderson's fraud scheme used some of the same techniques he had developed during his first fraud, specifically, forging documents and counterparty signatures to falsely inflate revenue or show fictitious impending acquisitions. On July 20, 2015, for example, Anderson emailed Victim 1 a fraudulent purchase agreement showing that UniV AC Corp was under contract to purchase Imbee for $42,525,000. The agreement was dated July 14, 2015. Anderson forged the signature of a real person, N.E., and listed her as the Sr. Vice President and General Counsel, Universal Consumer Products, UniV AC Corp. Tellingly, Anderson told Victim 1 not to share information about the purchase with anyone. Anderson continued sending Victim 1 fraudulent contracts with forged signatures. Anderson's January 14, 2016, purchase agreement for Imbee listed a purchase price of $13,937,600 to take place on January 31, 2016. Ten months later, Anderson emailed Victim 1 a false contract showing that Mattel had paid one of Anderson's companies more than $1 million, the first of three such payments. In March 2017,

Anderson emailed Victim 1 another false contract containing a forged counterparty signature, again misusing a real person's identity, indicating that Fuhu/Mattel would be paying Fanlala $12.5 million.

Meanwhile, Anderson was sending fake contracts with similarly forged counterparty signatures to other investors. Anderson provided R.M. with a fake contract between Imbee and F.2 Partners dated May 14, 2015, in which F.2 Partners would pay $89.6 million to acquire Imbee. The contract also contained the forged signature of N.E. and listed her as the Sr. Vice President and General Counsel of F.2 Acquisition Corp & Partners.

Anderson also shared a fake purchase agreement with Victim 7 showing that F.2 Acquisition Corp & Partners would be purchasing Imbee for more than $28 million. The contract contained yet another forged counterparty signature. Anderson also sent fake bank statements to assure investors that he had money and could repay their investments. And Anderson shared falsified profit and loss and ownership documents reflecting investors' supposed ownership stake in Anderson's companies. But these documents were fabricated. Anderson was making it all up.

### E. Anderson Defrauds the Brother of Imbee's Deceased Founder

In 2016, following the Fuhu bankruptcy, Anderson reached out to G.S., the brother of Imbee's deceased founder and the person Anderson had previously sued to obtain control of Imbee. Anderson lied to G.S. and won him over. Anderson represented that Imbee had an ongoing partnership with Mattel worth $10 million and that the two companies were in negotiations for Mattel to potentially buy Imbee. Anderson falsely represented that an existing investor wanted to sell his stake in Imbee and therefore G.S. had a chance to invest in his sister's company. G.S. began investing with Anderson shortly thereafter. Anderson continually solicited G.S. and called him repeatedly to talk about Imbee. In connection with G.S.'s investments, Anderson emailed fake contracts with forged counterparty signatures purportedly showing profitable partnerships or acquisitions involving Imbee.

### F. Anderson Defrauded More than 40 Victims Out of Nearly $11 Million

In total, between June 2010 and January 2017, Anderson defrauded more than 40 victims out of nearly $11 million. *See* Exhibit 1, FBI 302 Regarding Loss Calculation & Attachment; PSR ¶ 57. As the Victim Impact Statements, Victim Declarations, and PSR make clear, Anderson's fraud resulted in significant financial hardship. Further, he manipulated investor-victims by relying on his position of

trust and his special skills as an experienced executive to obtain and keep their investments over a nearly 10-year period.

### III.     GUIDELINES CALCULATIONS

#### A.     Guidelines Calculation, Criminal History, and Advisory Sentencing Range

The United States agrees with U.S. Probation that the advisory the Guidelines calculations set forth in the final PSR, ¶¶ 63-72, are as follows:

|   |   |   |
|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2B1.1(a)(1) | 7 |
| b. | Loss exceeding $9.5 million, U.S.S.G. § 2B1.1(b)(1)(K) | +20 |
| c. | 10 or more victims, U.S.S.G. § 2B1.1(b)(2)(A) | +2 |
| d. | Abuse of Trust or Special Skill, U.S.S.G. § 3B1.3 | +2 |
| e. | Acceptance of Responsibility, U.S.S.G. § 3E1.1(a) | -2 |
| f. | Adjusted Offense Level | 29 |

Further, the United States agrees with U.S. Probation that Anderson's prior securities fraud conviction places him in Criminal History Category II. PSR ¶¶ 75-77. On July 2, 2002, Anderson pled guilty in this district to one count of securities fraud, in violation of 18 U.S.C. § 1348. On March 1, 2005, a different court in this district sentenced Anderson to 12 months and one day in prison.

