1  JODI LINKER, Bar No. 230273
   Federal Public Defender
2  Northern District of California
   CANDIS MITCHELL, Bar No. 242797
3  Assistant Federal Public Defender
   19th Floor Federal Building - Box 36106
4  450 Golden Gate Avenue
   San Francisco, CA 94102
5  Telephone:   (415) 436-7700
   Facsimile:    (415) 436-7706
6  Email:         Candis_Mitchell@fd.org

7

8  Counsel for Defendant Anderson

9

10            IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

14  **United States of America,**          **Case No.:** CR 21–397 EMC

15            Plaintiff,                    **DEFENDANT'S SENTENCING
                                            MEMORANDUM**
16       v.

17  **Alan Anderson,**                     **Court:**         Courtroom 5, 17th  Floor
                                            **Hearing Date:**  September 12, 2024
18            Defendant.                    **Hearing Time:**  9:00 a.m.

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION .................................................................................................................. 1

BACKGROUND ..................................................................................................................... 1

SENTENCING GUIDELINES ............................................................................................... 3

1.  The Guidelines Calculation for Loss is affected by Mr. Anderson running a legitimate company prior to the fraudulent activity ........................................................................ 3

2.  Mr. Anderson's proposed loss calculations ......................................................... 5

    2.1.  Summary Chart .................................................................................... 5

    2.2.  Ace Home Health Care Hospice Inc./Lorenzo Friar ........................... 6

    2.3.  Andy Meyers ....................................................................................... 6

    2.4.  Anil Patel/Wine Country Hospitality .................................................. 7

    2.5.  Annant Patel ........................................................................................ 7

    2.6.  Anthony Zuiker ................................................................................... 8

    2.7.  Brenda Pannell ..................................................................................... 8

    2.8.  Clark Colvis/Linda Colvis ................................................................... 8

    2.9.  David Grossman/Neil Grossman .......................................................... 8

    2.10.  Diane Anderson ................................................................................... 9

    2.11.  Dipak Patel | Dipak 2007 Living Trust ............................................... 9

    2.12.  Dilley Design Inc | Jack and Reanne Dilley ........................................ 9

    2.13.  Edward/Julia DeLorme ........................................................................ 10

    2.14.  George Symons .................................................................................... 10

    2.15.  Greg Cham .......................................................................................... 10

    2.16.  H + H Assets LLC ............................................................................... 11

    2.17.  Hawthorn Suites by Wyndham ........................................................... 11

    2.18.  Howard Silverman ............................................................................... 11

    2.19.  Kelsey McCann ................................................................................... 12

    2.20.  Mark Coleman ..................................................................................... 12

| | | |
|---|---|---|
| 2.21. | Michelle Fields | 12 |
| 2.22. | Phillip Darren Buchanon | 12 |
| 2.23. | Deborah Pierson | 13 |
| 2.24. | Rajool Patel | 13 |
| 2.25. | Randy C Renfro/Ocean Front Equity LP \| Capital City Leasing | 13 |
| 2.26. | Ray Matheny | 13 |
| 2.27. | Richard Petzold | 14 |
| 2.28. | Richard Toriggino | 14 |
| 2.29. | Richard/Larry Hess; Hess Construction | 14 |
| 2.30. | Rodney E Maher/Angela Maher \| RE Maher Inc | 14 |
| 2.31. | RPM001 Intella Capital/Sushil Patel | 15 |
| 2.32. | Samit Channa | 15 |
| 2.33. | Siobhan Delfani/Moe Delfani | 15 |
| 2.34. | The Entrust Group/Phillip Wall | 16 |
| 2.35. | The Jones & Royce Revocable Trust | 16 |
| 2.36. | Theodore Kloth MD/Mary Kloth | 16 |
| 2.37. | Thomas A Whalen Jr | 16 |
| 2.38. | Vickie Jackson | 17 |
| 2.39. | Vijay Patel | 17 |
| 2.40. | Vikrant Patel | 17 |
| 2.41. | Viran Nana/Viren Patel | 18 |

3. Mr. Anderson's proposed Guideline calculations ............................................... 18

SECTION 3553(a) FACTORS ................................................................................................ 18

1. The history and characteristics of the defendant and the nature and circumstances of the offense ............................................................................................................... 19

2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense and to afford adequate deterrence to criminal conduct .......................................................................... 21

3. Any pertinent policy statement. .................................................................... 22

CONCLUSION ............................................................................................................... 25

1

TABLE OF AUTHORITIES

2

3

**Federal Cases**

4

*Dura Pharms., Inc. v. Broudo,*
    544 U.S. 336 (2005) ............................................................................................................ 4

5

*Kimbrough v. United States,*
6
    128 S. Ct. 558 (2007) ........................................................................................................ 3

7

*Sparling v. Daou  (In re Daou Sys.),*
    411 F.3d 1006 (9th Cir. 2005) .......................................................................................... 4

8

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) ............................................................................ 23
9

*United States v. Ameline,*
10
    409 F.3d 1073 (9th Cir. 2005) .......................................................................................... 3

11

*United States v. Bakhit,*
    218 F. Supp. 2d 1232 (C.D. Cal. 2002) .......................................................................... 4

12

*United States v. Blanchet,*
13
    518 F. App'x 932 (11th Cir. 2013) ............................................................................ 23, 24

14

*United States v. Booker,*
    543 U.S. 220 (2005) .......................................................................................................... 3

15

*United States v. Carty,*
16
    520 F.3d 984 (9th Cir. 2008) .......................................................................................... 18

17

*United States v. Harper,*
    32 F.3d 1387 (9th Cir. 1994) ............................................................................................ 4

18

*United States v. Mayo,*
    646 F.2d 369 (9th Cir. 1981) ............................................................................................ 4
19

*United States v. Peyton,*
20
    353 F.3d 1080 (9th Cir. 2003) .......................................................................................... 3

21

**Federal Statutes**

22

18 U.S.C. § 3553 ............................................................................................................... *passim*

23

24

**Other**

25

U.S.S.G. § 2B1.1 ............................................................................................................... *passim*

26

U.S.S.G. § 2B1.1 cmt. n.3 ....................................................................................................... 3

27

U.S.S.G. § 3B1.3 .................................................................................................................... 18

28

U.S.S.G. § 3E1.1 .................................................................................................................... 18

INTRODUCTION

The life of defendant Alan Anderson has been a journey filled with resilience, purpose, and achievement despite setbacks. However, his story is not straightforward. While working as CEO of a child friendly internet site Mr. Anderson made terrible financial and moral decisions. His reasons for committing these acts are complex and born from desperation to keep his businesses afloat. Mr. Anderson took on the role of CEO with the goal of running a legitimate business and the made the choices he made after financial struggles meant that he would not be able to make his investors whole. Eager to buy himself time to make his once legitimate company fruitful again Mr. Anderson began telling his investors not what he hoped his company might do in the future to making fanciful promises of current lucrative deals. The mistakes that Mr. Anderson made originated from his mounting personal struggles, his childhood trauma, and the crushing demands of trying to maintain his business. The mistakes he made are also completely human.

