1   ISMAIL J. RAMSEY (CABN 189820)
United States Attorney
2
MARTHA BOERSCH (CABN 126569)
3   Chief, Criminal Division

4   SAILAJA M. PAIDIPATY (NYBN 5160007)
CHRISTIAAN H. HIGHSMITH (CABN 296282)
5   Assistant United States Attorney

6        450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
7        Telephone: (415) 436-7200
FAX: (415) 436-7027
8        christiaan.highsmith@usdoj.gov
sailaja.paidipaty@usdoj.gov
9
Attorneys for United States of America
10
UNITED STATES DISTRICT COURT
11
NORTHERN DISTRICT OF CALIFORNIA
12
SAN FRANCISCO DIVISION
13

14   UNITED STATES OF AMERICA,                )   **CASE NO. 21-CR-397 EMC**
                                              )
15             Plaintiff,                     )   **UNITED STATES' REPLY TO DEFENDANT**
                                              )   **ANDERSON'S SENTENCING MEMORANDUM**
16        v.                                  )
                                              )   Hearing Date: September 13, 2024
17   ALAN ANDERSON,                           )   Time:         9:00 AM
                                              )   Court:        Hon. Edward M. Chen
18             Defendant.                     )
                                              )
19

20

21

22

23

24

25

26

27

28

### TABLE OF CONTENTS

I.    ANDERSON'S LOSS IS $10,119,822.13 ..................................................................................1

      A.    Relevant Law ...........................................................................................................1

      B.    Anderson's Fraud Scheme Started in 2010 .............................................................2

      C.    Anderson's Loss Amount is the Investor-Victims' Net Loss ..................................4

      D.    Anderson Incorrectly Calculates Individual Victim Losses ...................................7

II.   A Downward Departure is Not Warranted .........................................................................19

III.  Conclusion .........................................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**<u>Federal Cases</u>**

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005)..................................................................... 4, 6

*United States v. Bakhit*, 218 F.Supp.2d 1232 (C.D. Cal. 2002)........................................... passim

*United States v. Berger*, 587 F.3d 1038 (9th Cir. 2009) ..................................................... 6

*United States v. Blanchet*, 518 F. App'x 932 (11th Cir. 2013)............................................... 19

*United States v. Hicks*, 217 F.3d 1038 (9th Cir. 2000) ........................................................ 2, 6

*United States v. Laurienti*, 611 F.3d 530 (9th Cir. 2010) ................................................ 4, 5, 6

*United States v. Orton*, 73 F.3d 331 (11th Cir. 1996)................................................................. 5

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) ................................................................ 1

*United States v. Zolp*, 479 F.3d 715 (9th Cir. 2007) ........................................................ 2, 4, 5

**<u>Federal Rules</u>**

U.S.S.G. § 1B1.3(a)(3)........................................................................................................ 1, 2

U.S.S.G. § 2B1.1(b) ...................................................................................................... passim

U.S.S.G. § 2B1.1(b)(1) ........................................................................................................ 1, 16

U.S.S.G. § 2B1.1(b)(1)(F) ........................................................................................................ 1

## I.      ANDERSON'S LOSS IS $10,119,822.13

The Court should use investors' net loss as Anderson's loss for the purposes of sentencing under U.S.S.G. § 2B1.1(b)(1).  Net loss is calculated by taking the total amount invested ($10,938,374.16) and subtracting the amount of money Anderson returned to victims prior to detection of the crime ($818,552.03).  *See* Exhibit 1, Loss Analysis & FBI 302 (filed under seal).  Using net loss, Anderson's loss under the Guidelines is **$10,119,822.13**.  This yields in a 20-level increase in his offense level. U.S.S.G. § 2B1.1(b)(1)(F).[1]  Anderson incorrectly contends that loss in this case is only $5,999,491.80. He makes two arguments to support his claim: (1) that only investments made in 2013 and later should be considered loss, and (2) that only investments made by investors who relied on an explicit false statement by Anderson suffered loss.  Def. Sent. Memo. (Dkt. #90), at 3-4.  Anderson's arguments are not supported by the law or the facts.[2]

### A.      Relevant Law

Under the Guidelines, loss "is the greater of actual or intended loss." U.S.S.G. § 2B1.1(b), App. Note 3(A).  "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense."  *Id.*, App Note 3(A)(i).  "'Intended loss' . . . [includes] the pecuniary harm that the defendant purposely sought to inflict."  *Id.*, App. Note 3(A)(ii).  "'[R]easonably foreseeable pecuniary harm' means pecuniary harm [i.e., harm that is monetary or otherwise readily measurably in money] that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  *Id.*, App. Notes 3(A)(iii & iv).

The Guidelines instruct that the defendant must be held responsible for "all harm that resulted from the acts or omissions" of the defendant.   U.S.S.G. § 1B1.3(a)(3).  The Guidelines further state:

---

[1] The government's sentencing memorandum, Dkt. #89, incorrectly stated that loss is $10,947,374.16.  That loss number failed to credit Anderson for the $818,552.03 he returned to victims, which is reflected in Exhibit 1 to this Reply Memorandum.  Further, the government reduces the total loss amount and the total investment amount calculated by the FBI by a further $9,000 because, as discussed below, Michelle Fields did not invest in Anderson's companies, she lent him $9,000 based on their longstanding friendship.

[2] Arguably, Anderson's loss amount should not be reduced by the amount of money he returned to investor-victims before the offense was detected because he returned those funds in an effort to conceal his fraud, to prevent more investors from making withdrawal requests, and to prevent repeat withdrawal requests from investors who had already asked for a withdrawal.  *See, e.g.*, *United States v. Vilar*, 729 F.3d 62, 96 n.34 (2d Cir. 2013) ("defendants should not benefit from attempting to ensure continuation of their scheme").

1    "Relying on the entire range of conduct, regardless of the number of counts that are alleged or on which

2    a conviction is obtained, appears to be the most reasonable approach to writing workable guidelines for

3    [fraud] offenses." *Id.*, Background.  The government bears the burden of proving "by a preponderance

4    of the evidence the amount of harm that resulted from the acts or omissions of the defendant." *United*

5    *States v. Hicks*, 217 F.3d 1038, 1048-49 (9th Cir. 2000).