#### B.     Relevant Conduct & Loss of Nearly $11 Million

The Guidelines in this case are largely driven by the loss resulting from the defendant's fraud and relevant conduct. U.S.S.G. § 2B1.1(b). The government submits that a 20-level increase is appropriate because the defendant's fraud and relevant conduct resulted in a loss of approximately $11 million. As with other factual findings under the advisory Guidelines, the government must prove the loss amount by a preponderance of the evidence, "even when potentially large enhancements are at stake." *United States v. Lucas*, 101 F.4th 1158, 1163 (9th Cir. 2024) ("fact-finding by a preponderance of the evidence is sufficient to satisfy due process at sentencing").

Sentencing courts must "take a realistic, economic approach to determine what losses the defendant truly caused." *United States v. Crandall*, 525 F.3d 907, 912 (9th Cir. 2008) (quotation omitted). Accordingly, courts consider not only the monetary loss resulting from the offenses of which the defendant was convicted but must also "take into account the entire loss inflicted by the common

scheme." *United States v. Booth*, 309 F.3d 566, 575 (9th Cir. 2002) (holding district court did not err in sentencing based on entire loss rather than just loss resulting from counts of conviction).

Under the sentencing guidelines, a district court is required to consider "all acts and omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction" when determining the appropriate sentence. *See* U.S.S.G. § 1B1.3; *see also United States v. Lawrence*, 189 F.3d 838, 844 (9th Cir. 1999) (quoting earlier version of § 1B1.3). "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable sentencing range." USSG § 1B1.3 Cmt. Background; *see also Lawrence*, 189 F.3d at 844-45. The acts must merely be "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." *Lawrence*, 189 F.3d at 844; *see also* U.S.S.G. § 1B1.3 Cmt. 5(B)(i). Further, "[t]he cumulative loss produced by a common scheme or course of conduct should be used in determining the offense level, regardless of the number of counts of conviction." *Lawrence*, 189 F.3d at 844 (citing *United States v. Fine*, 975 F.2d 596, 599-600 (9th Cir.1992) ("[C]onduct which was part of the scheme is counted, even though the defendant was not convicted of crimes based upon the related conduct.")).

Here, Anderson's conduct starting in 2010 and extending through 2019 is relevant conduct. The scheme is an element of the wire fraud offense to which Anderson pled guilty. The fact that Anderson elected to plead guilty to only two wire fraud counts on the eve of trial does not constrain the Court from considering all of his relevant conduct. Indeed, Anderson's acts were "substantially connected to each other by … common victims, [a] common purpose, [and] similar modus operandi." *Lawrence*, 189 F.3d at 844. Accordingly, the Guidelines instruct that "[r]elying on the entire range of conduct, regardless of the number of counts that are alleged or on which a conviction is obtained, appears to be the most reasonable approach…." USSG § 1B1.3 Cmt. Background.

## IV. SENTENCING RECOMMENDATION

A sentence of 108 months is necessary based on the Section 3553(a) sentencing factors and, in particular, the unique facts and circumstances of this case and this defendant. Anderson executed a nearly decade-long fraud scheme after having been charged, convicted, sentenced, and released from prison for executing a substantially similar prior fraud scheme. Rather than being deterred by his prior

10

conviction and sentence, Anderson used the same playbook to commit a second fraud scheme – the scheme in this case that caused 40 investors to lose nearly $11 million.

### A. Nature and Circumstances of the Offense

Anderson's fraud scheme was exceptional. It lasted nearly a decade, impacted dozens of investor-victims, and caused nearly $11 million in losses. Many victims were Anderson's friends and neighbors. He preyed on their trust and social bonds to steal their hard-earned savings. Put simply, Anderson preyed on his community. Because of Anderson's fraud, victims had to sell homes, take on new jobs, and work into retirement years because they had invested their retirement savings with Anderson. One victim stated, "the financial hardship caused by the loss of this money has been tremendous." *See* Declaration of M.D. Of the nearly $11 million in loss, Anderson is unlikely to repay much if any restitution to victims.