Notwithstanding his reasons for committing the offense, Mr. Anderson takes full responsibility for his actions as demonstrated by his pleading guilty before the Court. With this new conviction, Mr. Anderson faces losses in his career and his community. He will have to work hard to rebuild his life to regain a glimpse of his former identity.

 Mr. Anderson offers the following memorandum in support of his request for a below-Guidelines sentence of 36-months in custody. This memorandum is offered to paint of picture of Mr. Anderson's life for the Court to consider when determining a sentence that is appropriately sufficient, and not greater than necessary. In doing so, Mr. Anderson seeks to explain, and not excuse, his poor choices in trying to maintain capital in his companies. His actions in doing so do not amount to the whole of who Mr. Anderson is to his family, his community, and our broader society. Mr. Anderson's requested sentence is supported by Mr. Anderson's age, lower likelihood of reoffending, and the particularized financial and emotional situation that caused him to become involved in the charged offense.

BACKGROUND

Imbee.com (Imbee) was a Facebook-like social networking site for kids age 8-14 that had parental control options and monitored the child's activity on the site. It was created in 2007 but went

dormant for a few years after its founder died. It was purchased in 2010 by a group of investors including the defendant, Alan Anderson. After purchasing Imbee, Inc., Mr. Anderson became CEO. In 2011, Imbee purchased Fanlala Corp. (Fanlala), which operated fanlala.com, an online destination for tweens that had partnerships with both Disney Channel and Nickelodeon. Fanlala featured behind-the-scenes videos, photos, and news about TV shows from Disney and Nickelodeon, as well as general celebrity news, quizzes, and other content focused on the tween celebrities like Justin Bieber and the Jonas Brothers. In 2015, Imbee acquired Cosmic Toast Studios, LLC (Cosmic Toast), an animation company. Cosmic Toast was a Sherman Oaks, California-based studio that had worked on Disney and Nickelodeon productions. Imbee expanded its offerings to include Imbee Radio, a subscription music service targeting children 8-14 after acquiring Fruit Punch, Inc. (Fruit Punch), a California corporation that provided music-streaming service for children. Altogether, the amalgamated platforms were designed to act as an online destination for youth including music, video, and animation. Imbee acted lawfully and with a non-fraudulent purpose to turn a profit from its inception.

As is commonly done, Mr. Anderson solicited funds from investors with hopes of growing the company and providing capital for business investors. In doing so, Mr. Anderson would speak hopefully of the business deal he wanted to have in the future and his hopes to grow the company to eventually go public. However, starting in 2013 Mr. Anderson could no longer sustain the continued growth of Imbee using lawful means and began resorting to making false representations to potential investors to encourage additional investing. Those statements included communicating to them that Imbee and its subsidiaries were to be purchased by larger companies or were making contracts with strategic partners to leverage large sources of income streams. Mr. Anderson contends that as Imbee was operating as a lawful company from 2010-2013 all investments made until he began engaging in fraudulent activity should not be considered either for restitution or loss amount calculations because the funds were not secured with a fraudulent intent. Prior to then, Mr. did not fraudulently convey information when speaking to potential investors. Rather, Mr. Anderson contends it is only those funds that were obtained with a fraudulent intent should be considered to his loss amount or restitution.

1

SENTENCING GUIDELINES

2

In sentencing Mr. Anderson, this Court must consider all of the directives set forth in 18 U.S.C.

3

§ 3553(a); the Guidelines are only one factor among many to be considered by the Court.[1] Mr.

4

Anderson disagrees with the Guidelines calculation in the Presentence Report (PSR). As a result, his

5

total offense level would be 27 with a Criminal History Category of II—resulting in an advisory

6

guideline range of 70-87 months.

7

**1.   The Guidelines Calculation for Loss is affected by Mr. Anderson running a legitimate company prior to the fraudulent activity**

8

9

The government bears the burden of proof on the facts underlying a sentence enhancement.[2]

10

The guidelines do not present a single universal method for loss calculation under § 2B1.1-nor could

11

they, given the fact-intensive and individualized nature of the inquiry. The guidelines do, however,

12

offer several possible approaches to this calculation. The commentary to § 2B1.1 indicates that "loss"

13

for this purpose is "the greater of actual loss or intended loss."[3] Actual loss is defined as "the

14

reasonably foreseeable pecuniary harm that resulted from the offense."[4] Intended loss is defined as

15

"the pecuniary harm that was intended to result from the offense."[5] The court need not make its loss

16

calculation with absolute precision; rather, it need only make a reasonable estimate of the loss based

17

on the available information.[6] If the court is unable to determine either actual or intended loss with

18

sufficient certainty, it may rely on the defendant's personal gain from the fraud as an alternate

19

measure of loss.[7]

20

In making a loss calculation in a case such as this, the Court should distinguish between the

21

activity that occurred after the fraud occurred and related to a fraudulent company promises and

22

investments made to an otherwise legitimate company. Prior cases-and common sense-suggest that a

23

investments made prior to a company engaging in fraudulent behavior should not be considered in a

24

25

[1] *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007).

26

[2] *See United States v. Ameline*, 409 F.3d 1073, 1086 (9th Cir.2005) (en banc) ("[W]hen the government seeks an upward adjustment, it bears the burden of proof.") (citation omitted).

27

[3] U.S.S.G. § 2B1.1, cmt. n. 3(A).
[4] U.S.S.G. § 2B1.1, cmt. n. 3(A)(i).
[5] U.S.S.G. § 2B1.1, cmt. n. 3(A)(ii).

28

[6] U.S.S.G. § 2B1.1, cmt. n. 3(C); *United States v. Peyton*, 353 F.3d 1080, 1090 n. 11 (9th Cir.2003).
[7] U.S.S.G. § 2B1.1, cmt. n. 3(B).

DEFENDANT'S SENTENCING MEMORANDUM
*ANDERSON*, CR 21–397 EMC

3

1   loss calculation as it was not "pecuniary harm that resulted from the offense" as the money was

2   acquired prior to the offense occurred. Similarly, it should not be considered intended loss, as the

3   funds were provided prior to the intent being formed to commit the offense. This calculation would

4   be similar to the one that occurs when evaluating the loss amount when comparing a sham company

5   and a legitimate company. If the company whose stock is sold does not legally exist or has no

6   activities, assets, facilities, or any other source of value, that "company" has no underlying equity.

7   Absent highly unusual circumstances, its stock would also be worthless.[8] In such a case, the court

8   could appropriately determine the loss to be equal to the value of all outstanding shares before the

9   fraud came to light. Measurement of loss becomes considerably more complex, however, when the

10  court confronts a "pump-and-dump" scheme involving an otherwise legitimate company. In such a

11  case, because the stock continues to have residual value after the fraudulent scheme is revealed, the

12  court may not assume that the loss inflicted equals the full pre-disclosure value of the stock; rather,

13  the court must disentangle the underlying value of the stock, inflation of that value due to the fraud,

14  and either inflation or deflation of that value due to unrelated causes.[9]

15      In calculating loss in this case, the Court should take a realistic, economic approach to

16  determine what losses Mr. Anderson truly caused or intended to cause, rather than the use of some

17  approach which does not reflect the monetary loss due to fraud rather than by faulty business

18  practices.[10]

19      Additionally, the Guidelines contemplate that the calculated loss may be reduced if money was

20  returned to the victims prior to the offense being detected.[11] The FBI began doing interviews of

21  purported victims in 2018 after a civil lawsuit was filed regarding events surrounding this case.