6    "The guidelines do not present a single universal method for loss calculation under § 2B1.1…."

7    *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007).  The Court "need only make a reasonable

8    estimate of the loss."  U.S.S.G. § 2B1.1(b), App. Note 3(C).  Because the Court is in a unique position to

9    assess the evidence and estimate the loss, its determination is entitled to appropriate deference.  *Id.*  In

10   estimating loss, the Guidelines direct the Court to consider "the cost to the victim of replacing [the

11   unlawfully taken] property," "[t]he approximate number of victims," and "reduction that resulted from

12   the offense in the value of equity securities or other corporate assets." *Id.*  "The court need not make its

13   loss calculation with absolute precision; rather, it need only make a reasonable estimate of the loss based

14   on the available information." *Zolp*, 479 F.3d at 719 (citing U.S.S.G. § 2B1.1(b), App. Note 3(A), 3(B),

15   and 3(C).

16   Here, the Court should use actual loss because the evidence in the record establishes by a

17   preponderance that "the reasonably foreseeable pecuniary harm that resulted from the offense" is greater

18   than the "pecuniary harm that was intended to result from the offense." *Id.* at 718-19 (citing U.S.S.G. §

19   2B1.1(b), App. Note 3(A)).  Further, as discussed in more detail below, the government has established

20   by a preponderance of the evidence that total money invested minus money returned to investors prior to

21   detection of the scheme is the "most reasonable estimate of loss based on the available information." *Id.*

22   at 719.

23   **B.     Anderson's Fraud Scheme Started in 2010**

24   Anderson's claim that the fraud started in 2013 is factually wrong because his lies to investors

25   started in 2010, and those lies are relevant conduct.  *See* USA Sent. Memo. (Dkt. #89), at 5-6.  Anderson

26   first approached Moe and Siobhan Delfani (Victims 3 and 4) in 2010 for a loan for Imbee and "[f]rom

27   that point on [Anderson] would bombard us with lies and deceits in order to get more money…." *Id.* at

28   5 (quoting Victim Impact Statement of Moe and Siobhan Delfani).  Meanwhile, in October 2010,

Anderson falsely represented to Samit Channa (Victim 5), Anil Patel (Victim 6), and Dipak Patel (Victim 7) that Imbee had a relationship with Disney.  PSR ¶ 32.  And on September 13, 2011, Anderson sent investor-victim Clark Colvis (Victim 8) an email filled with false statements about Imbee's purported deal with YouTube/Google, including that Imbee would be signing a "YouTube/Google deal", that Imbee would be given a $1.5 million grant, and that "YouTube/Google [had] first right of refusal on acquiring imbee, with a floor price set at $62,500,000 (epic!)."  PSR ¶ 37; Exhibit 2, Colvis Documents.  There was no YouTube/Google deal, no grant, and no impending $62.5 million purchase.  PSR ¶ 37.  Further, it is reasonable to infer that Anderson's email to Clovis used pressure tactics that amplified the fraudulent misstatements about the impending deal.  Anderson's email pressured Clovis to accept a special, limited time investment offer only available because a different investor supposedly dropped out "at the last minute" and based on a purported "epic!" Imbee-YouTube deal that "only" Anderson, Clovis, "and 2 others … currently know" about.  PSR ¶ 37 Exhibit 2, Colvis Documents.  Anderson's false Imbee-YouTube deal and limited-time investment opportunity were part of a fraud that started in 2010, and certainly no later than 2011, designed to get Colvis to invest in Anderson's companies.[3]  And Anderson's pressure tactics were not limited to Colvis.  In mid-2013, Anderson approached a different existing investor, told him about Imbee's impending $60 million acquisition, and offered him additional shares based on the fanciful story that another investor was going through a divorce and wanted to sell his shares rather than let his ex-wife profit from Imbee's impending purchase.  PSR ¶ 47.  These were more of Anderson's pressure tactics and were part of his nearly decade-long fraudulent conduct.

Anderson's relevant conduct spans 2010 through 2019 because he continued lying to investors and potential investors about impending acquisitions, partnerships, and business deals to continue the fraud scheme by obtaining additional money from existing investors, ensuring that existing investors did not seek to withdraw their money, and preventing investors from reporting Anderson to authorities for

---

[3] Perhaps recognizing that his relevant conduct for loss started earlier than 2013, Anderson concedes that the entire amount invested by Thomas Whalen (Victim 1) should be considered loss even though Whalen began investing in 2010.  Def. Sent. Memo., at 16-17.  Anderson does not distinguish between Whalen's pre- and post-2013 investments because Anderson provided Whalen false documents to encourage his investment.  Yet with other victims who received Anderson's false documents, Anderson tries to differentiate between pre- and post-2013 investments.

1   his numerous lies.  *See generally* PSR ¶¶ 16-57.  Further, in calculating loss, the Court should not

2   distinguish between loans and direct investment.[4]  Anderson frequently roped in investors by soliciting

3   loans and then, when he could not repay the loans, converting them to Imbee shares.  PSR ¶¶ 16, 18, 27,

4   28, 35, 47.  Thus, Anderson ensnared even reluctant investors and then slowly bled the investors of

5   funds over several years.  *See, e.g.*, PSR ¶¶ 16-31, 46-49.  And to prevent investors from going to

6   authorities or taking other action against him, Anderson repeatedly promised to pay investors.  PSR ¶¶

7   30, 31, 41, 54.  Anderson even showed those investors checks he had written to them.  PSR ¶¶ 30, 31,

8   41, 54.  But Anderson's checks inevitably bounced because, as he knew, Anderson's bank accounts

9   lacked the necessary funds to cover the checks to investors.  Anderson's nearly 10 years of fraudulent

10  acts are relevant conduct that caused investors to lose the entirety of what they invested with Anderson

11  minus what he returned to them.