Anderson exploited his investor-victims to fuel his greed. The victims' stories are heartbreaking. Victims 1 and 2 were neighbors and friends of Anderson and his family. Anderson preyed on their relationship to drain more approximately $1 million from Victims 1 and 2 over nearly six years. Victims 3 and 4 were also Anderson's neighbors and friends and were particularly close to Anderson's family. *Id.* As with Victims 1 and 2, Anderson slowly drained the hard-earned savings of Victims 3 and 4, who even took out a home equity line of credit to invest with Anderson. In addition to losing hundreds of thousands of dollars to Anderson, Victims 3 and 4 incurred an additional $50,000 in tax liability by taking out the loan to invest with Anderson. These victims were not sophisticated professional investors, they were hard-working neighbors who succumbed to their charismatic and convincing neighbor. Anderson even defrauded the brother of the Imbee's deceased founder. Anderson preyed on G.S.'s emotional connection to his departed sister's company, her labor of love. Starting in 2016, Anderson repeatedly called G.S. and befriended him. Anderson solicited and received numerous investments based on his lies about Imbee's success and impeding deals.

Anderson's lies were egregious. He told victims that Imbee had signed valuable strategic partnerships and was on the eve of acquisitions that would result in huge investor gains. Anderson prepared and showed investor-victims numerous false documents to lure them into thinking that Imbee would be acquired imminently. Anderson forged the counterparty signatures on many false acquisition

contracts, using the identities of real, unsuspecting people to perpetuate his fraud. Anderson handed investors false profit and loss statements and false ownership documents. Anderson sent investors fake documents to lull them into thinking he would repay them. And Anderson pressured many of his victims by saying that they only had a short timeframe to invest or they would miss out on an impending buy out. None of this was true.

Anderson's fraudulent conduct spanned nearly a decade, starting in 2010. And he committed the egregious and harmful acts in this case after having been convicted and sentenced of a substantially similar fraud. Given the scope, impact, and egregiousness of Anderson's crime and relevant conduct, a 108-month sentence is necessary.

### B.   History and Characteristics of the Defendant

Anderson's history and characteristics also support an extraordinary sentence. Anderson is a repeat fraud offender who used the techniques acquired in his first fraud scheme to commit a second and far more egregious fraud. Anderson's first conviction and prison sentence did not stop him. Consequently, Anderson went out and defrauded more than 40 investors out of nearly $11 million. As this Court has recognized, Anderson's prior criminal conduct was substantially similar to his criminal conduct in this case: "in both cases Mr. Anderson committed a fraud schemed allegedly using a similar technique—use of forged documents and false documentation of fake transactions to falsely inflate the financial performance of entities he controlled and managed." Dkt. #64, at 11.

Further, Anderson committed these multiple frauds despite having enjoyed many advantages. Unlike so many defendants before this Court, "Anderson was raised by his parents in a nurturing and supportive home," and he enjoys "a close relationship with his wife and children." ¶¶ 83, 84. Anderson received an education and earned, prior to his first fraud conviction, a good job. Anderson lives in a comfortable upper middle-class neighborhood, has a pool in his backyard, sent his children to private schools, owned a vacation home, drove luxury automobiles, and traveled internationally. Anderson has no issues with drugs or alcohol, and he takes no medications. Despite all these advantages, Anderson preyed on unsophisticated investors and the trust of his friends, neighbors, and acquaintances. He funded his comfortable lifestyle through greed and fraud. While Anderson lied to get and keep his victims' money, his victims suffered.

Anderson's nearly decade-long fraud was not the product of passion or impulse or a momentary lapse of judgment. Nor was Anderson's crime the product of youthful indiscretion. Anderson committed the crime here in the prime of his professional life after careful deliberation. After all, his fraud spanned nearly a decade. Anderson's crime here was cold, calculating, and ruthless. He knew exactly what he was doing – stealing money from people who trusted him. Section 3553(a)(2)(C) requires the Court to consider the need "to protect the public from further crimes of the defendant." A very lengthy sentence is needed to protect the public from a defendant who has repeatedly defrauded numerous victims over an almost 10-year period.