22

23

24  [8] See, e.g., United States v. Mayo, 646 F.2d 369, 374 (9th Cir.1981) (purpose of conspiracy involving "sham corporations" was "bilking the unsuspecting public by foisting worthless stock upon it").

25  [9] See United States v. Bakhit, 218 F.Supp.2d 1232 (C.D.Cal.2002) (thoughtfully analyzing several approaches to this task). See also Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42, (2005) (requiring

26  plaintiffs in civil securities fraud cases to establish a "causal connection between the material misrepresentation and the loss"); In re Daou Sys., Inc., 411 F.3d 1006, 1014 (9th Cir.2005) (construing and applying Dura ).

27  [10] See e.g. United States v. Harper, 32 F.3d 1387, 1392 (9th Cir.1994), cert. denied, 513 U.S. 1178 (1995)( rejected the proposition that U.S.S.G. § 2B1.1' s definition of "loss" applied to all fraud cases

28  except those falling within the exceptions enumerated in Note 7).

[11] U.S.S.C. § 2B1.1 app.note 3(E)(i).

1   Therefore, payments made to the investors prior to 2018 should be credited against the Guideline loss

2   amount.

3   **2. Mr. Anderson's proposed loss calculations**

4       The chart provided below summarizes Mr. Anderson's calculation of the Guideline loss and

5   restitution attributable to each investor identified by the government. After the summary chart,

6   detailed information regarding each of the identified investors supports the summarized information

7   with materials supporting found in Exhibit A.

8       On whole, Mr. Anderson argues that the amount attributable for Guideline calculations is

9   $5,999,491.80 and the amount for restitution is $5,090,710.89.

10   **2.1. Summary Chart**

| | Amount Attributable for Guidelines Loss | Amount Attributable for Restitution |
|---|---|---|
| Ace Home Health Care Hospice Inc./Lorenzo Friar | $ 70,000.00 | $ 70,000.00 |
| Andy Meyers | $ - | $ - |
| Anil Patel/Wine Country Hospitality | $ - | $ - |
| Annant Patel | $ 32,248.00 | $ 32,248.00 |
| Anthony Zuiker | $ 280,637.50 | $ 280,637.50 |
| Brenda J Pannell | $ - | $ - |
| Clark Colvis/Linda Colvis | $ - | $ - |
| David Grossman/Neil Grossman | $ - | $ - |
| Deborah Pierson | $ - | $ - |
| Diane Anderson | $ - | $ - |
| Dilley Design Inc \| Jack and Reanne Dilley | $ 166,721.00 | $ 166,286.00 |
| Dipak Patel \| Dipak 2007 Living Trust | $ - | $ - |
| Edward/Julia DeLorme | $ - | $ - |
| George Symons | $ 501,090.00 | $ 137,308.00 |
| Greg Cham | $ - | $ - |
| H + H Assets LLC | $ - | $ - |
| Hawthorn Suites by Wyndham | $ 8100.00 | $ 8100.00 |
| Hess Construction | $ - | $ - |
| Howard Silverman | $ - | $ - |
| Kelsey McCann | $ 69,804.00 | $ 64,803.00 |
| Larry Hess | $ - | $ - |
| Mark Coleman | $ - | $ - |
| Michelle Fields | $ - | $ - |

| | | | |
|---|---|---|---|
| Phillip Darren Buchanon | $ - | $ - |
| Rajool Patel | $ - | $ - |
| Randy C Renfro/Ocean Front Equity LP \| Capital City Leasing | $ 2,326,152.00 | $ 2,326,152.00 |
| Ray Matheny | $ - | $ - |
| Richard Hess | $ - | $ - |
| Richard Petzold | $ 4,300.00 | $ - |
| Richard Toriggino | $ 26,797.90 | $ 26,797.90 |
| Rodney E Maher/Angela Maher \| RE Maher Inc | $ 708,273.11 | $ 685,311.11 |
| RPM001 Intella Capital/Sushil Patel | $ - | $ - |
| Samit Channa | $ 18,708.00 | $ 18,708.00 |
| Siobhan Delfani/Moe Delfani | $ 30,365 | $ 30,365 |
| The Entrust Group/Phillip Wall | $ - | $ - |
| The Jones & Royce Revocable Trust | $ - | $ - |
| Theodore Kloth MD/Mary Kloth | $ - | $ - |
| Thomas A Whalen Jr | $ 1,191,560.10 | $ 679,259.19 |
| Vickie Jackson | $ - | $ - |
| Vijay Patel | $ 564,735.19 | $ 564,735.19 |
| Vikrant Patel | $ - | $ - |
| Viran Nana/Viren Patel | $ - | $ - |
| | $ 5,999,491.80 | $ 5,090,710.89 |

## 2.2. Ace Home Health Care Hospice Inc./Lorenzo Friar

Mr. Anderson concedes that Ace Home Health Care Hospice Inc./Lorenzo Friar contributed $70,000 on June 22, 2015, well after fraudulent behavior commenced. Mr. Anderson made no repayments.[12] That total should be properly attributed to both the overall loss amount and to restitution owed.[13]

## 2.3. Andy Meyers

Mr. Anderson argues that he owes no restitution and no loss should be attributed to Andy Meyers.[14] Andy Meyers was a principal at M3 which was a parent company to Fanlala which was ultimately purchased by Imbee. The sale of the company occurred in August 2011. The purchase

---

[12] Under Seal Exhibit A at 10.
[13] *Id.* at 2.
[14]*Id.* at 2.

1  price was set to be $510,120.00.[15] Mr. Anderson did not complete payment to Mr. Meyers for the

2  purchase of Fanlala. There is no indication that Mr. Anderson fraudulently induced Mr. Meyers to

3  completed the sale of Fanlala. Though it ultimately ended up being a bad business deal for Mr.

4  Meyers, as Mr. Anderson was unable to follow through on the complete payment, the actions of Mr.

5  Anderson should not be attributed to fraudulent activity and therefore should not be included in

6  either the loss guideline calculations or in restitution.

7  **2.4. Anil Patel/Wine Country Hospitality**

8  Mr. Patel was a part of a group of investors who included Samit Channa, Vikrant Patel, Dipak

9  Patel, Annant Patel, and Rachel Patel. Anil Patel made investments from November 12, 2010 to

10  August 30, 2015. Mr. Anderson contends that the initial investments made by Mr. Patel were made

11  without the auspicious of fraudulent activity. Mr. Patel received fraudulent documents from Mr.

12  Anderson after 2013.[16] In Mr. Patel's case, he made investments into the company from 2010-2015.[17]

13  Considering only those investments made during or after 2013 to be fraudulent, the total amount

14  invested into the company that should be considered or the loss amount is $32,200. Mr. Anderson

15  made repayments to Mr. Patel of $46,300 in 2013 and 2014.[18] Therefore, none of the amounts Mr.

16  Patel invested into the company should be considered for guideline loss calculations or for restitution

17  amounts.