12          **C.      Anderson's Loss Amount is the Investor-Victims' Net Loss**

13          Anderson incorrectly argues that he is only responsible for loss where a victim invested with

14  Anderson based on a false statement made directly to that victim.  Def. Sent. Memo., at 4 n.9 (citing

15  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005), for the proposition that there must be a

16  "causal connection between the material misrepresentation and the loss"), 8 ("it has not been supported

17  that Mr. Anderson was engaging in fraudulent representations associated with Imbee to induce the

18  Clovis' to invest"), 9 ("it has not been supported that Mr. Anderson was engaging in fraudulent

19  representations specifically to the Grossmans' [*sic*] to induce the Grossmans' [*sic*] to invest").

20  Anderson misstates the law.

21          In the Ninth Circuit, investors' net loss is a reasonable estimate of loss for an investment fraud or

22  Ponzi scheme where the underlying company is essentially worthless.  *See United States v. Laurienti*,

23  611 F.3d 530, 558 (9th Cir. 2010) ("If the underlying company was worthless or practically worthless, it

24  is reasonable to use the total investment cost as the actual loss.") (discussing *United States v. Zolp*, 479

25  F.3d 715, 717-19 (9th Cir. 2007)).  As the Guidelines and caselaw make clear, a reasonable estimate of

26  loss is all that is required; the Court need not tie a specific misstatement to each investors' investment to

27

28          [4] The government has already credited money Anderson returned, including loan amounts returned.

USA REPLY TO DEF. SENT. MEMO
CASE NO. CR. 21-397 EMC                    4

1   calculate the defendant's loss.  *Id.* at 557 (rejecting defense argument that of the 100 victims in the case

2   loss could only come from the losses of the 30 victims investigated by the government).  Put differently,

3   for a given investor-victim, "it is the net loss … that truly accounts for the actual loss to the victim as a

4   result of the scheme to defraud."  *Id.* (citing *United States v. Orton*, 73 F.3d 331, 334 (11th Cir. 1996)

5   ("holding that, in calculating loss from a Ponzi scheme, the district court correctly calculated the net loss

6   to the losing victims").

7           Here, net actual loss to investor victims is the most reasonable estimate of loss under the

8   Guidelins based on the available evidence.  As the PSR describes, Anderson's companies were so

9   infused with his fraud that by the time the fraud was discovered Imbee and its related companies were

10  essentially sham companies.  *See United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007) ("Prior cases

11  – and common sense – suggest that a security could be literally worthless after the fraudulent scheme is

12  exposed if the fraudulent scheme involves a 'sham' company.").  Anderson's companies were not

13  publicly traded, and they had no underlying equity.  By the time Anderson's fraud was uncovered, his

14  companies had "no activities, assts, facilities, or any other source of value."  *Id.*  Anderson's fraudulent

15  conduct caused all investments to become worthless.  *See United States v. Laurienti*, 611 F.3d 530, 558

16  (9th Cir. 2010) ("If the underlying company was worthless or practically worthless, it is reasonable to

17  use the total investment cost as the actual loss.") (discussing *United States v. Zolp*, 479 F.3d 715, 717-19

18  (9th Cir. 2007)).  "The proper focus is on the amount of loss for a particular victim."  *Id.*

19          Anderson's continued lies to investors about acquisitions, partnerships, and business deals

20  infused Imbee and Fanlala with fraud to the point that the companies were nothing except for

21  Anderson's false representations about business deals and pending acquisitions.  Imbee's shares were

22  not publicly traded, and Anderson hid truthful information about revenue and expenses from investors.

23  Anderson even hid truthful information about Imbee's ownership structure.  By the time Anderson's

24  fraud came to light, the only value was what Anderson had falsely told investors.  For example, in

25  November 2016, Anderson told investor-victim Randy Renfro that a Fuhu executive wanted to buy

26  Imbee for $21.6 million.  This was false.  Nonetheless, Anderson followed up on that conversation with

27  an email to Renfro falsely representing that Renfro owned 70% of a company worth $21.6 million.  PSR

28  ¶ 42.  The PSR details a steady stream of Anderson's false statements to 14 investor-victims.  Given the

1  sheer volume of Anderson's uncontested false statements about pending acquisitions, partnerships, and

2  business deals described in the PSR, "it is reasonable to infer that all [investors in Anderson's entities]

3  were duped by the [fraud]." *Laurienti*, 611 F.3d at 557.

4         Anderson incorrectly suggests that the Court should rely on *Dura Pharm., Inc. v. Broudo*, 544

5  U.S. 336, 341-42 (2005), and find loss only where there is "causal connection between the material

6  misrepresentation [to a specific investor-victim] and the loss [suffered by that victim]." Def. Sent.

7  Memo., at 4 n.9.  But the Ninth Circuit explicitly has "not applied *Dura Pharmaceuticals*'s strict loss

8  causation standard to criminal fraud cases." *United States v. Berger*, 587 F.3d 1038, 1043 (9th Cir.

9  2009).  Instead, the Ninth Circuit has "endorsed a more general loss causation principle, permitting a

10  district court to impose sentencing enhancements only for losses that resulted from the defendant's

11  fraud." *Id.* (quoting *Hicks*, 217 F.3d at 1048 (internal quotations omitted).  This is so because "[t]he

12  Guidelines' relevant conduct provision requires a defendant's sentence to be based on all harm that

13  resulted from the acts or omissions of the defendant." *Id.* (internal citations and quotations omitted).

14  Under the Guidelines' relevant conduct guidance, Anderson must be held accountable for all of the harm

15  he caused as part of his Imbee fraud scheme.  The only way to fairly and reasonably account for the

16  harm Anderson caused is to use net loss of more than $10 million.