Nor has Anderson fully accepted responsibility for his crime. He waited until the eve of trial and only then pled guilty to just two counts related to one victim. That is not accepting responsibility. Nor is it rehabilitation. Anderson's statements to the U.S. Probation Officer are further evidence that he still to refuses to accept full responsibility for his egregious fraud scheme: "at a high-level, I was trying to absolutely do the right thing." PSR ¶ 60. Despite defrauding more than 40 victims, Anderson only accepted responsibility "for my offenses I perpetrated on G.S." *Id.* Anderson fails to acknowledge the tremendous pain and suffering he caused to nearly 40 other victims. He fails to acknowledge the fraudulent documents, the forged signatures, and the continuous stream of lies.

Remarkably, Anderson now claims "it's important that I am a useful, accountable[] neighbor, and community member." PSR ¶ 86. He says this after preying on his neighbors and his community to fuel his greed. He now says, "[f]or me, [i]t's about leading an authentic and true life … and investing in myself, my community, and anyone who I come in contact with." *Id.* Anderson says this after having stolen nearly $11 million from his community and demonstrating repeatedly that he preys on the trust and goodwill of others while also admitting the bare minimum of criminal conduct. His claims of wanting to lead an "authentic" life going forward contrast with his inability to even acknowledge the harm the caused to dozens of victims.

### C. Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence

A significant custodial sentence is necessary in this case to promote respect for the law, protect the public, provide just punishment for a serious financial crime, and provide adequate deterrence. Both

the public and those contemplating the commission of financial crimes need to know that committing fraud leads to prison. General deterrence in white collar cases is especially important. As other Courts have said, "economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity," and, thus, "are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.*

In this case, Anderson's cold calculus is especially egregious because he had already been convicted of and sentenced to prison for a prior fraud. Anderson apparently determined that, although it was illegal, engaging in a massive scheme to defraud his friends and neighbors was worth the risk of another potential conviction and sentence. Here, a significant custodial sentence is required to change that calculus Anderson and for other similarly situated individuals who find themselves facing the choice to commit financial fraud.

Likewise, Anderson's failure to accept responsibility, his plea only on the eve of trial, the fact that he only pled guilty to two counts (limited to one victim), and his continuing failure to acknowledge the lies and scope of his criminal conduct demonstrates that an heavy sentence is needed in this case. Rather than promoting respect for the law, Anderson's conduct throughout this case, up to his comments to the U.S. Probation Officer and his failure to accept responsibility for his wide-ranging fraud, reiterates the unique need in this case to promote respect for the law with a significant sentence.

### D. Need to Avoid Unwarranted Sentencing Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct

Section 3553(a)(6) requires the Court to account for "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." Anderson committed a classic fraud scheme praying on vulnerable victims and resulting in losses of $11 million. In *United States v. Murray*, 12-cr-278 EMC, this Court sentenced the defendant after trial in an investment fraud case to 180 months in prison on a lower loss amount. In *United States v. Morgan*, 08-cr-845 CRB, the Court sentenced the defendant after a guilty plea in an investment fraud case to 188 months in prison on a loss amount of approximately $9 million. Of course, each case and each

defendant must be evaluated based on their own unique application of the Section 3553(a) factors. But here, there are no mitigating factors that would support a variance from the advisory Guidelines range. Anderson is a repeat fraud offender who abuses his position of trust to prey on unsuspecting neighbors to cause massive financial harm. He lied continuously over many years, and he forged unsuspecting victims' signatures on fake business contracts to induce and then keep millions of dollars in investments. He does not acknowledge the full extent of his crime or accept responsibility for his conduct. A sentence of 108 months is consistent with sentences received by other defendants for similar conduct based on a similar background.

## V. CONCLUSION

With full consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a), the United States respectfully requests that the Court impose a sentence of 108 months' imprisonment, three years of supervised release, restitution in the amount of no less than $10,947,374.16, and a $200 special assessment.

DATED: August 29, 2024                                Respectfully submitted,

                                                      ISMAIL J. RAMSEY
                                                      United States Attorney


                                                      _____/s/_____
                                                      SAILAJA M. PAIDIPATY
                                                      CHRISTIAAN H. HIGHSMITH
                                                      Assistant United States Attorneys