18  **2.5. Annant Patel**

19  Mr. Annant Patel made investments from March 2012 until September 2015.[19] It is unclear

20  when or if Mr. Patel specifically received fraudulent documents from Mr. Anderson but presuming

21  his association with Anil Patel the date is assumed to be 2013. Accordingly, any investments made

22  after 2013 could be attributable to fraudulent activity. As a result, the amount that should be

23  attributable for guideline purposes is $32,248. As Mr. Anderson made no repayments to Mr. Annant

24  Patel the same amount should be paid in restitution.

25

26

27  [15] Under Seal Exhibit A at 12.
   [16] PSR ¶ 33.

28  [17] Under Seal Exhibit A at 14-18.
   [18] *Id.* at 19-31.
   [19] *Id.* at 34-36.

**2.6. Anthony Zuiker**

Mr. Zuiker was both an investor[20] and also contracted with Imbee/Fanlala to for work services.[21] Mr. Zuiker provided Imbee with a total of $337,850 in funds after 2014 and presumably relied upon fraudulent representations made by Mr. Anderson in making the decision to invest. The terms of the agreement provided that Mr. Zuiker and Imbee were to contribute $57,212.50 to the joint endeavor to create scripts and movies for children's projects which the staff at Fanlala and Imbee did work on.[22] Mr. Anderson argues that these funds should be subtracted from the total applicable resulting in an amount attributable to both the Guidelines calculation and restitution of $280,637.50.

**2.7. Brenda Pannell**

Ms. Pannell made an investment of $21,650 on August 30, 2011.[23] At the time she made her investment it has not been supported that Mr. Anderson was engaging in fraudulent representations associated with Imbee. As a result, the amount she invested into the company should not be attributed to either the Guideline loss calculation nor the restitution amount.

**2.8. Clark Colvis/Linda Colvis**

Mr. and Ms. Clovis entered into an agreement on to purchase stocks where they received stock certificates on two occasions in February and December 2011.[24] While bank records do not confirm the transference of funds, the total amount that was intended to be purchased was $300,000 worth of stock. However, based upon the date of investment and the lack of supporting documentation, it has not been supported that Mr. Anderson was engaging in fraudulent representations associated with Imbee to induce the Clovis' to invest. As a result, the amount they invested into the company should not be attributed to either the Guideline loss calculation nor the restitution amount.

**2.9. David Grossman/Neil Grossman**

Neil Grossman is an associate of Howard Silverman, another investor in Imbee/Cosmic Toast.

---

[20] Under Seal Exhibit A at 38-48.
[21] *Id,* at 49.
[22] *Id*.
[23] *Id.* at 57.
[24] *Id.* at 69-73.

Together the Grossmans invested $233,305.83 after 2013.[25] While the time-period places the funds after Mr. Anderson began making fraudulent assertions, it has not been supported that Mr. Anderson was engaging in fraudulent representations specifically to the Grossmans' to induce the Grossmans' to invest. As a result, the amount they invested into the company should not be attributed to either the Guideline loss calculation nor the restitution amount.

**2.10.     Diane Anderson**

Ms. Anderson made an investment of $100,000 on June 28, 2010.[26] At the time she made her investment it has not been supported that Mr. Anderson was engaging in fraudulent representations associated with Imbee. Additionally, Mr. Anderson made payments totaling $55,212.48 prior to the time the fraudulent activity was discovered.[27] As a result, the amount she invested into the company should not be attributed to either the Guideline loss calculation nor the restitution amount.

**2.11.     Dipak Patel | Dipak 2007 Living Trust**

Mr. Dipak Patel made investments and loans from February 2011 – June 2012. It is unclear when or if Mr. Patel specifically received fraudulent documents from Mr. Anderson but presuming his association with Anil Patel the date is assumed to be 2013. The fraudulent conduct specifically mentioned in the PSR occurred in 2013 and 2014 with the production of a false purchase agreement.[28] Accordingly, any investments made after 2013 could be attributable to fraudulent activity. Here there were none. As a result, the amount that should be attributable for guideline purposes is $0. As Mr. Anderson made multiple repayments to Mr. Dipak Patel no amount should be paid in restitution.[29]

**2.12.     Dilley Design Inc | Jack and Reanne Dilley**

The Dilley's made investments totaling $166,721 after Mr. Anderson began fraudulent behavior in 2013 so the total amount invested is worthy of consideration for Sentencing Guideline purposes.[30] Additionally, proof has been provided that Mr. Anderson engaged in fraudulent behavior with the

---

[25] *Id.* at 70-72.
[26] *Id.* at 75.
[27] *Id.* at 76-81.
[28] PSR ¶ 35.
[29] *Id.* at 88-105.
[30] *Id.* at 108-127.

DEFENDANT'S SENTENCING MEMORANDUM
*ANDERSON*, CR 21–397 EMC

Dilley's by showing them profit and loss statements which were false.[31] Mr. Anderson made multiple repayments totaling $435.00 to the Dilleys but did so after investigation began in the case in 2018.[32] As a result, the amounts paid to the Dilleys should not be considered for Guidelines purposes but should for restitution. The amount attributable for guideline loss is $166,721.00 and the amount attributable for restitution is $166,286.00.

### 2.13.    Edward/Julia DeLorme

The DeLormes made investments totaling 37,500 in December 2010.[33] At the time they made their investment it has not been supported that Mr. Anderson was engaging in fraudulent representations associated with Imbee. As a result, the amount they invested into the company should not be attributed to either the Guideline loss calculation nor the restitution amount.

### 2.14.    George Symons

Mr. Symons invested in Imbee after Mr. Anderson informed him that Imbee has a partnership with Mattel worth $10 million dollars.[34] Accordingly, all the funds Mr. Symons invested in Imbee, which total $137,308, should be considered for restitution and count toward calculation of the Guideline calculation. Additionally, Mr. Symons and Mr. Anderson executed a number of loan agreements in September 2021. Considering the executed loans as potential loss an additional $363,782 should be counted to the total applicable for Guideline loss. For Mr. Symons, that brings the total to $501,090 for the amount attributable for Guideline loss and $137,308 for restitution.

### 2.15.    Greg Cham

Mr. Cham was an employee of Imbee, Fanlala, and Fruit Punch. On September 1, 2015, it is alleged that he made an investment of $49,081.84.[35] At the time he made their investment it has not been supported that Mr. Anderson supplied fraudulent information in inducing Mr. Cham to invest. Additionally, a series of payments to Mr. Cham exceed the total amount that Mr. Cham invested.[36] As a result, Mr. Cham should not be reimbursed for his investment and the amount that he paid should

---

[31] PSR ¶ 48.
[32] Under Seal Exhibit A at 128-131.
[33] *Id.* at 134.
[34] PSR ¶ 50.
[35] Under Seal Exhibit A at 150.
[36] *Id.* at 150-276.

DEFENDANT'S SENTENCING MEMORANDUM
*ANDERSON*, CR 21–397 EMC

1   not count to the Guidelines loss calculation.

2   **2.16.      H + H Assets LLC**

3   H + H Assets LLC made investments totaling $172,500 between December 2011 and April

4   2012.[37] At the time they made their investment it has not been supported that Mr. Anderson was

5   engaging in fraudulent representations associated with Imbee. As a result, the amount they invested

6   into the company should not be attributed to either the Guideline loss calculation nor the restitution

7   amount.