17         Anderson also suggests that the Court treat his Imbee fraud scheme as a "pump-and-dump" case

18  involving an otherwise legitimate company where shares in the company have residual value following

19  discovery of the fraud scheme.  Def. Sent. Memo., at 4 & n.9 (citing *United States v. Bakhit*, 218

20  F.Supp.2d 1232 (C.D. Cal. 2002).  But Anderson's non-public companies had no residual value after

21  discovery of the fraud scheme.  Unlike the publicly-traded company with a share price of $5 per share

22  after the fraud at issue in *Bakhit*, 218 F.Supp.2d at 1236-37, Imbee and its related

23  companies were not publicly traded and had no value after discovery of Anderson's fraud.  All of

24  Imbee's supposed value was based on Anderson's lies about acquisitions, deals, and revenue.  In 2016,

25  for example, Anderson emailed several long-time investors about past struggles but encouraging

26  optimism and continued investment because: "we have a set of strategic initiatives that Fuhu and Mattel

27  are partnering with us on, and we are excited about the future with Fuhu/Mattel."  PSR ¶ 14.  These

28  were blatant lies.  Fuhu had gone bankrupt and after purchasing Fuhu out of bankruptcy Mattel was

1  phasing out the Nabi tablet that had used Anderson's products in the past.  PSR ¶ 14.  Meanwhile,

2  Anderson was forging the signature of a former Fuhu executive on fake revenue agreements and sharing

3  the fake contracts with investors to keep the fraud scheme going.  PSR ¶ 24.

4       Anderson lied to induce investors to invest, he lied to investors to keep them invested in his

5  companies rather than seeking to withdraw funds, he lied to investors so that they would think that his

6  companies had prospects for success, and he lied to investors to stop them from going to authorities or

7  taking action against him.  Anderson's fraud is more like a Ponzi scheme involving a sham company

8  than a "pump-and-dump" involving an otherwise legitimate company.  In fact, similar to a Ponzi

9  scheme, Anderson routinely solicited new investments to pay a prior investor who had finally had it with

10 Anderson's stall tactics and failure to repay.  For example, Anderson claimed to one victim (Jack

11 Dilley), that another investor wanted to sell his shares rather than provide them to the investor's wife in

12 a divorce proceeding.  PSR ¶ 47.  He told another victim (George Symmons) that an existing investor

13 wanted to sell his equity and because Imbee was facing financial difficulty at the time, Anderson was

14 pleased to offer the shares to G.S. at a good price.  PSR ¶ 50.  In essence, Anderson robbed Peter to pay

15 Paul, the key feature of a Ponzi scheme.  That Imbee and the related companies did some nominal

16 amount of legitimate work is insufficient to find that the companies held any identifiable value.

17      Ultimately, the entire endeavor was tainted by Anderson's lies.  Starting in 2010, Anderson told

18 numerous investors that Imbee and its related companies had promising partnership deals or would

19 imminently be acquired.  Anderson continued these lies through discovery of the scheme.  His

20 companies were not publicly traded.  They had no intrinsic value to shareholders.  Once Anderson's

21 fraud was discovered, his companies were worthless.  Discounting any investments from loss would

22 result in a windfall to Anderson that effectively would allow him to dodge responsibility for his criminal

23 conduct.

24      **D.      Anderson Incorrectly Calculates Individual Victim Losses**

25      Anderson tries to dodge responsibility for the harm caused by his fraud scheme by limiting the

26 date range of his relevant conduct and asking the Court to only attribute loss to Anderson where it can

27 be shown that he made a material misrepresentation to induce investment.  As discussed in detail above,

28 Anderson's limitations on loss are legally and factually wrong.  Anderson essentially asks the Court to

ignore approximately 40% of the economic loss caused by his conduct. Anderson further asks the Court to ignore the fact that his decade-long stream of lies and fake documents infected Imbee, Fanlala, and Anderson's related companies with so much fraud that even if the companies had had any value in the early 2010s they were worthless by the time Anderson's fraud came to light.

Based on the available evidence, and, in particular the FBI's analysis of Anderson's bank records, including multiple bank accounts Anderson held for Imbee, Fanlala, and his related companies, the government urges the Court to adopt net loss as the measure of both (1) loss under the Guidelines and (2) restitution to victims. The government's (and defendant's) view of loss and restitution are set forth below:

| Victim-Investor | Government Loss Calculation | Defense Loss Calculation | Government Restitution Calculation & (Defense Calculation) |
|---|---|---|---|
| Ace Home Health Care Hospice Inc./ Lorenzo Friar | $80,000 | $70,000 | $80,000 ($70,000) |
| Andy Myers | $510,120 | $0 | $510,120 ($0) |
| Anil Patel/Wine Country Hospitality | $0[5] | $0 | $0 (same) |
| Anant Patel | $117,198 | $32,248 | $117,198 ($32,248) |
| Anthony E Zuiker | $337,850 | $280,637.50 | $337,850 ($280,637.50) |
| Brenda J Pannell | $21,650 | $0 | $21,650 ($0) |
| Clark Colvis/Linda Colvis | $300,000 | $0 | $300,000 ($0) |
| David Grossman/Neil Grossman | $233,205.83 | $0 | $233,205.83 ($0) |
| Deborah Pierson/Pierson D | $0 | $0 | $0 (same) |
| Diane Anderson | $44,787.52 | $0 | $44,787.52 ($0) |
| Dipak Patel/Dipak 2007 Living Trust | $12,000 | $0 | $12,000 ($0) |
| Dilley Design Inc/Jack and Reanne Dilley | $222,053 | $166,721 | $222,053 ($166,286) |

[5] FBI lists loss as negative $1,300. The government credits that amount toward Anderson's total loss amount under the Guidelines and credits $1,300 toward restitution for Patel's Hawthorn Suites by Wyndham.