8   **2.17.      Hawthorn Suites by Wyndham**

9   Hawthorn Suites is a hotel associated with the Anil Patel. It made investments from June 2013

10  to August 2015[38]. It is unclear when or if Mr. Patel specifically received fraudulent documents from

11  Mr. Anderson but presuming his association with Anil Patel the date is assumed to be 2013.

12  Accordingly, any investments made after 2013 could be attributable to fraudulent activity. As a result,

13  the amount that could be attributable for guideline purposes is $22,000. However, because Mr.

14  Anderson made payments to Mr. Patel and Hawthorn Suites for $46,300 before he was being

15  investigated and Mr. Patel individually invested $54,400 the amount attributable for guideline loss

16  and restitution should be reduced accordingly to be 8,100 for both the Guideline loss and the

17  restitution.[39]

18  **2.18.      Howard Silverman**

19  Howard Silverman was the prior owner of Cosmic Toast, the company that was acquired by

20  Imbee in 2014. When interviewed Mr. Silverman could not recall statements made to him by Mr.

21  Anderson and did not indicate that Mr. Anderson made any fraudulent statements that induced him

22  to invest in the company.[40] Absent a showing that Mr. Anderson fraudulent induced Mr. Silverman to

23  continue to invest in Cosmic Toast (his former company) the funds he provided should not be

24  considered towards either the Guideline loss calculation or restitution amount.

25

26

27  [37] *Id.* at 276.
    [38] *Id*. at 281-284.

28  [39] Anil Patel/Wine Country Hospitality investments were 32,200, the amount repaid directly to Anil
    Patel was $46,300.
    [40] *Id.* at 295.

1    **2.19.      Kelsey McCann**

2          Mr. McCann does not have a direct bank transfer indicating that funds were transferred from

3    her account to Imbee. However, a stock purchase agreement details a purchase of stock for $69,804.00

4    on August 14, 2015.[41] At the time that Mr. McCann invested in the company he had been informed

5    that Mr. Anderson intended to sell Imbee shortly and that he could recoup his investment for a

6    higher rate of return. This induced him to invest in the company. Mr. Anderson did make some

7    payments prior to the investigation in this case to Mr. McCann totaling $5,001.00.[42] As a result, the

8    amount attributable for Guideline losses is $69,804 and the amount attributable for restitution is

9    $64,803.

10   **2.20.      Mark Coleman**

11         Mr. Coleman made his investment for $25,000 in 2010, well in advance of the time that Mr.

12   Anderson engaged in fraudulent conduct related to Imbee.[43] There has been no additional evidence

13   offered to confirm that Mr. Coleman made his investment because of fraudulent inducement. As a

14   result, Mr. Coleman is not entitled to restitution nor should his investment be attributed to the

15   Guideline calculation.

16   **2.21.      Michelle Fields**

17         Ms. Fields is a long-time friend of Mr. Anderson who loaned Mr. Anderson $9000.[44] He

18   reached out to her seeking a loan but did not indicate any details connected to the purpose of the loan

19   and Ms. Fields made the loan to Mr. Anderson solely based off of the nature of their friendship.[45] As a

20   result, her loaning the money was not connected to any fraudulent activity of Mr. Anderson and the

21   funds loaned should not be attributed to the Guideline calculation nor included in the amount for

22   restitution.

23   **2.22.      Phillip Darren Buchanon**

24         Mr. Buchanon made his investment for $34,000 in 2011, well in advance of the time that Mr.

25

26

27   [41] *Id.* at 297.
     [42] *Id.* at 302-317.
     [43] *Id.* at 319.
28   [44] *Id.* at 321.
     [45] *Id.* at 322.

Anderson engaged in fraudulent conduct related to Imbee.[46] There has been no additional evidence offered to confirm that Mr. Buchanon made his investment because of fraudulent inducement. As a result, Mr. Buchanon is not entitled to restitution nor should his investment be attributed to the Guideline calculation.

### 2.23.    Deborah Pierson

Ms. Pierson was the president of Cosmic Toast Studies. It appears that on March 10, 2015, she made an $8000 payment to Imbee that was repaid the next day in full.[47] As a result, Ms. Pierson is not entitled to restitution nor should this amount be attributed to the Guideline calculation

### 2.24.    Rajool Patel

Mr. Patel made his investment for $110,000 in 2012, in advance of the time that Mr. Anderson engaged in fraudulent conduct related to Imbee.[48] There has been no additional evidence offered to confirm that Mr. Patel made his investment because of fraudulent inducement. As a result, Mr. Patel is not entitled to restitution nor should his investment be attributed to the Guideline calculation.

### 2.25.    Randy C Renfro/Ocean Front Equity LP | Capital City Leasing

Mr. Renfro made investments in Imbee from 2013-2014 after Mr. Anderson provided Mr. Renfro with profit and loss statements and a letter of intent from Google for the purchase of Imbee.[49] Because Mr. Renfro made his investments with the understanding that the company was being sold to Google, he is entitled to restitution and application of his funds to the Guideline calculation. As a result, a total of $2,326,152 should be added to both.

### 2.26.    Ray Matheny

Mr. Matheny was an investor in the company and made $17,000 in investments in 2011 and 2012.[50] Mr. Metheny did not receive any falsified profit and loss statements from Mr. Anderson until 2013. As a result, his initial investments were done with a non-fraudulent basis and the total should not be applied to restitution nor should the funds be applied to the Guideline calculation.

---

[46] *Id.* at 325.
[47] *Id.* at 327-328.
[48] *Id.* at 331.
[49] *Id.* at 333-347.
[50] *Id*. at 349.

1    **2.27.     Richard Petzold**

2        Richard Petzold made an investment to Mr. Anderson for $4300 in anticipation of Imbee being

3    sold to Mattel.[51] After the investigation of the case Mr. Anderson paid Mr. Petzold a total of $4302.[52]

4    As a result, no payment to Mr. Petzold should made via restitution, however, the $4300 should be

5    applied to the Guideline calculation.

6    **2.28.     Richard Toriggino**

7        Mr. Toriggino made an investment for $26,797 in 2016 in Imbee in part because of a long

8    history with Mr. Anderson and in part because Mr. Anderson indicated that Imbee would be going

9    public shortly.[53] As Mr. Toriggino made his investment based upon fraudulent representations the

10   total sum of the investment and restitution should be accounted for at $26,797.

11   **2.29.     Richard/Larry Hess; Hess Construction**

12       Mr. Richard Hess made a series of investments in Imbee on the basis of a long-term friendship

13   with Mr. Anderson. Mr. Hess encouraged Larry Hess to also invest in the company based upon his

14   interest in a safe internet space for children. Though the Hesses began their investments before Mr.

15   Anderson began making fraudulent statement and continued to make their investments after Mr.

16   Anderson began making fraudulent statements to his investors it is unclear whether either was made

17   aware of the statements as part of the calculus to make an investment in the company.[54] As a result,

18   Mr. Anderson would argue that the amounts invested by the Hesses should not be considered as part

19   of the Guideline calculation nor for restitution purposes.