| Edward/Julia Delorme | $37,500 | $0 | $37,500 ($0) |
|---|---|---|---|
| George J Symons | $472,390 | $501,090 | $472,390 ($501,090) |
| Greg Cham | $2,729.07 | $0 | $2,729.07 ($0) |
| H + H Assets LLC | $172,500 | $0 | $172,500 ($0) |
| Hawthorn Suites by Wyndham | $22,200 | $8,100 | $20,900[6] ($8,100) |
| Howard Silverman | $1,115,802.17 | $0 | $1,115,802.17 |
| Kelsey McCann | $69,804 | $69,804 | $64,803 (same)[7] |
| Mark Coleman | $25,000 | $0 | $25,000 ($0) |
| Michelle Fields | $0 | $0 | $0 (same) |
| Phillip Darren Buchanon | $34,000 | $0 | $34,000 ($0) |
| Rajool Patel | $110,000 | $0 | $110,000 ($0) |
| Randy C Renfro/Ocean Front Equity LP/Capital City Leasing & Management/Hunter Renfro | $2,396,094 | $2,326,152 | $2,396,094 ($2,326,152) |
| Ray Matheny | $17,000 | $0 | $17,000 ($0) |
| Richard Petzold | ($673) | $4,300 | $0 (same) |
| Richard Toriggino | ($22,266.89) | $26,797.90 | $0 ($26,797.90) |
| Richard/Larry Hess; Hess Construction | $102,860 | $0 | $102,860 ($0) |
| Rodney E Maher/Angela Maher | RE Maher Inc | $1,329,073 | $708,273.11 | $1,329,073 ($685,311.11) |
| RPM001 Intella Capital/Sushil Patel | $10,000 | $0 | $10,000 ($0) |
| Samit Channa | $106,395.69 | $18,708 | $106,395.69 ($18,708) |
| Siobhan Delfani/Moe Delfani | $100,365 | $30,365 | $100,365 ($30,365) |
| The Entrust Group/Phillip Wall | $25,000 | $0 | $25,000 ($0) |
| The Jones & Royce Revoc Trust | $200,000 | $0 | $200,000 ($0) |

[6] This includes a $1,300 credit for Anderson's repayment to Patil as discussed above.

[7] This reflects $5,001 returned to McCann by Anderson per Anderson's sentencing memorandum, Def. Sent. Memo., at 12, not accounted for by the FBI's analysis.  Exhibit 1.  The government credits this difference to Anderson.

| Theodore Kloth/Mary Kloth | $108,337 | $0 | $108,337 ($0) |
|---|---|---|---|
| Thomas A Whalen Jr | $1,008,005.23 | $1,191,560.10 | $1,008,005.23 ($679,250.19) |
| Vickie Jackson | $11,886.32 | $0 | $11,886.32 ($0) |
| Vijay Patel | $701,135.19 | $18,708 | $701,135.19 ($18,708) |
| Vikrant Patel | $62,121 | $0 | $62,121 ($0) |
| Viran Nana/Viren Patel | $25,000 | $0 | $25,000 ($0) |
| **Total** | **$10,119,822.13** | **$5,999,491.80** | **$10,114,821.13[8]** |

### 1.    Ace Home Health Care Hospice Inc./ Lorenzo Friar

Anderson agrees that he caused this victim $70,000 in loss.  Def. Sent. Memo., at 6.  However, Anderson's review of relevant records misses a second investment of $10,000 in 2015 by this victim, whose loss and restitution should be $80,000 based on the available evidence.  *See* Exhibit 1, Loss Analysis & FBI 302.

### 2.    Andy Meyers

Anderson claims that his fraudulent conduct did not cause Meyers to lose $510,120.  Def. Sent. Memo., at 6.  In 2011, Meyers sold Fanlala to Imbee and Anderson for a combination of Imbee stock and cash.  *See* Exhibit 3, Andrews Meyers Documents (filed under seal); Def. Sent. Memo., Exhibit A, at 12.  But as with other victims, Anderson was inducing Meyers into a deal with a fraudulent entity, Imbee.  As discussed in detail above, by the time of Anderson's 2011 deal with Meyers, Anderson's fraud scheme had already started.  Anderson was inducing Meyers to buy into a fraudulent company, and Anderson had no prospect of being able to pay Meyers the $510,000 cash portion of the purchase price because Imbee was not generating sufficient revenue.  The parties do not dispute that Meyers paid Anderson $510,000 in August 2011; they dispute whether Anderson's loss is relevant conduct for the purposes of loss.  The government's position is that because Anderson knowingly induced Meyers into a deal with a fraudulent entity, Imbee, Meyers's loss is relevant conduct under the Guidelines and should be counted toward restitution.

---

[8] Total restitution is net loss less the $5,001 returned to Kelsey McCann.

### 3. Anil Patel/Wine Country Hospitality

The government agrees with the defense that Anderson repaid Anil Patel and therefore that Patel suffered no loss.  *See* Exhibit 1, Loss Analysis & FBI 302.

### 4. Annat Patel

Patel invested with Anderson via three wires in 2012 and one wire in 2015.  *See* Exhibit 1, Loss Analysis & FBI 302.  Anderson incorrectly contends that Patel's investments only count as loss if made in 2013 or later.  For the reasons discussed above, all four of Patel's investments with Anderson, which total $117,198, should be counted toward loss and restitution because Anderson's relevant fraudulent conduct started in 2010, spanned the entirety of his ownership and management of Imbee, and caused Patel's investment losses.  Anderson concedes that there was no repayment of Patel's investments.

### 5. Anthony Zuiker

Zuiker invested $337,850 with Anderson's companies via five separate wire transfers in 2014 and 2015.  *See* Exhibit 1, Loss Analysis & FBI 302.  This is the correct loss and restitution amount. Anderson tries to discount Zuiker's loss by $57,212.50, which, he claims, Zuiker invested as part of a joint venture between Zuiker and Anderson's company, Fanlala.  Def. Sent. Memo., at 8.  As discussed in detail above, Anderson was inducing Zuiker to invest in Anderson's fraudulent (essentially sham) companies and therefore the $57,212.50 Zuiker invested as part of the joint venture should be considered loss and counted toward restitution.

### 6. Brenda Pannell

The parties do not dispute the Pannell invested $21,650 with Anderson in August 2011. Anderson claims this investment is not loss because it came before his fraud started in 2013.  As discussed in detail above, Anderson's fraud started in 2010 and, moreover, his continued fraud caused all earlier investments to completely fail.  Pannell's investment should be credited toward both loss and restitution.