20   **2.30.     Rodney E Maher/Angela Maher | RE Maher Inc**

21       The Mahers began investing with Imbee in 2011. Initially, Mr. Anderson had expressed a hope

22   for the company to eventually get bought out but he did not induce Mr. Maher to invest with a claim

23   that such a buy-out was imminent. That changed in 2012 when Mr. Anderson began to fraudulently

24   tell Mr. Maher that a number of deals were soon to occur and that Mr. Maher would be a beneficiary

25   of the deal as he had a large stake in Imbee. That was not the case. As a result all the investments Mr.

26

27   [51] *Id.* at 351.
     [52] *Id.* at 359-361.
28   [53] *Id.* at 363-379.
     [54] *Id.* at 381-387.

DEFENDANT'S SENTENCING MEMORANDUM
*ANDERSON*, CR 21–397 EMC

14

Maher made after 2012 should be considered for the purpose of sentencing Guideline calculations as well as for restitution. Because Mr. Anderson did make some payments to the Mahers both before and after he was being investigated the Guideline calculation and restitution amounts should be modified to reflect the payments.[55] As a result, the amounts attributable to Guideline loss is $708,273.11 and the amount for restitution should be $685,311.11.

**2.31.      RPM001 Intella Capital/Sushil Patel**

Mr. Patel made his investment for $10,000 in 2010, well in advance of the time that Mr. Anderson engaged in fraudulent conduct related to Imbee.[56] There has been no additional evidence offered to confirm that Mr. Patel made his investment because of fraudulent inducement. As a result, Mr. Patel is not entitled to restitution nor should his investment be attributed to the Guideline calculation.

**2.32.      Samit Channa**

Samit Channa made bank document investments and loans in 2013.[57] There are some additional documents regarding plans for stock transfers that predate 2013. It is unclear when or if Mr. Patel specifically received fraudulent documents from Mr. Anderson but presuming his association with Anil Patel the date is assumed of exposure to fraudulent content is assumed to be 2013. The fraudulent conduct specifically mentioned in the PSR occurred in 2013 and 2014 with the production of a false purchase agreement.[58] Accordingly, any investments made after 2013 could be attributable to fraudulent activity. Here that amounts to $37,000. Mr. Anderson made a number of payments to Channa prior to being investigated for fraud.[59] As a result, the amount that should be attributable for both Guideline purposes and restitution purposes is $18,708.00.

**2.33.      Siobhan Delfani/Moe Delfani**

The Delfanis initially invested in Imbee based upon the strength of their personal relationship with Mr. Anderson. That changed in 2015 when Mr. Anderson informed the Delfini's that Imbee was

---

[55] *Id*. at 508-514.
[56] *Id*. at 516.
[57] *Id*. at 518.
[58] PSR ¶ 35.
[59] *Id*. at 528.

1  soon to be purchased by NBC Universal. As a result, any investments made by the Delfanis after Mr.

2  Anderson's fraudulent statement should be considered for Guideline loss calculation and restitution

3  purposes minus the payments that the Delfanis made prior to the investigation in this case. As a

4  result, $30,365 should be attributed to the Guidelines and to restitution.

5  **2.34.      The Entrust Group/Phillip Wall**

6       The Entrust Group was an investor in the company and made $25,000 in investments in 2011.[60]

7  There has been no evidence that The Entrust Group/Phillip Wall received any falsified information

8  from Mr. Anderson to induce investment. As a result, the investments were done with a non-

9  fraudulent basis and the total should not be applied to restitution nor should the funds be applied to

10  the Guideline calculation.

11  **2.35.      The Jones & Royce Revocable Trust**

12       The Jones and Royce Trust was an investor in the company and made $200,000 in investments

13  in 2012.[61] There has been no evidence that trust received any falsified information from Mr.

14  Anderson to induce investment. As a result, the investments were done with a non-fraudulent basis

15  and the total should not be applied to restitution nor should the funds be applied to the Guideline

16  calculation.

17  **2.36.      Theodore Kloth MD/Mary Kloth**

18       The Kloths made a series of investments in 2014 and 2015 to Imbee.[62] There has been no

19  evidence that the Kloths received any falsified information from Mr. Anderson to induce investment.

20  As a result, the total should not be applied to restitution nor should the funds be applied to the

21  Guideline calculation.

22  **2.37.      Thomas A Whalen Jr**

23       Mr. Whalen began investing in the company in 2010 and continued into 2015 after Mr.

24  Anderson began engaging in fraudulent activity. Mr. Whelan received false documents from Mr.

25  Anderson and statements from Mr. Anderson to encourage his investment. While some repayment

26

27  ───────────────

28  [60] *Id.* at 624.
   [61] *Id.* at 626.
   [62] *Id.* at 629.

was made, the sums were paid after Mr. Anderson was under investigation so the amounts should not be credited against the Guidelines. As a result, $1,191,560.10 should be considered towards the Guidelines while Mr. Whalen is entitled to $679,250.19 in restitution.

### 2.38. Vickie Jackson

Vickie Jackson invested $55,000 in Imbee in 2015.[63] While the time-period places the funds after Mr. Anderson began making fraudulent assertions, it has not been supported that Mr. Anderson was engaging in fraudulent representations specifically to Ms. Jackson to induce the Ms. Jackson to invest. As a result, the amount they invested into the company should not be attributed to either the Guideline loss calculation nor the restitution amount.

### 2.39. Vijay Patel

Vijay Patel made bank document investments in 2013 and 2015. It is unclear when or if Mr. Patel specifically received fraudulent documents from Mr. Anderson but presuming his association with Anil Patel the date is assumed of exposure to fraudulent content is assumed to be 2013. The fraudulent conduct specifically mentioned in the PSR occurred in 2013 and 2014 with the production of a false purchase agreement.[64] Accordingly, any investments made after 2013 could be attributable to fraudulent activity. Here that amounts to $37,000.[65] Mr. Anderson made a number of payments to Channa prior to being investigated for fraud. As a result, the amount that should be attributable for both Guideline purposes and restitution purposes is $18,708.00.

### 2.40. Vikrant Patel

Vikrant Patel an investor in the company and made $61,121 in investments in 2012.[66] There has been no evidence that Vikrant Patel received any falsified information from Mr. Anderson to induce investment. As a result, the investments were done with a non-fraudulent basis and the total should not be applied to restitution nor should the funds be applied to the Guideline calculation.

---

[63] *Id.* at 642.
[64] PSR ¶ 35.
[65] Exhibit A at 655.
[66] *Id.* at 656

1

2.41.      **Viran Nana/Viren Patel**

2

Viran Patel an investor in the company and made $25,000 in investments in 2011.[67] There has

3

been no evidence that Viran Patel received any falsified information from Mr. Anderson to induce

4

investment. As a result, the investments were done with a non-fraudulent basis and the total should

5

not be applied to restitution nor should the funds be applied to the Guideline calculation.