### 7. Clark Colvis/Linda Colvis

Anderson claims that the Colvis investment losses should not count as relevant conduct or restitution because their investments were made in 2011.  Anderson is wrong.  The Colvis investments totaled at least $300,000.  They lost their investment based on Anderson's fraud because, as discussed

above, Anderson's companies were essentially sham companies or became sham companies because of his fraudulent conduct. *See* Exhibit 1, Loss Analysis & FBI 302; Exhibit 2, Colvis Documents (filed under seal); PSR ¶ 37. As discussed above, Anderson's Imbee fraud started in 2010. And at the time Colvis was investing in 2011, Anderson was blatantly lying to Colvis in connection with his Imbee investments.

As discussed above, Anderson sent Colvis an email on September 13, 2011, filled with false statements about Imbee's purported deal with YouTube/Google, including that Imbee would be signing a "YouTube/Google deal", that Imbee would be given a $1.5 million grant, and that "YouTube/Google [had] first right of refusal on acquiring imbee, with a floor price set at $62,500,000 (epic!)." PSR ¶ 37; Exhibit 2, Colvis Documents. And, as discussed above, Anderson amplified the fraudulent misstatements about the impending deal by pressuring Clovis to accept a special, limited time investment offer only available because a different investor supposedly dropped out "at the last minute." PSR ¶ 37; Exhibit 2, Colvis Documents. Anderson caused the Colvises to lose $300,000 in investments, which should be counted toward Anderson's loss and restitution.

### 8.    David Grossman/Neil Grossman

The Grossmans invested $233,205.83 with Anderson via five separate wire transfers in 2013 and 2014. *See* Exhibit 1, Loss Analysis & FBI 302. Anderson claims their investments should not count as relevant conduct because there is no evidence that Anderson made fraudulent representations directly to the Andersons to induce their investment. Def. Sent. Memo., at 9. As discussed in detail above, Anderson's claims are legally and factually wrong. Anderson's fraud started in 2010, and he caused the Grossman's to lose their $233,205.83 investment. This amount is attributable to Anderson for loss under the Guidelines and should be paid in restitution.

### 9.    Diane Anderson

The parties agree that Diane Anderson invested $100,000 with the defendant on June 28, 2010, and that the defendant returned $55,212.48 to Ms. Anderson prior to detection of the fraud. *See* Exhibit 1, Loss Analysis & FBI 302. However, the defendant contends that Ms. Anderson suffered no loss because she invested prior to 2013. As discussed in detail above, the defendant is incorrect. Investments into Imbee and the defendant's companies prior to 2013 should be considered loss under

relevant conduct.  Ms. Anderson's loss attributable to the defendant is $44,787.52, which is also the amount that should be paid in restitution.

### 10.     Dipak Patel/Dipak Patel Living Trust

Patel invested with Anderson twice – $20,000 in 2011 and $25,000 in 2012.  *See* Exhibit 1, Loss Analysis & FBI 302.  Anderson returned $33,000; therefore, Patel's loss is $12,000.  *Id.*  Anderson claims Patel's loss is zero because he invested prior to 2013.  As discussed above, Anderson's relevant conduct includes investments solicited as early as 2010.  Patel's loss and restitution amount is $12,000.

### 11.     Dilley Design Inc./Jack and Reanne Dilley

Anderson concedes that his loss due to the Dilleys' investment is $166,286.  Def. Sent. Memo., at 10; *see also* Exhibit 1, Loss Analysis & FBI 302.   However, the Dilleys provided additional investor documents, check copies, and contracts of their investments to the FBI showing $55,332 in additional investments with Anderson.  *Id.*  Accordingly, their total loss and restitution amount is $222,053.

### 12.     Edward/Julia DeLorme

The DeLormes invested $37,500 with Anderson via two wire payments in December 2010.  *See* Exhibit 1, Loss Analysis & FBI 302.  Anderson claims these payments are not relevant conduct because they were made prior to 2013.  For the reasons discussed above, Anderson caused the DeLormes to lose their $37,500 investment and it should be considered loss for the purposes of relevant conduct and restitution.

### 13.     George Symmons

The government's loss figure for Symmons is slightly less than the loss figure proposed by Anderson.  The government urges the Court to find that the government's loss figure ($472,390) is correct.  *Id.*  The parties disagree regarding restitution.  The government contends that Symmons' loss amount should also be his restitution amount because Anderson's conduct caused Symmons' $472,390 in losses.[9]

---

[9] Anderson, on the other hand, contends that Symmons' loans do not count toward restitution and that Symmons is only entitled to $137,308 in restitution, but this ignores the fact that Anderson caused Symmons' losses.

### 14.   Greg Cham

Cham invested $49,081.84 on September 1, 2015, and Anderson returned 46,352.77 of that investment.  *Id.*  Cham's loss and restitution amount should be $2,729.07.  *Id.*  Anderson concedes that Cham made his investment during the fraud period but contends that he did not cause Cham's losses because there is no evidence in the record that Anderson made a false statement directly to Cham to induce him to invest.  For the reasons stated above, that is not the correct legal standard.  Cham's loss and restitution amount should be $2,729.07.

### 15.   H + H Assets LLC

Anderson claims that the $172,500 invested by this investor-victim via three separate wires in 2011 and 2012, *see id.*, do not count as loss or restitution because the investments were made before 2013.  For the reasons stated above, Anderson's fraud started in 2010 and caused all investors in his companies to lose their net investment.  The loss and restitution figure for this victim is $172,500.

### 16.   Hawthorn Suites by Wyndham

Anderson does not contest that this entity invested $22,200 with Anderson via two payments, one in 2013 and a second in 2015.  Def. Sent. Memo., at 11.  Anderson also admits that these investments are properly counted as loss and restitution.  *Id.*  But he argues that he deserves credit against loss for repayments to Anil Patel, who is associated with Hawthorn Suites by Wyndham.  The government has credited all but $1,300 returned from Anderson to Patel in his individual capacity and therefore Patel has zero loss or restitution.  The government credits the remaining $1,300 toward Anderson's loss amount and believes that the restitution to Hawthorn Suites by Wyndham should be reduced by the $1,300.  Therefore, total loss and restitution for this victim is $20,900.