6

**3.   Mr. Anderson's proposed Guideline calculations**

Base Offense Level, U.S.S.G. § 2B1.1(a)(1) ........................................................................ 7

7

Loss Amount, U.S.S.G. § 2B1.1(b)(1)(K) ($5,999,491.80) ........................................... +18

Ten or More Victims, U.S.S.G. § 2B1.1(b)(2)(A) ......................................................... +2

8

Abuse of Trust, U.S.S.G. § 3B1.3 ................................................................................... +2

Acceptance of Responsibility, U.S.S.G. § 3E1.1 .......................................................... -2

9

10

Total Offense Level ............................................................................................................ 27

Criminal History Category ............................................................................................... II

11

Guideline Range ......................................................................................................... 78-87

12

Mr. Anderson's Request ...................................................................................... 36 months

Probation's Recommendation ......................................................................... 42 months[68]

13

14

The wire fraud charges each carry maximum statutory penalties of up to 20 years in prison and

15

a $250,000 fine. Mr. Anderson faces a required $100 special assessment per each count totaling $200.

16

SECTION 3553(a) FACTORS

17

"The overarching statutory charge for a district court is to impose a sentence sufficient, but not

18

greater than necessary" to achieve the goals of § 3553(a).[69] Those goals include the need to: (1) reflect

19

the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment for the

20

offense; (4) afford adequate deterrence to criminal conduct; (5) protect the public from further crimes

21

of the defendant; and (6) provide the defendant with needed educational or vocational training,

22

medical care, or other correctional treatment in the most effective manner.[70] Section 3553(a) also

23

directs the Court to consider additional factors, including: the nature and circumstances of the

24

offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of

25

26

---

27

[67] *Id*. at 663

28

[68] PSR Sentencing Recommendation.

[69] *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted).

[70] *See* 18 U.S.C. § 3553(a)(2).

DEFENDANT'S SENTENCING MEMORANDUM
*ANDERSON*, CR 21–397 EMC

sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

Mr. Anderson addresses these concerns below and argues that a 36-month sentence would be sufficient but not greater than necessary to achieve the sentencing goals of §3553(a).

**1. The history and characteristics of the defendant and the nature and circumstances of the offense**

Alan Anderson, 62, was born in Delaware. In his two-parent household, he was one of four children. As the only male child he took on a role where he felt obligated to be a protector and provider in his family. Soon to be a grandfather, Mr. Anderson is a devoted husband and father. When describing his actions Mr. Anderson wrote of his wife, "[s]he is an amazing person, and the guilt and shame I feel when I think about what my actions have cost her are almost unbearable."[71] In her letter to the Court, his sister Denise gushes about the level of support, care, and devotion to others that he provides.[72]

Thought Mr. Anderson has previously had a conviction he was able to restart his life after he was released and eventually work his way up to becoming the head of Imbee, a technology company that permitted him to meld his love for technology with the attention and devotion for supporting children. He writes of Imbee that:

> When I took over Imbee, I set out to build something special. It was the early days of social media, and I was deeply concerned about the negative impact platforms like Facebook were having on youth. I saw an opportunity to create a safe, supportive social media platform specifically for kids, one that would meet their need for communication and community while protecting them from harm. I believed in that mission wholeheartedly and dedicated myself to making it a reality. Personally, for me, it was the best of all worlds. I had the opportunity to do. something good for kids and their families and work with technology.

Exhibit B.

For a period of time Imbee and its subsidiaries were thriving and Mr. Anderson was able to expand and hire employees to work to create a digital space safe for children. His time spent coaching

---

[71] Exhibit B, Letter from Alan Anderson.
[72] Exhibit C, Letter from Denise Bess.

kid's football was extremely rewarding for him and being able to give back to children in a larger way through his company was an ideal placement for him.[73]

Ultimately his business plan began to fail. The pressure began to rise on Mr. Anderson as his hard fought for second chance began to disappear after he had spent long hours finding investors to support his otherwise viable business. It realizing he was in trouble he writes:

> However, it became clear that, while the idea of a social media platform for kids was novel, the market did not support it. Children wanted to use the same platforms as their older siblings, and they didn't want a separate space just for themselves, and ironically parents wanted our service, but usually just allowed kids to sign up for the most popular services, like Facebook. Despite numerous conversations with potential partners, great progress technically, a video service that was quite popular with young Hollywood, we were failing. The pressure I alone applied to myself to perform for all I was committed to, was debilitating. Rather than share the honest truth about our failings with all stakeholders, I kept it to myself and was dishonest to those who I truly care for. Those who trusted me.

> To buy the company time, and hoping to find new markets I encourage investors to continue to support the company. This was my greatest failure; one I will carry with me for the rest of my life. At that crucial juncture, I should have communicated openly with our investors and acknowledged that the market wasn't there—that we had failed. But I didn't. In that moment, I failed myself, my family, my investors, and my employees. It was a colossal breach of trust and judgment.

> The deceit I demonstrated is unforgivable. When it became clear that I couldn't make the company successful, I turned my attention to returning whatever funds I could to the investors. There were investors that we were able to keep our commitments to. In fact, There were times when I sent small amounts—$30, $40—to demonstrate to investors that I was serious about making amends. Many of these people, were not just investors to me, many were close friends, and this was my responsibility, and I failed them. For more than a decade, not a day has gone by that I haven't thought about those relationships and the people I let down. I have continued to this day, do anything and everything in my power to make things right. If any revenue was generated, I paid anything I could. My crimes have cost people that trusted me dearly.

> Exhibit B.

Mr. Anderson's actions damaged the trust that his family and friends felt for him. He has had to suffer the financial consequence and most horribly for him, see the effect that this case has had on his family. His children and wife have all had liens placed upon them because of Mr. Anderson's actions

---

[73] *See* Exhibit D, Letter from Ron Davis.

and have had to suffer financially as well. Sincerely contrite for his actions Mr. Anderson writes:

> I understand what I have done is wrong, And all of the above items would not have taken place if not for my own, incredibly poor and selfish judgment. I truly understand I have hurt those who have entrusted me I understand that the pain I have caused trickle down to our kids and the relationships that those kids have had with each other. I understand I must atone, pay a price, and demonstrate a willing and commitment participation in the reinstatement of trust. At no time did I enrich myself, my family, or in any manner profit from my mistakes and selfish decisions.

> Exhibit B.

**2.  The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense and to afford adequate deterrence to criminal conduct**

Mr. Anderson has significant potential for rehabilitation. He can engage in counseling and financial management education programs to address the underlying issues that led to his criminal behavior. His willingness to change and his proactive steps toward rehabilitation indicate a low risk of recidivism.

Mr. Anderson is 62 years old. A 36-month sentence would be sufficient to serve the interests of justice, providing ample time for punishment and reflection, while also allowing Mr. Anderson the opportunity to reintegrate into society as a reformed individual. In a 2017 study done by the United States Sentencing Commission, the Commission found a direct link between age and the risk of reoffending: younger offenders were more likely to be rearrested than older offenders, they were rearrested faster than older offenders, and they committed more serious offenses after they were released than older offenders.[74] Specifically, the reincarceration rate was highest among those between the ages of 21 to 24 years old (38.6%) and declined in each subsequent age group. The Commission found that time to reincarceration expands with age and severity of reincarceration offense declined with age. At 62, Mr. Anderson's likelihood of recidivism is approaching the lowest level identified by

---

[74] United States Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders, Dec 2017. Accessed at: https://www. ussc. gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_ Recidivism-Age. pdf.

the Sentencing Commission at 8.8%.