### 17.   Howard Silverman

From 2013-2015, Silverman invested $1,115,802.17 with Anderson and his companies via 10 separate wires.  *See* Exhibit 1, Loss Analysis & FBI 302.  For the reasons discussed in detail above, Anderson's fraudulent conduct caused Silverman to lose his investment and therefore Silverman's loss should be accounted for in Anderson's relevant conduct and for purposes of restitution.[10]

---

[10] Anderson further notes that Silverman had previously been the owner of Cosmic Toast, an animation studio.  Def. Sent. Memo., at 11.  A separate individual took over Cosmic Toast from Silverman and then Imbee acquired Cosmic Toast, and, in February 2015, Anderson began running it.

### 18.   Kelsey McCann

The government agrees with Anderson that loss attributable to McCann's investment is $69,804 and that her restitution should be $64,803 due to payments by Anderson.

### 19.   Mark Coleman

Coleman invested $25,000 with Anderson on November 12, 2010.  *See* Exhibit 1, Loss Analysis & FBI 302.  For the reasons stated above, the government contends that this is relevant conduct for loss and should be counted toward restitution.  Anderson claims the investment was made before 2013 and therefore is not relevant conduct are not supported by fact or law.

### 20.   Michelle Fields

The government agrees with Anderson that Ms. Fields loaned Anderson $9,000 based on their personal friendship and that the loan was not connected to investments in Imbee or Anderson's companies.  The $9,000 should not count toward loss or restitution.

### 21.   Phillip Buchanon

Buchanon invested $34,000 via one wire on November 8, 2011.  *Id.*  Anderson claims the investment pre-dated the fraud.  For the reasons discussed above, the government contends that the investment is both loss and restitution.

### 22.   Deborah Pierson

The government agrees with the defense that there is no loss or restitution associated with Pierson.

### 23.   Rajool Patel

Patel invested $110,000 with Anderson in 2012 via two separate wires.  *Id.*  For all the reasons discussed in detail above, the government believes sufficient evidence exists to establish that Anderson caused Patel's $110,000 in losses, which should also count toward restitution.

### 24.   Randy Renfro/Ocean Front Equity LP/Capital City Leasing

Anderson agrees that Renfro's investments are relevant conduct of loss and subject to restitution.

---

Def. Sent. Memo., Exhibit A, at 295; PSR ¶ 49.  As with his other companies, Anderson ensnared Cosmic Toast in his fraud.  In early 2016, investor-victim Jack Dilley visited Cosmic Toast's studios and learned that its animators were not being paid.  PSR ¶ 49.  Cosmic Toast was failing.  *Id.*  But Anderson emailed Dilley a false profit and loss statement showing Cosmic Toast turning a $153,000 profit.  *Id.*

1  The government calculates Renfro's net loss and amount for restitution to be approximately $70,000

2  higher than calculated by Anderson: $2,396,094 vs. $2,326,152.  *Id.*

3            **25.   Ray Matheny**

4       Matheny invested $17,000 with Anderson via two wires in 2012.  *Id.*  Anderson contends this

5  investment predates the fraud; the government contends the investment falls within the time period for

6  relevant conduct and should be included as fraud loss and restitution.

7            **26.   Richard Petzold**

8       The government agrees with Anderson that Petzold's $4,300 payment should count toward loss

9  but not restitution because Anderson repaid Petzold.  However, in an abundance of caution and for the

10  purposes of arriving at a reasonable estimate of loss, the government has credited Anderson with all

11  repayments to investors.  *Id.*  Therefore, neither the government's loss calculation nor restitution

12  calculation includes Petzold's investment.  This does not impact Anderson's Guidelines range or the loss

13  enhancement U.S.S.G. § 2B1.1(b)(1).

14            **27.   Richard Toriggino**

15       While the defense believes that Toriggino's $26,797 investment should be counted toward loss

16  and restitution, the government has reviewed evidence that Anderson repaid Toriggino more than his

17  full investment.  Accordingly, the government does not attribute loss or restitution to this investment.

18  *Id.*

19            **28.   Richard/Larry Hess/Hess Construction**

20       From 2013 to 2016, the Hesses invested $233,060 with Anderson.  *Id.*  Anderson returned

21  $130,200.  *Id.*  Based on the detailed discussion above, the government believes Anderson caused the

22  Hesses to lose $102,860, which represents both loss and restitution connected to this group of investors.

23            **29.   Rodney Maher/Angela Maher/RE Maher Inc.**

24       From 2011 through 2015, the Mahers made approximately 22 separate investments with

25  Anderson and his companies totaling $1,417,073.11.  *Id.*  Anderson repaid approximately $88,000.  *Id.*

26  The Maher's net loss therefore is $1,329,073, which, for the reasons discussed in detail above, should be

27  the loss and restitution figures attributable to these investors.

28

### 30. RPM Intella Capital/Sushil Patel

Patel invested $10,000 with Anderson on November 18, 2010. *Id.* For the reasons discussed above, the government contends that this is relevant conduct for the purposes of loss and should also be counted toward restitution.

### 31. Samit Channa

Channa invested $131,700 with Anderson in seven separate transactions spanning 2011 through 2013. *Id.* Anderson returned approximately $25,304.31 to Channa, resulting in a net loss of $106,395.69. *Id.* For the reasons discussed above, the government contends that Channa's net investment loss is relevant conduct for the purposes of loss and should be paid in restitution.

### 32. Siobhan & Moe Delfani

From 2013 through 2015, the Delfanis invested $390,735 with Anderson and his companies via eight separate transactions. *Id.* Anderson returned $290,370. *Id.* Accordingly, the Delfanis net loss is $100,365. Anderson's attempt to distinguish between pre- and post-2013 investments is not supported by law or the facts of this case. The Delfanis net loss of $100,365 should be counted toward both loss and restitution.