*Fig. 15* **Reincarceration Rates for Recidivism Study Offenders by Age at Release**

### 3. Any pertinent policy statement.

A lengthy custodial sentence would have a detrimental impact on Mr. Anderson's family, who rely on him for emotional and financial support. Mr. Anderson's children are becoming parents themselves and he is soon to be a first-time grandparent. Additionally, a shorter sentence would allow Mr. Anderson to contribute positively to his community once he has served his time, utilizing his skills and experience in a lawful manner.

Research by the Washington State Institute for Public Policy and others has also shown that use of research-based rehabilitation and prevention programs to reduce recidivism among targeted criminal offenders is more effective than incarceration.[75] The research evidence is unequivocal that incarceration does not reduce offender recidivism. To the contrary, incarceration actually results in slightly increased rates of offender recidivism.[76] In The Diminishing Returns of Increased Incarceration: A Blueprint to Improve Public Safety and Reduce Costs, nationally-renowned researchers James Austin and Tony Fabelo concluded that what governments now need to do, after

---

[75] Washington State Institute for Public Policy, The Criminal Justice System in Washington State: Incarceration Rates, Taxpayer Costs, Crime Rates, and Prison Economics 292-294 (2003), 293. Available at: https://www. wsipp. wa. gov/ReportFile/824/Wsipp_The-Criminal-Justice-System-in-Washington-State-Incarceration-Rates-Taxpayer-Costs-Crime-Rates-and-Prison-Economics_Full-Report. pdf

[76] Raymond Liedka, Anne Morrison Piehl & Bert Useem, The Crime-Control Effect of Incarceration: Does Scale Matter?, 5 Crime and Public Policy 245, 245-276 (2006).

ensuring that dangerous and violent prisoners are incarcerated, is to improve utilization of limited criminal-justice resources and enhance public safety—by diverting non-violent offenders from prison to alternative rehabilitation and sanctioning programs.[77] While conceding that some time in custody is appropriate, Mr. Anderson argues that any additional months in custody has diminishing returns in terms of preventing recidivism, particularly in light of his age and the situational nature of the offense. Science thus supports his request for a 36-month sentence.

Additionally, the immensely outsized effect that the loss enhancement under U.S.S.G. § 2B1.1(b)(1) has on the total offense level and resultant guidelines range in financial fraud cases would vastly over punish Mr. Anderson based on his level of culpability, and thus, a Guidelines sentence is not required to reflect the seriousness of the offense per § 3553(a). The outsized effect of the loss enhancement has been specifically decried by a number of judges, with others showing their disagreement through below guidelines sentences. The Hon. Jed Rakoff, in *United States v. Adelson*, forcefully argued that the loss enhancement in financial fraud cases yielded preposterous guidelines ranges that bore no relation to the defendant's actual culpability.[78] In *Adelson*, the defendant's guidelines recommended life imprisonment because the defendant had joined the tail end of a conspiracy responsible for a $50 million loss amount. Judge Rakoff ultimately sentenced Adelson to 42 months of imprisonment.[79]  This point of view has been echoed, albeit less explicitly, by the Eleventh Circuit. In *United States v. Blanchet*, the Circuit upheld identical 36-month sentences for each defendant who had been found guilty at trial of fraudulently obtaining a government contract worth $100 million which had been set aside for small businesses.[80] The sentencing court held (and the Circuit agreed), that because the contract was fraudulently obtained, the total value of the $100 million contract was the proper loss amount attributable to the defendants, even though the defendants' company performed the work required by the contract.[81] The $100 million loss amount resulted in a Guidelines range of 108–135 months, based on a total offense level of 31 and criminal

---

[77] See James Austin & Tony Fabelo, The JFA Institute, The Diminishing Returns of Increased Incarceration: A Blueprint to Improve Public Safety and Reduce Costs 5 (2004).
[78] 441 F. Supp. 2d 509 (S.D.N.Y. 2006).
[79] Id.
[80] 518 F. App'x 932, 955 (11th Cir. 2013).
[81] *Id.*

1   history category of I for each defendant.[82] The sentencing Judge, the Hon. Virginia Covington,

2   specifically noted that she believed that the loss amount and resulting Guidelines range

3   "overrepresented the seriousness of the Defendants' offenses," and thus sentenced them to the

4   significantly below guidelines sentence of 36 months— or just 33% of the bottom of the guidelines

5   range.[83]

6         Many, if not most, judges across the country routinely sentence defendants convicted of

7   financial fraud to below-Guidelines sentences, often substantially so. Nationally, a majority of

8   defendants (57.1%) receive sentences below their Guidelines range, and the majority of which are due

9   to variances, rather than a departure.[84] For crimes involving fraud, theft, or embezzlement, this

10  number is slightly higher, at 60.03%.[85] For all cases where the sentence departs downward from the

11  Guidelines, the average amount of departure is by 35.1%.[86] For sentences for fraud, theft, or

12  embezzlement, however, the average amount of departure is by 51.4%.[87]

13        A Guidelines sentence would excessively punish Mr. Anderson, and we submit that, as in the

14  cases above, a downward variance is warranted in this case. Indeed, considering the unique personal

15  characteristics of Mr. Anderson, and the sincerity with which he wanted to make Imbee a thriving

16  company merits a sentence that takes into account that Mr. Anderson began his company with

17  honest intention. In this case, a significant downward variance is warranted, and ultimately,

18  incarceration not necessary, to carry out the ends of justice. Factoring in the totality of the

19  circumstances, a sentence of 36 months would be sufficient in this case to satisfy the goals of

20  sentencing, without being excessive.

21

22  _____

23  [82] Id.
    [83] Id.

24  [84] U.S. Sentencing Commission, Sentence Imposed Relative to the Guideline Range, Datafile, 2023,

25  available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-
    andsourcebooks/2023/Table29.pdf.

26  [85] U.S. Sentencing Commission, Sentence Imposed Relative to the Guideline Range by Type of Crime,
    Datafile, 2023, available https://www.ussc.gov/sites/default/files/pdf/research-and-

27  publications/annual-reports-andsourcebooks/2023/Table31.pdf.
    [86] U.S. Sentencing Commission, Extent of Downward Variances by Type of Crime, Datafile, 2023,

28  available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-
    andsourcebooks/2023/Table40.pdf.
    [87] Id.

CONCLUSION

Mr. Anderson has let down his investors, his employees, his family, and himself. As noted at the inception, he makes no excuses. At this point, he simply prays that the Court finds a way to punish him with minimal collateral damage to his family. The facts before the Court establish compelling reasons to sentence Mr. Anderson to a term of 36 months and three-years supervised release concurrently on all counts. The sentence is supported by the struggles Mr. Anderson experienced and his initial intention to lawfully make a profit at Imbee.

Such a sentence would adequately balance the necessity of meting out sufficient punishment for the instant offense, serve as an adequate deterrent, while also simultaneously accounting for the myriad countervailing sentencing objections and considerations provided for in 18 U.S.C. § 3553(a).

Dated:      August 30, 2024                          Respectfully submitted,

                                                     JODI LINKER
                                                     Federal Public Defender
                                                     Northern District of California

                                                     _____/S_____
                                                     CANDIS MITCHELL
                                                     Assistant Federal Public Defender