### 33. The Entrust Group/Phillip Wall

Wall invested $25,000 with Anderson and his companies on May 9, 2011. *Id.* Anderson contends that this investment predated the fraud; the government counters that Anderson's fraud started in 2010 and that his conduct caused Wall's losses. Therefore, Wall's $25,000 investment should be counted toward Anderson's loss amount and restitution.

### 34. The Jones & Royce Revocable Trust

The trust wired $200,000 to Anderson and his companies via separate transactions in February and November 2012. *Id.* Anderson contends that this investment predated the fraud; the government counters that Anderson's fraud started in 2010 and that his conduct caused the Trust's losses. The Trust's $200,000 and should be counted toward Anderson's loss amount and should be paid in restitution.

### 35. Theodore Kloth MD/Mary Kloth

The Kloths invested $114,617 with Anderson and his companies via two transactions in 2014

and 2015. *Id.* Anderson returned $6,280 to them. *Id.* Their net loss is $108,337. *Id.* Anderson claims that this amount should not count toward loss because there is no evidence he made a material misrepresentation to the Kloths to induce their investment. The government contends that Anderson's companies were part of an ongoing fraud scheme involving essentially sham companies and that net investment is the most reasonable estimate of loss. Accordingly, the Kloths' net loss should be counted toward Anderson's loss and restitution.

### 36.   Thomas Whalen

Anderson concedes that the entirety of Whalen's investment, made over approximately 30 separate transactions from 2010 through 2015 should be counted toward Anderson's loss. Anderson concedes that restitution to Whalen should be his net loss (loss less repayments). The government calculates Whalen's net loss to be $1,008,005.23, *id.*, which should be Anderson's loss amount and should be paid in restitution.

### 37.   Vickie Jackson

Jackson's net actual loss is $11,886.32. *Id.* Anderson claims that because the evidentiary record contains no evidence of him making a false statement to Jackson to induce investment and therefore that Jackson's net loss should not be counted as his loss under the Guidelines. As discussed in detail above, Anderson's caused Jackson's net loss and he should be held accountable for it under the Guidelines and as restitution.

### 38.   Vijay Patel

In 2013 and 2015, Patel invested $701,135.19 with Anderson and his companies via nine separate payments. *Id.* Anderson contends that only the two payments in 2015 constitute loss under the Guidelines. As discussed in detail above, Anderson's conduct caused Patel's full losses. Anderson returned no money to Patel. Patel's full investment of $701,135.19 should be counted towards Anderson's loss under the Guidelines and should be paid in restitution.

### 39.   Vikrant Patel

Patel invested $62,121 with Anderson and his companies in early 2012. *Id.* Anderson contends that this predates his fraud scheme. As discussed above, the government counters that Anderson's fraud started in 2010 and that his conduct caused Patel's losses. Therefore, Patel's $62,121 investment should

1  be counted toward Anderson's loss amount and restitution.

2       **40.    Viran Nana/Viren Patel**

3       In February 2011, Nana/Patel invested $25,000 with Anderson and his companies.  *Id.*  Anderson

4  argues that he did not make materially false statements to these investors to induce their investment.  For

5  the reasons discussed above, Anderson's fraud started in 2010 and caused Nana/Patel to lose their

6  $25,000 investment.  Accordingly, the $25,000 investment should be counted toward Anderson's loss

7  amount and restitution.

8  **II.    A Downward Departure is Not Warranted**

9       Anderson incorrectly claims that the loss enhancement in this case bears no relation to his actual

10  culpability.  Def. Sent. Memo., at 23.  The facts of this case prove Anderson wrong.  Anderson duped

11  more than 40 friends, neighbors, and acquaintances into investing over $10 million with him.  These

12  were not sophisticated investors.  All but a four invested less than $1 million.  The vast majority

13  invested less than $500,000.  Anderson essentially stole the hard-earned savings and retirement funds of

14  his community.  Anderson's sentence must account for the fact that he targeted non-sophisticated

15  investors in his community and drained their hard-earned savings.

16       Likewise, Anderson's citation to *United States v. Blanchet*, 518 F. App'x 932, 955 (11th Cir.

17  2013), in which the defendant fraudulently obtained a government contract but performed the work

18  required by the contract, is not applicable.  This is not a government contract fraud case.  Anderson did

19  not perform the work he promised.  Quite the opposite.  Anderson continuously lied about the state of

20  his companies for nearly a decade to induce investment and to prevent investors from withdrawing their

21  investment.  Anderson provided no value to his investors and no return on their investment.  Anderson's

22  loss enhancement under the Guidelines correctly accounts for the harm he caused.

23       Further, Anderson's citation to nationwide fraud statistics do not account for the unique

24  circumstances of this particular case.  Anderson does not cite to cases in which the defendant committed

25  a $10 million fraud after having been previously convicted of committing an earlier fraud.  Nor does

26  Anderson account for the fact that he used the same *modus operandi* to commit both frauds.  The PSR

27  indicates that fraud defendants like Anderson facing Total Offense Level 29, Criminal History Category

28  II, and a Guidelines range of 97-121 months receive an average sentence of 75 months and a median

sentence of 81 months.  PSR ¶ 123.

Given the fact that Anderson committed the nearly decade-long fraud in this case in the prime of his professional life, after having been convicted and sentenced for a substantially similar crime, despite the advantages of his stable upbringing and supportive family, Anderson's extremely limited and troubling lack of acceptance of responsibility, and his targeting susceptible members of his community and draining $10 million of their hard-earned savings, a sentence of 108 months is sufficient but not greater than necessary to achieve the purposes of sentencing.

**III.    Conclusion**

For the reasons stated above, the government respectfully requests that the Court sentence defendant Alan Anderson to 108 months in prison and a three-year term of supervised release.  The Court should also order restitution of $10,114,821.13 to the 40 victims of Anderson's crime and order that he pay a special assessment of $200.

DATED: September 6, 2024                                   Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

_____/s/_____
SAILAJA M. PAIDIPATY
CHRISTIAAN H. HIGHSMITH
Assistant United States Attorneys