Pages 1 - 99

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) **NO. 3:21-CR-00397-EMC** |
| | ) |
| ALAN ANDERSON, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

San Francisco, California
Friday, September 13, 2024

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES:**</u>

For Plaintiff:
                        ISMAIL J. RAMSEY
                        UNITED STATES ATTORNEY
                        450 Golden Gate Avenue, 11th Floor
                        San Francisco, California 94102
                   BY:  **CHRISTIAN H. HIGHSMITH**
                        **ASSISTANT UNITED STATES ATTORNEY**

For Defendant:
                        JODI H. LINKER
                        FEDERAL PUBLIC DEFENDER
                        450 Golden Gate Avenue
                        Room 19-6884, Box 36106
                   BY:  **CANDIS L. MITCHELL**
                        **ASSISTANT FEDERAL PUBLIC DEFENDER**

Also Present:          **Melissa Moy, U.S. Probation**
                       **Anthony Zuiker**
                       **George Symons**
                       **Thomas A. Whalen**
                       **Peggy Whalen**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

```
1    Friday - September 13, 2024                        9:08 a.m.

2                          P R O C E E D I N G S

3                              ---oOo---

4              (Defendant present, out of custody.)

5              THE CLERK:  Calling Criminal Action 21-397,

6    United States of America vs. Alan Anderson.

7          Counsel, please state your appearance, beginning with

8    the Government.

9              MR. HIGHSMITH:  Good morning, Your Honor.  Chris

10   Highsmith on behalf of the United States.

11             THE COURT:  All right.  Good morning, Mr. Highsmith.

12             MS. MITCHELL:  Good morning, Your Honor.  Candis

13   Mitchell on behalf of Mr. Anderson, who's present before

14   the Court on bond.

15             THE COURT:  All right.  Thank you, Ms. Mitchell.

16       Good morning, Mr. Anderson.

17             THE DEFENDANT:  Good morning.

18             MS. MOY:  And good morning.  Melissa Moy with

19   U.S. Probation standing in for Monica Romero.

20             THE COURT:  All right.  Thank you, Ms. Moy.

21       All right.  We are here for sentencing in this matter, to

22   which, as we all recall, there was a plea, I think, to two out

23   of the -- was it five counts or six counts?

24             MR. HIGHSMITH:  Correct, Your Honor, yes.

25             THE COURT:  Five counts.
```

 1          And I think there was an understanding and agreement

 2    reached that that would be permissible and Mr. Anderson would

 3    be able to proceed but that the losses, if any, in connection

 4    with the other counts would be considered as relevant conduct

 5    here.  And so that's going to be one of the big issues that we

 6    need to talk about.  Obviously, there's several rounds of

 7    briefing here.

 8          But I first want to make sure that Mr. Anderson has had a

 9    chance to review the Presentence Report and gone over that.

10          **MS. MITCHELL:**  Yes, Your Honor.

11          **THE COURT:**  And he's read that, and you've answered

12    all the questions he might have about that?

13          **MS. MITCHELL:**  Yes, Your Honor.

14          **THE COURT:**  Okay.  So I have a couple of preliminary

15    questions.

16          I don't see any description here as to what happened to

17    the money.  There's allegedly 11 -- 10 or 11 million dollars of

18    revenues or income that was collected, whether all that -- how

19    much of that counts for sentencing purposes, but there were

20    sort of two competing stories that I'm getting.

21          One is that there was an effort -- it was a legitimate

22    effort to start; it was a worthy cause; and then things started

23    not working out and so, to keep the enterprise afloat, more

24    money was raised, though through fraudulent representations.

25          But was this a situation where money kept going into the

1    company and it just kept going down and down and down or some

2    of it was used to repay other loans, et cetera, et cetera?  And

3    was any of it used for personal purposes?

4        So since the Government has --

5            **MR. HIGHSMITH:**  Yeah.

6            **THE COURT:**  -- the burden, I'd like to hear from you.

7            **MR. HIGHSMITH:**  Absolutely.

8        Let me take "Where did the money go?"  And then I'd also

9    like to address the Court's point about your hearing two

10   stories.

11           **THE COURT:**  Yeah.

12           **MR. HIGHSMITH:**  The money went to all the places that

13   the Court mentioned.  The money went to early days' business

14   expenses.  The money went to fund Mr. Anderson's living

15   expenses, his lifestyle.  At trial, we would have introduced

16   tracing testimony, showing that money went directly from

17   investors to his various personal expenses.

18       So it went to his lifestyle; it went to his family; it

19   went to business expenses; and some of it went to repay

20   other -- to repay investors or to -- some of it went to repay

21   investors; some of it -- this is why I mentioned it's akin to a

22   Ponzi scheme, is some of the money also went to go back --

23   you know, you bring money in, and then some of it would go out

24   to an investor who is complaining about "Hey, I need my money

25   back."

1          **THE COURT:**  Right.

2          **MR. HIGHSMITH:**  The thing -- then the Court said

3     there's two competing narratives.  I don't think they're

4     competing.  I think this is --

5          **THE COURT:**  Before you get to that --

6          **MR. HIGHSMITH:**  Yeah.

7          **THE COURT:**  -- I know the repayment numbers are in

8     here individually, but of the 10 or 11 million, what amount was

9     repaid or, compared to that, how much was repaid?

10         **MR. HIGHSMITH:**  818,000.  800,000.  A little bit more

11    than 800,000 was repaid to the identified victims.  So the

12    people who were identified as victims, the 40 victims that

13    the Government identified, $818,000 went back to them.

14      And we did not distinguish timeframe.  In an abundance of

15    caution and to credit the defendant, we said:  Look, for the

16    entirety of the time period, it's a credit against, because it

17    also doesn't move the -- in the Government's view, it doesn't

18    move the needle.  It's still that north of $9 1/2 million loss

19    amount.

20         **THE COURT:**  And in terms of the -- I don't think

21    there's any evidence of this.  Correct me if I'm wrong.

22    Between going back into the business versus supporting the

23    lifestyle of Mr. Anderson and his family is what percentage?  I

24    mean, do we have any --

25         **MR. HIGHSMITH:**  I don't have a percentage.

1          **THE COURT:**  You don't have that?

2          **MR. HIGHSMITH:**  No.

3          **THE COURT:**  Okay.

4          **MR. HIGHSMITH:**  But could I address the two stories?

5          **THE COURT:**  Yes.

6          **MR. HIGHSMITH:**  So I don't think it's two separate

7     stories.  I think what you have is you've got a business that

8     the defendant was putting money into; he's also paying himself;

9     but he's infusing the business with fraud by lying to get

10    money, lying to keep it, and then lying to stop his investors

11    from going to authorities, reporting him, et cetera.

12         So the point is, basically, over time --

13         **THE COURT:**  You're saying from the very outset, there

14    was lying to get money, even to fund the initial acquisition of

15    the first company and then, later, the other companies?

16         **MR. HIGHSMITH:**  Not -- I'm not -- I'm not alleging

17    lies to get the companies.  I'm not alleging he lied to get

18    Imbee.  I'm not alleging he lied to get Fanlala.  I'm not

19    making any allegations about Cosmic Toast.

20         What I'm saying is that he lied to the investors from the

21    beginning; he doubled down on those lies so that he would keep

22    their money; and then he kind of doubled down yet again to stop

23    them from going to authorities.

24         **THE COURT:**  Well, the initial -- would you concede

25    that there was as least some initial fundraising that was not

1    based on fraud?

2          **MR. HIGHSMITH:**  Yeah.

3          **THE COURT:**  And how do we -- I know different lines

4    were drawn.

5          **MR. HIGHSMITH:**  Yeah.

6          **THE COURT:**  But how do you draw the line when --

7    because there has to be some causal relationship between the

8    fraud and the money.  So if somebody put in money without any

9    solicitation, for instance, or any influence of anything that

10   was misrepresented, you can't count that.

11        So how do you -- given that there were -- I guess it was

12   escalating lies, in a sense, the way it looks, and at some

13   point it sort of got worse and worse.

14         **MR. HIGHSMITH:**  That's true.  He started more heavily

15   documenting the lies by forging, you know, the -- he starts

16   with the oral lies.  He goes and meets with investors over and

17   over, lies to them, but is savvy about handing over documents.

18   He's pretty savvy.  He doesn't hand over the profit and loss

19   statements, showing -- he doesn't hand over the acquisition

20   documents he's talking about.

21         **THE COURT:**  So there's an argument that withholding

22   material information -- fraud can be accomplished a number of

23   ways.  One is an affirmative lie; second is a half-truth; third

24   is omission when you have a duty to give.  You tell somebody

25   "I'm going to" -- "Here's the company," blah-blah-blah, but you

1    don't show them the actual loss sheets or the -- so that also

2    could constitute fraud.

3        But I do think in order to count in doing the guideline

4    calculation, there has to be some causation.  If somebody just

5    gave the money and there was no representation at all or

6    nothing to -- I guess that's the question.

7        I think the big question I have is kind of a legal

8    question.  And that is, I think we accept that there has to be

9    some causal relationship between some wrongful conduct, but it

10   could be omission.  It doesn't have been to be affirmative.

11       How much was showing, and how did the Government respond?

12   I guess it's gotten into sort of the weeds here, because with

13   each investor -- you each have briefed this, and some of it is

14   based on timing; some of it is based on, well, there's been no

15   showing that any misrepresentations have been made.

16       Does the Government have, for each of the amounts that

17   were contributed and obtained and accounted in the guideline

18   calculation, that there was some causal relationship to either

19   some omission, half-truth, or affirmative misrepresentation?

20       **MR. HIGHSMITH:**  In my view -- I a hundred percent

21   agree on the standard.  There must be some causal relationship.

22   I disagree that he has to affirmatively lie to a defendant in

23   order to get their money because, for the purposes of

24   relevant -- when you look at relevant conduct, the standard is

25   there must be some causal relationship.

```
 1            THE COURT:  So do you --

 2            MR. HIGHSMITH:  So --

 3            THE COURT:  Is it your position that there was some

 4    either half-truth -- not an affirmative lie but a half-truth or

 5    non-disclosure of a material fact as to each?

 6            MR. HIGHSMITH:  With all of them, there was a

 7    non-disclosure of a material fact, 100 percent, because he's

 8    constant- -- he's not telling them about the true condition of

 9    the company.  He's not telling them about the fact that the

10    deals don't exist.  He's not telling them about the lack

11    of profits.

12            THE COURT:  I'll just pull one out of the air -- not

13    out of the air but -- out of the briefs --

14            MR. HIGHSMITH:  Yeah.

15            THE COURT:  -- as an example.

16        I just turned to Mr. Coleman.  Mark Coleman invested in

17    2010.  They say -- there's an argument about sham company.  If

18    the whole thing was a sham to start with, then it's sort of

19    easy.

20            MR. HIGHSMITH:  But that's not my -- I'm not saying

21    that.  I'm saying it became a sham over time.

22            THE COURT:  Right.  But if, in the beginning, it

23    wasn't a sham company and there was no misrepresentation,

24    there's no causation.

25            MR. HIGHSMITH:  Hundred percent.
```

1        **THE COURT:**  So the defendant argues (as read):

2            "The Government offers no proof that

3        Mr. Anderson engaged in fraudulent representations to

4        encourage investment in this case."

5        What do you know?  What can you tell me?  Just as an

6    example, Mr. Coleman:  Was there some omission, for instance,

7    when funds were solicited from him?  There's a claim of $25,000

8    here.

9        **MR. HIGHSMITH:**  At the -- at the -- I mean, I don't

10   know exactly when he -- my point is not at the time that the

11   check gets -- my point is, I do not think the law requires

12   there to be a material omission or a lie at the time the check

13   is written.

14       **THE COURT:**  Oh, that's interesting.  So maybe we

15   should discuss that.

16       **MR. HIGHSMITH:**  Because if you --

17       **THE COURT:**  How do you square that with the causation

18   rule?

19       **MR. HIGHSMITH:**  Because the causation rule is not what

20   the defense -- it's not that strict.  It's not the causation --

21   it's not the causation in time.  It's not -- it's not about the

22   time of causation.  It's about -- it's a but-for causation.

23       If Alan Anderson hadn't omitted facts, lied continuously,

24   doctored all these documents, but for all of his activities,

25   that's what caused their loss.  His subsequent activities

1    caused their loss.  His subsequent fraud caused their loss.

2         **THE COURT:**  Well, the loss of somebody who invested --

3    let's say Investor Number 1, who invested without reliance on

4    something but it turned out to be a disaster because of --

5    you're saying -- the Government's theory is that because of his

6    later frauds, that's what sunk the company and that's why --

7    that's the causal connection between the initial good

8    investment and bad outcome.

9         **MR. HIGHSMITH:**  And also, you can't parse it -- you

10   can't parse it like the defense wants to parse it because the

11   lies infused these companies from the beginning.  So --

12        **THE COURT:**  Well, that's what I'm asking.  So here's

13   somebody early on.  It looks like -- according to this thing,

14   it says 2010.  I don't know when in 2010.

15       Had there been a lie at the time of his investment,

16   whether to him or anybody else?

17        **MR. HIGHSMITH:**  Oh, I'm sorry.  Okay.  So if we look

18   at the Whalens, their lie to the Whalens -- I put this in my

19   sentencing memo.  If we look at the lie to the Whalens early

20   on --

21        **THE COURT:**  And let me see.  Let me look at -- I don't

22   know which number -- I'm looking at the reply reply.  So I

23   want to --

24        **MR. HIGHSMITH:**  Sure.

25        **MS. MITCHELL:**  It's 3.36 on mine.

1        **THE COURT:**  3.36?

2        **MR. HIGHSMITH:**  Well, let's look at one of -- let's

3   look at one of --

4        **THE COURT:**  Okay.  Thomas Whalen.

5        **MR. HIGHSMITH:**  If we look at his -- if we look at --

6        **THE COURT:**  So there was continuing investments by

7   Mr. Whalen from 2010 into 2015.

8        **MR. HIGHSMITH:**  So that's -- I mean, that's the other

9   thing.  That's a separate issue, but I think it's important,

10  but that's a separate issue.

11       **THE COURT:**  Okay.  And I think the argument of the

12  defendant is that maybe the later investments -- they certainly

13  concede after 2013 -- can be considered because those were

14  arguably induced by fraudulent misrepresentations.  But their

15  argument is, prior to that, he didn't receive any false

16  documents or statements; and so the early investments were,

17  quote, kind of untainted.

18      What's your response to that?

19       **MR. HIGHSMITH:**  My response is that he's lying from

20  the beginning.  So for the Whalens --

21       **THE COURT:**  So what's the lie?

22       **MR. HIGHSMITH:**  So for the Whalens -- let's start with

23  the Whalens.

24       **THE COURT:**  Yes.

25       **MR. HIGHSMITH:**  He's telling the Whalens Imbee is

1    under contract to be purchased by a number of different

2    companies.  He tells the Whalens in January of 2011 "Loan me

3    money."  They loan him $73,000 pursuant to a written agreement

4    stating that Anderson would repay them within 90 days or when

5    Anderson secures funding, 500,000, from the named strategic

6    partner, whichever occurs first.

7         There is no named --

8         **THE COURT:**  At that point, there'd already been a

9    representation made to the Whalens that Imbee was under

10   contract to be purchased?  That 2011 -- or by the time of that

11   loan, there was a representation?

12        **MR. HIGHSMITH:**  Directly to them?  I don't know if

13   directly to them there was a representation before that time

14   that it was under contract to be purchased.  But he does, in

15   January 2011, refer to a named strategic partner, which

16   obviously does not exist, and says, you know, look, he's going

17   to pay them back, when he's in no position to pay them back.

18        **THE COURT:**  So you're saying that there was a promise

19   to pay back knowing, at that point, there was no real intent to

20   pay back within the time frame?

21        **MR. HIGHSMITH:**  Correct.

22        **THE COURT:**  So that's your classic fraud.  You borrow

23   money from somebody, say "I'll pay you back in 90 days,"

24   knowing there's no way you're going to pay it back in 90 days.

25   That's the Government's --

1          **MR. HIGHSMITH:**  (Nods head.)

2          **THE COURT:**  So that's why the 2011 loan should be

3    included, even though it's in advance of 2013.  That's an

4    example?

5          **MR. HIGHSMITH:**  And he doesn't dispute it.  He says

6    everything -- he says, for the Whalens, who start -- they're

7    the first investors or among the first -- he says:  I don't

8    dispute that their entire amount is fraud.  He said:  All --

9    from -- he concedes that.  He concedes the entire Whalen

10   investment is fraud.  So if you look at the any of the charts

11   that we submitted, he's conceded that.

12         **THE COURT:**  Well, I'm looking at the reply reply, and

13   it says that only those payments made after 2013.

14      So the defendant lists the loss from the Whalens at

15   804,000.  The Government is a million 8.  So there is a

16   difference.  There's a delta there.

17         **MR. HIGHSMITH:**  Okay.  Well, in their sentencing memo,

18   if we go to their sentencing memo --

19         **THE COURT:**  The first one or the second?

20         **MR. HIGHSMITH:**  Their first -- if we go to their first

21   sentencing memo.

22         **THE COURT:**  Yes.  What page?

23         **MR. HIGHSMITH:**  It's 16.  Page 16 and 17.  If we go to

24   the bottom of page 16 (as read):

25              "Mr. Whalen began investing in the company in

1        2010 and continued into 2015 after Mr. Anderson began

2        engaging in fraudulent activity.  Mr. Whalen received

3        false documents from Mr. Anderson and statements from

4        Mr. Anderson to encourage his investment.  While some

5        repayment was made, the sums were paid after

6        Mr. Anderson was under investigation so the amounts

7        should not be credited against his Guidelines.  As a

8        result, 1,191,000 should be considered towards the

9        Guidelines . . . ."

10            MS. MITCHELL:  And essentially, Your Honor, when we

11   submitted the additional documentation, we recalculated and

12   realized that we had put too high of a number in.  And so

13   that's the number that we calculated as --

14            THE COURT:  Well, except your initial brief didn't

15   draw a distinction at 2013.

16            MS. MITCHELL:  Yes, Your Honor.

17            THE COURT:  So why the change?

18            MS. MITCHELL:  Because I went back through and took a

19   look at the actual information there and realized that there

20   was no sufficient documentation establishing fraud prior to

21   that date.

22            THE COURT:  What about the 2011 loan?

23            MR. HIGHSMITH:  Can I talk about more?  It's not just

24   that one.  I've got more.

25            THE COURT:  Well, I just want to get a counterpoint to

1    that.  There's one specific example where the Government says

2    the 2011 loan is an example of something before 2013 that

3    should be included.

4        What's your response to that one?

5        **MS. MITCHELL:**  So the response to that is,

6    Mr. Anderson is saying to them:  I'm either going to pay you

7    back in 90 days or if I can make a deal with a partner.

8        At that time that he was engaging in that promise, he had

9    anticipated that that was, in fact, going to be able to happen.

10       This is the same thing that happens in millions of

11   different businesses where people are making goals based off --

12   or making promises and -- to investors based off of where they

13   are right then and there at the time --

14       **THE COURT:**  Well, if it's --

15       **MS. MITCHELL:**  -- of the negotiation.

16       **THE COURT:**  If it's a genuine belief.

17       **MS. MITCHELL:**  If it's --

18       **THE COURT:**  So scienter is required.  So let me stop

19   you there and let me ask the Government.

20       Mr. Highsmith, what's the evidence that he knew that there

21   was not going to be this deal with the partner and he wasn't

22   going to be able to pay them back in 90 days?  Is there

23   something to show scienter?

24       **MR. HIGHSMITH:**  Okay.  So the answer to that is, look

25   at all of his conduct over ten years.  If you look at all of

his conduct, he's constantly telling over 40 people:  I have

deals.  I have imminent deals.  Mattel is going to buy me.

Google is going to buy me.  Fuhu is going to buy me.

Non-existent companies that are not real companies --

        THE COURT:  In this case --

        MR. HIGHSMITH:  -- are going to buy me.

        THE COURT:  -- what was the partner that was -- on

this particular loan, do you know what was the particular

partner that this payback was going to be hinged upon?

        MR. HIGHSMITH:  The evidence in the record shows no

strategic partner.  The PSR has no strategic partner.  The

defense does not object to the PSR and say, "No, there's

additional facts.  Here's additional facts for the record."

The facts in the record show there was no strategic partner.

        MS. MITCHELL:  The facts in the record show that

Mr. Anderson was making deals with production companies; his

companies were putting out animation; that he had deals with

various different animation houses.  He was --

        THE COURT:  In 2011?

        MS. MITCHELL:  In 2010, the companies that he

purchased had started already making these partnerships with

Disney Channel, Nickelodeon.  When he acquired, for instance,

Fanlala, that was already making these deals with Disney and

Nickelodeon.  He acquired them and continued doing the work

with them.  He -- this isn't -- he made the partnership with

1    Fuhu that had the music streaming platform.

2        The partnerships and deals were ongoing.  Some of it may

3    have been a "We are going to get the company to the point where

4    it could be bought by Google, where it could be" -- and the

5    hope of developing a company that could be acquired by other

6    companies is something that was pervasive in Mr. Anderson's

7    acquisition of Imbee and what he had hoped to do.

8        **THE COURT:**  So the question is whether or not that was

9    a genuine belief or whether that was just a way to get people

10   to invest money.  And so it goes to scienter.

11       Put it in traditional fraud terms.  If this were an

12   individual case brought by the Whalens against -- a civil case,

13   for instance, they'd have to prove that when they made this

14   loan and he said "I'm going to get secured funding from a

15   strategic partner," blah-blah-blah-blah-blah, that he knew or

16   should have known that that wasn't really going to happen.

17   That's your classic fraud.

18       Or if he did think it was going to happen, even if it

19   never happened, then that's maybe negligence or something else,

20   but it's not fraud.

21       So I don't see a lot of facts in here, and I'm

22   wondering --

23       **MR. HIGHSMITH:**  Let's go further down.

24       So in my sentencing memo on page 5, Victims 3 and 4 were

25   Anderson's friends and neighbors, Moe Delfani and Siobhan

1    Delfani.

2              **THE COURT:**  This is your opening brief?

3              **MR. HIGHSMITH:**  Yes, Your Honor, on page 5.

4              **THE COURT:**  Yes.

5              **MR. HIGHSMITH:**  So line 9 (as read):

6               "In 2010, Anderson first approached Moe and

7         Siobhan Delfani for a loan."

8         And then in their declaration, they state (as read):

9               "From that point on, every few months Anderson

10        would bombard us with lies and deceits in order to

11        get more money."

12        Approximately one year later, he returned for additional

13   investment.

14        Then let's move down to October.  So line 15 (as read):

15               "In October 2010, Anderson pitched Imbee to a

16        separate group of . . . investors.  According to

17        Victim 5, Anderson spoke regularly about new purchase

18        or licensing agreements that promised to deliver

19        large profits . . . .  Those purported deals were

20        false; they never came to fruition.  Another member

21        of the group . . . reported that Anderson represented

22        Imbee had a relationship with Disney.  This was not

23        true."

24        That's in the record in the PSR.  It's not objected to in

25   the PSR.  There's no evidence in the record to the contrary.

```
 1        In September 2011, we have an email, a very clear email
 2   that's filled with lies.  September 2011, Mr. Anderson -- he's
 3   emailing with Clark Colvis, William Clark Colvis.  That's the
 4   bottom of page 5.  And this is detailed in the PSR, not
 5   objected to.  And he discusses in detail a business deal with
 6   Google or YouTube.
 7        (As read):
 8            "We are all very, very excited for the
 9        Google/YouTube deal.  We have worked very hard for
10        this."
11        THE COURT:  So let me -- because I have to adhere to
12   the record and not the brief, where in the -- I appreciate your
13   citing your brief, but I'd like to see where in the PSR this
14   statement is made that's not objected to factually.
15        MR. HIGHSMITH:  So this is --
16        MS. MITCHELL:  And, Your Honor --
17        MR. HIGHSMITH:  -- PSR 37, paragraph 37.
18        MS. MITCHELL:  -- for Mr. Colvis, Mr. Anderson
19   concedes that the email was sent.
20        This is -- in our filing, it's 3.7.  We concede that the
21   email was sent.  I think what the issue here -- and we concede
22   that the entire loss is owed to Mr. Colvis.
23        I think the issue here, what the Court has pointed out is
24   that the Government is engaging in generalizations, without
25   factual support for each of the individual investors, to say
```

that Mr. Anderson engaged in deceitful conduct with them.

And our argument has been, and what we have done in our briefing is to say, from the information that the Government has provided, from the information that's available, if there has been specific information with dates on it that can be tied to a specific investor, we have credited that information and Mr. Anderson has admitted that that is fraudulent conduct that he has engaged in.

However, what the Government has done with a number of these investors is just taken the amount that the investors have given Mr. Anderson without any tie to any specific statements that Mr. Anderson --

**THE COURT:**  Okay.  So here -- I understand your point.

The Government's point, as I understand it, is that even if they don't have a specific statement or specific letter that was sent to that other investor, the pattern was set by October, or whatever it is, in 2010, going into '11, a pattern of making false representations, inducing others, from which the finder of fact, i.e., the Court, could infer that by a preponderance of the evidence that likely happened in the case of Mr. Whalen, the Whalens, even though we don't have a specific -- we didn't get to trial -- even though there isn't a specific declaration or a document saying, "This is what was sent.  This is what was said."

Am I right, Mr. Highsmith?  You were relying on an

1    inference that given this pattern of pretty widespread and

2    pervasive misrepresentations and a way to get money, almost an

3    MO kind of a thing, that there's a good chance -- or you would

4    say preponderance of the evidence -- a likelihood that this

5    happened for all the other folks for which you don't have a

6    specific --

7              MR. HIGHSMITH:  That's exactly --

8              THE COURT:  That's kind of a large -- there's a lot of

9    people, based on the --

10             MR. HIGHSMITH:  That's exactly --

11             THE COURT:  -- briefing.

12             MR. HIGHSMITH:  That's exactly right.

13        In addition, he owes a duty to them, and he's omitting the

14   truth from them.

15        So all of what the Court just said is 100 percent true.

16   Plus, he's omitting true facts that would influence their

17   future conduct.  If they had known the truth, they would have

18   gone to the authorities in 2010, 2011.  If they had --

19             THE COURT:  One of the true facts is that:  I'm

20   defrauding other investors.  As I have your money and as I'm

21   collecting a loan from you, I've now already induced others,

22   based on false pretenses, to invest.

23             MR. HIGHSMITH:  Exactly.

24             THE COURT:  And had that particular investor known

25   that there was this fraud going on -- never mind whether this

```
1   partner company was real or the Sony deal was going to happen.

2   But if I knew that you, the investment vehicle, is committing

3   widespread fraud, I wouldn't invest; I wouldn't make a loan.

4           MR. HIGHSMITH:  Exactly.

5           THE COURT:  Okay.  What's your response to that,

6   Ms. Mitchell?

7           MS. MITCHELL:  Your Honor, I believe that it's faulty

8   to say that Mr. Anderson's conduct in that way should be

9   ascribed to every single investor here, specifically because we

10  have investors who in their information say that they didn't

11  talk to Mr. Anderson in detail about any part of --

12          THE COURT:  But now the Government is asserting an

13  omission.  And that is, there are different kinds of fraud.

14  And as I'm sure you know, fraud can be committed by an omission

15  of a material fact where there's a duty to speak.

16      And a duty to speak often obtains when you have

17  information that is material to the other counterparty and you

18  withhold that, knowing that you have the exclusive access to

19  that information that's important to them and you don't tell

20  that person.  That's a form of misrepresentation.

21          MS. MITCHELL:  It is a form of misrepresentation.

22  However, in Mr. Anderson's case, I don't believe that he is --

23  this is a situation where if -- if, for instance, this was a

24  publicly traded company and Mr. Anderson was engaging in stock

25  purchases in a publicly traded company, he would have an
```

1    obligation to his shareholders to provide them with updated

2    statements, things like that.

3        This is a closely held company.  There is no obligation to

4    share, for instance, profit and loss statements with

5    individuals.

6        **THE COURT:**  Wouldn't there be an obligation to share

7    the fact that "I'm bringing in money to the enterprise through

8    fraud"?

9        **MS. MITCHELL:**  But he's -- Mr. Anderson is -- in some

10   of the statements that were made, yes, we concede that the

11   statements that Mr. Anderson was starting to make to individual

12   investors after 2013 contained fraudulent statements.

13       However, some of these investors, especially those who

14   invested in 2010, 2011, and 2012, before Mr. Anderson had

15   started to engage in pervasive fraudulent activity, those

16   investors were investors who made investments in some instances

17   solely just based off of the fact that they and Mr. Anderson

18   had a friendship, they had a relationship, and there was no

19   follow-up.  It was a singular investment that may have occurred

20   in 2010 with nothing else to follow.

21       And I want to be clear that the Government is

22   misrepresenting that we never made objections.  We made

23   objections to the PSR.  They were not listed in the Presentence

24   Report as specific individualized objections.  The Presentence

25   Report summarizes our objections.  We objected to the factual

1    assertions made in paragraphs 16 through 57.

2        So we did make objections to this in the PSR.  We

3    specifically pointed out that Mr. Anderson had engaged in

4    lawful business with -- with Disney; with Nickelodeon, through

5    its subsidiaries; that Mr. Anderson was making a company that

6    did have profits coming in; that the profits, however, never

7    met to the aspirations that Mr. Anderson --

8        **THE COURT:**  Okay.  So let me ask you this:  You've

9    drawn a line in one direction, sort of a timeline, and whether

10   there's specific evidence of a specific misrepresentation.

11       If the line were those who initially invested before there

12   were any significant misrepresentations, when it was totally

13   bona fide, how much money was invested before

14   misrepresentations began?

15       **MS. MITCHELL:**  I could -- it would take me a few

16   seconds, but I do have my spreadsheet here, and I can give

17   the Court -- if the Court were, for instance, to say every

18   investment without specific evidence that was made before 2013,

19   with the exception of those individuals that the Government has

20   provided, for instance, the 2011 email, if the Court were to

21   say all the investments made before 2013 without specific

22   evidence, I could do a calculation as to --

23       **THE COURT:**  No.  I'm asking for a different line.

24   That is, if I accept the Government's inference argument that

25   anybody who invested at a time when there was a significant

amount of fraudulent raising activity but it wasn't disclosed to them would be included, even 2012, 2011, is there a group of investments that were made even before there's an argument of omission; that is, just straight out "I'm trying to raise money for Imbee," et cetera, et cetera?

      **MS. MITCHELL:**  I believe that would be the majority of the investments that were made before 2013.

      **THE COURT:**  The majority?

      **MS. MITCHELL:**  Yes.  I would believe that the investments made before 2013 were those investments that were -- with the exception of those investments that may have been made at the behest of the email that the Government has provided, the 2011 investments, I believe that the bulk of those investments were made by Mr. Anderson at a time where he was not engaging in fraudulent activity; there were no omissions that were being done by him; and these individuals were investing solely off of the belief that they were investing in a company that was young, ambitious, and trying to go after a particular market.

      **THE COURT:**  Well, the Government says by October 2010 --

      **MS. MITCHELL:**  Which is near in time to when Mr. Anderson started -- like, took over control of Imbee. They're essentially saying from inception, this company was engaging in fraud, which the record does not support.

1          **THE COURT:**  So the record doesn't support

2   the Government's assertion about Victim 5, who is a group of

3   potential investors, where Mr. Anderson spoke regularly about

4   new purchases or licensing agreements and promised to deliver

5   large profits for Imbee but those deals were false and never

6   came to fruition?

7          **MS. MITCHELL:**  In that instance, we have no idea the

8   date or times of these conversations.  We have no idea of --

9   and the way it's written, Victim 5 is whom?  I've been trying

10  to figure that out.

11         And when going through this, essentially what we did was

12  take a look at every single document in the record ascribed to

13  every single person the Government has identified and listed as

14  being a victim.  We went through and looked to see:  Were each

15  of these victims, in their FBI statements, in the documentation

16  they submitted, did they give something specifically tied to a

17  date where they could say, "This is a fraudulent statement that

18  was made," or, even going with the Court's new theory, "Here is

19  when some omission should have occurred where I asked for

20  something and I didn't receive it"?

21         Based off of what the Government provided, because it's

22  their burden to sustain, that this is when this fraudulent

23  activity was going on, this is why these investors invested, it

24  just was not substantiated.  To go with a theory that either

25  this whole thing was a fraud does not work.

```
 1        Mr. Anderson was making deals, he was engaging in conduct,
 2   and he was working through things.  To say it was fraud just
 3   because Mr. Anderson was talking about hoping to get the
 4   company to a place where he could make deals with various
 5   partners -- it also is not fraudulent to say, "We are talking
 6   to Disney.  We are talking to Nickelodeon."
 7        They were engaging in these talks with Disney and
 8   Nickelodeon.  The property that -- the intellectual property
 9   that they were producing through their YouTube channels
10   confirms this.  Otherwise, there would not have been these
11   videos that were available on Fanlala after 2011 if they were
12   not engaging in conversations with Disney and Nickelodeon to
13   put their stars on their show.  They would not have had the
14   partnerships with Nabi to put their tablets out and develop the
15   radio.  They would not have engaged in partnerships with other
16   individuals to develop intellectual property, like the cartoons
17   that came out.
18        The idea that Mr. Anderson was not doing anything at all
19   is not confirmed based off of what we've actually been able to
20   show was the product that was developed.
21        In this instance, Mr. Anderson did do what most people do
22   when they're trying to get investors in.  They talk very
23   aspirationally about what they hope the end product will be, a
24   lucrative company that they could sell that will enrich all the
25   people who invested early.
```

1          That is why so many people invest in many, many companies.

2    But companies go out of business.  Not wholly through the fault

3    of Mr. Anderson did Imbee fail.  And the Government has not

4    proven in any way that Mr. Anderson --

5          **THE COURT:**  Let me ask, specifically, the Government.

6          Paragraph 32 of the PSR talks about Victim 6, indicating

7    that Anderson represented that Imbee had a relationship with

8    Disney, which later proved to be untrue.  What is the -- what

9    evidence is there that at the time that representation was made

10   to Victim 6, that Mr. Anderson knew that that was false?

11         **MR. HIGHSMITH:**  It's what we talked about before.  The

12   evidence -- this is 2010.  We're talking about October 2010.

13   And Mr. Anderson pitches Samit Channa, Anil Patel, and Dipak

14   Patel, October 2010, and he says to this collection of victims,

15   "Imbee has a relationship with Disney."

16         There's no evidence in the record there is a relationship

17   with Disney.  There's no evidence in the record of a contract

18   with Disney.  There's no evidence in the record of revenue with

19   Disney.

20         **MS. MITCHELL:**  Except through Fanlala, which had been

21   producing videos since 2009, whose website I reference.  I put

22   into my papers and say Fanlala has had a partnership with

23   Disney and Nickelodeon since 2009.  If you go to the website,

24   you can see the videos they've had since 2009 with Disney

25   stars.

1        Mr. Anderson had a relationship with Fanlala, and through

2   Fanlala, Mr. Anderson had a relationship with Disney.

3        **THE COURT:**  Well, so to a degree, this turns on the

4   burden of proof.  So the Government has the burden of proof of

5   proving by a preponderance of the evidence in these proceedings

6   that monies raised that are going to be included into the

7   guideline calculation were raised as a result of fraud for

8   which there is scienter.

9        This is complicated to a certain extent because I don't

10  think there's an assertion that Imbee was a shadow company or a

11  fake company, to start with.  Like, I've seen some cases where

12  it's just absolutely false; but there are other cases where

13  things start off with good intent but then turn south very

14  quickly and then fraud is used to kind of save a sinking ship

15  and then things go from bad to worse.

16       And this seems to be, at least there was some period of

17  time when there was a legitimate effort.  And I think the

18  burden is on the Government to show that causal relationship,

19  and that causal relationship does require fraud, and fraud

20  includes scienter.

21       And so, just take the Disney thing.  I guess there's some

22  conflicting evidence.  It wasn't totally made up, but what did

23  he know at the time.  Maybe he overstated it.  Maybe he knew

24  it.  But since we don't have a trial and I don't have a whole

25  lot of evidence of -- I have a lot of evidence about who paid

what and when; but in terms of what was said and what was sort
of known, it's one of those things that gets clearer over time.

 And the Government's argument about at some point there's
enough pervasive fraud that there was a duty to disclose that,
even if -- not just with respect to any specific partnership
that's alleged or anything else.  Where that starts, it's a
little hard to tell from this --

             **MR. HIGHSMITH:**  Well, I would --

             **THE COURT:**  -- evidence.

             **MR. HIGHSMITH:**  So I don't think the standard is, a
majority of the statements are false.  I think once you are
lying to the investors, once you are not disclosing the truth
to them, you have started -- your conduct is now relevant to
the crime.  It is now relevant conduct.

 So even if the Court does not see -- if the Court wants to
look at that October 2010 pitch meeting alone, in isolation,
then I agree with the Court and I agree with the defense.
Potentially, we haven't met our burden of proof in isolation on
that one October deal.

 But if you add together -- that's only if you ignore all
the other facts in the case.  That's only if you ignore the
fact that in September of 2011, Anderson is sending an email
filled with lies and pressure tactics to Clark Colvis.

             **THE COURT:**  Is that the clearest example of --

             **MR. HIGHSMITH:**  Yes.

```
 1              THE COURT:  -- fraud --

 2              MR. HIGHSMITH:  Yes, because --

 3              THE COURT:  -- September 2011?

 4              MR. HIGHSMITH:  Yes, because the defendant doesn't put

 5    stuff in writing.  In those early days, he is telling people

 6    orally "Here's what I'm doing.  This is what's happening."

 7         We have a lot of oral misrepresentations from these

 8    victims, but that's the earliest time we have it in an email is

 9    September 2011.

10              MS. MITCHELL:  But it's unclear that the majority or

11    even all of these individuals invested off of a similar promise

12    made by Mr. Anderson.

13         For example, the Government is including in there

14    individuals who are investing based off of promises made by

15    Mr. Anderson, individuals who basically in their statement said

16    that they really didn't speak to him at all.  He just came to

17    them and said this is the type of --

18              THE COURT:  No, but you're not addressing the omission

19    kind of fraud.  I understand your point that there's not

20    evidence of a specific affirmative misrepresentation; but

21    the Government's theory -- and I think it's one that fits the

22    legal definition -- is that if at some point it becomes evident

23    that he is engaging in fraud to keep the company afloat, even

24    if he didn't affirmatively misrepresent any particular deal,

25    monies that are raised at that point are tainted on the theory
```

```
1    that there should have been a disclosure that some of the money
2    that's coming in is coming in as a result of
3    misrepresentations:  That's what's keeping us afloat.
4         So my question, I guess, to the Government is:  If we use
5    September of 2011 as the cutoff point, as a benchmark, how does
6    that -- does that change -- how much does that change the
7    calculus?  How much was invested prior to that in your table?
8         MR. HIGHSMITH:  I don't know if -- I don't know if
9    that gets us below 9.5 million or not.
10        One of the issues is that the case -- we don't have bank
11   records going back to those earliest days, and so we're looking
12   at -- so that's one of the issues.
13        Number one, I don't have an answer to your question about
14   what's the pre-September 2011 investment.
15        Number two, the subpoenas didn't reach back that far
16   because the fraud had been going on for so long that the
17   bank record- -- that we had to use the investor statements, the
18   paper, these little pieces of paper that showed they had 30,000
19   shares.  And so we used the investor statements, their shares,
20   their share slips and their contracts, their investment
21   contracts and, where they could provide them, their checks in
22   their own saved records.
23        THE COURT:  Do you have an estimate?  I guess you
24   have -- you have various dates, but it's by year, not by any
25   specific --
```

```
1         MS. MITCHELL:  No.  I actually could do it based off
2    of dates if the Court would -- I have an Excel spreadsheet.  I
3    could do a calculation for the Court based off of the specific
4    dates.  I do have all the dates of the particular investments.
5         But I am hesitant to ascribe the 2011 date to say that
6    Mr. Anderson omitted particular information to all the
7    investors.  Based off of one email that went to -- that's been
8    documented going to one investor, to then say this date is the
9    date that Mr. Anderson thus is now omitting key information to
10   all investors, that he needs to be -- that all the loss then
11   needs to be attributed to him from that day forward.
12        If an individual makes one fraudulent statement to one
13   investor, it does not mean that Mr. Anderson should then be
14   considered to have omitted key information that he needed to
15   give to all the investors.
16        THE COURT:  Which investor was it that got the email?
17        MR. HIGHSMITH:  Clark -- William Clark Colvis.
18        THE COURT:  And that's a $300,000 loss --
19        MR. HIGHSMITH:  Correct.
20        THE COURT:  -- right?
21        MR. HIGHSMITH:  Yes.
22        MS. MITCHELL:  Which Mr. Anderson has conceded is
23   properly owed because it has been properly documented to the
24   Government -- by the Government.
25        MR. HIGHSMITH:  But I guess our argument is, like,
```

1    that's not the standard.  The standard isn't -- we've gone over

2    this.

3              **THE COURT:**  Yes.  No, I understand.

4         I think the counterargument is that:  All right.  So there

5    was clear fraud at that point, admitted fraud; right?  Even the

6    defendant admits that Colvis's loss should be included in the

7    guideline loss calculation.

8         The question is if the Court were to use, in its effort to

9    try to find some date between when it became sufficiently

10   material that it should have been disclosed to all investors at

11   that point -- $300,000 is not an immaterial amount.

12        Is there evidence of other things that happened, other

13   fraudulent representations that were made, either before or at

14   the September 2011 date, in addition to this email?

15             **MS. MITCHELL:**  No.  The Government hasn't provided any

16   documentation aside from generalized claims that investors at

17   some point in time had been given false promises by

18   Mr. Anderson.  But the majority of it is not based off of

19   actual -- documented with dates.

20             **MR. HIGHSMITH:**  I mean, I -- that 2011 is the earliest

21   email.  That's the earliest email we have of very clear fraud.

22   Before that, it's oral statements.

23             **MS. MITCHELL:**  And my rough calculation, Your Honor --

24   hold on a second.

25        There is at least $1.316 million of investments that

```
 1   occurred before September of 2011.  I have investments dating
 2   from June 2010, that I'm considering, through August 30th of
 3   2011.  My rough number comes to 1.316.
 4            THE COURT:  And if you applied that, that gets you
 5   below the 9.5?
 6            MS. MITCHELL:  It does, from the Government's number.
 7            THE COURT:  It gets you to around close to 9.  8.7 or
 8   something like that, 8.8.
 9            MS. MITCHELL:  Yes, Your Honor.  And that's just a
10   rough estimate.  That's just me doing this right here at the
11   podium.
12            THE COURT:  All right.  Let me go on to some other
13   issues.  We can return to this.  I mean, that's the key issue
14   in terms of the loss calculation.
15        Now, it makes a difference -- at the end of the day, it
16   makes a difference of two levels; correct?
17            MS. MITCHELL:  Yes, Your Honor.
18            THE COURT:  From a net --
19            MR. HIGHSMITH:  But it may also impact restitution.
20   So if they're saying this person is not a victim -- the other
21   problem is that it impacts restitution.
22        So if the Court accepts, you know, some version of the
23   defense argument that this person was not -- there's no loss
24   amount, then they have an argument that person was not
25   victimized; therefore, they're not entitled to restitution.
```

1        And then, of course, my response to that is that doesn't

2   make sense because, you know, if they say "I invested in 2011,

3   after that email and he omitted all the truth of the company

4   from me, I would have asked for my money back or I would have

5   gone to authorities.  And of course I'm entitled to

6   restitution.  I invested money, and then he infused this

7   company with lies.  I never went to the SEC.  I never went to

8   anybody.  Of course I'm a victim."

9        **THE COURT:**  Well, certainly, anybody who invested

10  afterwards who weren't told the truth when it should have

11  been --

12       **MR. HIGHSMITH:**  But similarly --

13       **THE COURT:**  -- disclosed --

14       **MR. HIGHSMITH:**  -- if you're -- a lot of these folks,

15  a lot of the pre- -- so that email is September 2011.

16       Many of the folks who invested pre-September 2011 went

17  back.  These are -- remember --

18       **THE COURT:**  Oh, anybody who went back and gave

19  additional money -- I'm not saying you exclude the whole class.

20  So people who gave from 2010 to 2015, maybe the early

21  investment was, quote, legit, at least for lack of proof, but

22  the latter is not.  All of -- everything -- certainly, the

23  argument is that anything that was invested after September

24  2011 was tainted for the non-disclosure of the fraud scheme.

25       **MR. HIGHSMITH:**  I hear the Court saying -- please

1    correct me if I'm wrong.  I hear the Court saying:  Look, if

2    you are an investor who stopped investing September 2011,

3    there's a chance that that does not count as loss.

4         **THE COURT:**  If you were an early investor -- it's a

5    matter of proof.

6         **MR. HIGHSMITH:**  But remember, like, Tom Whalen, who

7    will speak to the Court.  He starts in 2010, but then he keeps

8    investing.

9         So is the Court saying, "Oh, I'm going to exclude Tom

10   Whalen's first $73,000 investment, but I'm going to count

11   everything that came after"?

12        **THE COURT:**  Under this construct, if it holds, that by

13   2011, there was a duty to disclose.

14        **MR. HIGHSMITH:**  I just -- I think that construct

15   doesn't -- for relevant conduct and the principles of causation

16   under relevant conduct and loss, it sort of is illogical that

17   Tom Whalen is a victim only from 2011 through 2018.

18        **THE COURT:**  It depends when the fraud, legally proven,

19   started.  And I have to look at the evidence.  So what is the

20   evidence of fraud between 2010 and September of 2011?  Put it

21   that way.

22        **MR. HIGHSMITH:**  No, but --

23        **THE COURT:**  That includes scienter.

24        **MR. HIGHSMITH:**  But my question is:  Is the Court

25   saying Whalen did not lose money?  Like, his early -- his

1  pre-2011 --

2       **THE COURT:**  He may have lost money, but it's not

3  causally related to the fraud.  He wasn't induced.

4       Now, if the Government can provide by a preponderance of

5  the evidence -- obviously, when you have an email, that's

6  pretty good.

7       What is the evidence of fraud in 2010, for instance?

8  There's a Sony representation -- or Disney representation, but

9  I need evidence, something to show that Mr. Anderson knew that

10  that was a pipe dream, that wasn't really happening.

11       **MR. HIGHSMITH:**  So we have the victim impact statement

12  from Moe and Siobhan Delfani, his very, very close friends and

13  neighbors.

14       **THE COURT:**  What victim number?

15       **MR. HIGHSMITH:**  They're Victim 3 and 4.

16       So they're some of the only people -- only a few people

17  knew that Mr. Anderson already had a felony conviction for

18  fraud in connection with running a previous company.  They

19  actually knew that, and they -- I mean, so, arguably, that's a

20  material omission too, is not telling people:  Hey, I want you

21  to invest in my new company but --

22       **MS. MITCHELL:**  Your Honor, I think to say that anyone

23  who's ever had a conviction before has to reveal to future

24  investors that they --

25       **THE COURT:**  Well, that's a different theory.  And the

```
 1   problem with that is that if Victims 3 and 4 knew of the

 2   felony, then you can't say there was --

 3           MR. HIGHSMITH:  Absolutely.

 4           THE COURT:  -- reliance.

 5           MR. HIGHSMITH:  They actually say the opposite.

 6   Victims 3 and 4 said:  We thought he would never do this again

 7   because he had already been punished for it.

 8           THE COURT:  Okay.  So what representation was made --

 9           MR. HIGHSMITH:  Their representation is --

10           THE COURT:  Let me finish, Mr. Highsmith.  You keep

11   interrupting.

12           MR. HIGHSMITH:  Sorry.

13           THE COURT:  You can't do that because the court

14   reporter can't keep up.

15           MR. HIGHSMITH:  My apologies.

16           THE COURT:  So let me finish my sentence.

17           MR. HIGHSMITH:  Yes, sir.

18           THE COURT:  What is the alleged fraudulent statement

19   and what is the evidence that it was fraud and there was

20   scienter?

21           MR. HIGHSMITH:  For the Delfanis, only that 9 -- only

22   that 10 and 11, lines 10 and 11 (as read):

23               "'From that point on . . . ," their statement,

24           "Anderson would bombard us with lies and deceits in

25           order to get more money...."
```

1      For Victims 3 and 4.

2      For Victim 5 and 6, just that statement about the

3  purported relationship with Disney, new purchaser -- you know,

4  his regular statements about new purchaser licensing agreements

5  that promised to deliver large profits for Imbee.  Just those

6  statements.

7          THE COURT:  And is there -- what is the evidence that

8  Mr. Anderson knew that was a false statement about Disney and

9  the -- just the fact it didn't turn out?  Or was there

10  something to show, if you'd gone to trial, that he knew full

11  well as of October 2010 this was never going to happen or not

12  going to happen?

13          MR. HIGHSMITH:  It's inference.  It's based on the

14  fact that nothing panned out.

15          MS. MITCHELL:  And, Your Honor, inference --

16          MR. HIGHSMITH:  Over and over again, nothing panned

17  out.

18          MS. MITCHELL:  Inference is not enough to meet the

19  burden that the Government has here.

20      And there's direct evidence in the form of subsequent

21  deals that were made and product that was produced that

22  contradicts the idea that these were not true and, in fact,

23  realistic conversations that Mr. Anderson was having.

24      There were partnerships with Disney.  There were -- there

25  was product that was produced with Disney stars.  There was

1   product that was produced with Nickelodeon stars after this

2   date.  There was product that continued to be produced with

3   these individuals after this date.  It's available for view on

4   the Internet right now.  The fact that Mr. Anderson was able to

5   develop these partnerships and put animation on tablets, it's

6   proof that these deals, in fact, actually happened.

7        Was it as lucrative as he had aspirationally hoped for?

8   No.  However, saying, "We hope that this is going to be a great

9   deal.  We're working these deals up.  We're making these

10  partnerships," that is not fraud so long as Mr. Anderson, at

11  the time he's making these statements, is working to achieve

12  these goals.

13       And that is what he was doing.  He was making these

14  partnerships.  He was returning product.  He was putting out

15  things.  He had employees who were being employed and were

16  tasked to do these things, and they were doing it.

17       **THE COURT:**  All right.  Let me go to the 3553 factors.

18  So the guideline range is either, at a Level 29, 87 to 108 --

19  no -- 97 to 121; correct?

20       **MR. HIGHSMITH:**  Correct.

21       **THE COURT:**  Or, at Level 27, 78 through 97.

22       **MS. MITCHELL:**  That's correct.  Yes, Your Honor.

23       **THE COURT:**  All right.  So why shouldn't the Court,

24  whatever the guideline range is, impose a sentence that is

25  either at the upper end of the guideline range or, if

1    necessary, an upward variance in view of the facts?

2        Number one, this was taking advantage of a large number of

3    people, people with whom Mr. Anderson had some relationship

4    with and, therefore, was in a position to take advantage of

5    their trust and friendship.

6        Two, this was ongoing for a lengthy period of time.

7        Three -- and I don't understand this is accounted for in

8    the guidelines but -- this is a very sophisticated scheme.  It

9    wasn't a one-time thing.  This was inventing all sorts of

10   stories, forged documents, fake documents, an elaborate scheme

11   and, too, after he'd already been convicted of a similar

12   offense and served time for it.

13       And this is -- I've seen fraud cases where somebody has to

14   commit some kind of crime or do something because they have a

15   loved one that is in dire need of medical care and will

16   probably die if they don't have the money by some means, or

17   I've had a case where somebody was trying to raise money for

18   their child to go into a dance program that they desperately

19   wanted.  Not to excuse that, but at least you certainly

20   understand that.

21       I'm having trouble understanding why here.  I saw the

22   psychologist, the insufficiency syndrome and all that.  But

23   why?

24           **MS. MITCHELL:**  So, Your Honor, to address the

25   questions that the Court has, I think the "why" here is

```
 1    Mr. Anderson truly believed in Imbee.  He truly believed in the

 2    product that he was putting out; and he thought if he just

 3    could have some more time, he could put this together in a way

 4    that would be sustainable and was going to be able to follow

 5    through.

 6         This was not a situation where Mr. Anderson was seeking to

 7    solely enrich himself.  During the course of the time he was

 8    running the company, he mortgaged his home.  He forewent --

 9    despite the claims of some of the investors who assumed that

10    Mr. Anderson was living large and spending their money on a

11    lavish lifestyle, that isn't bear'd out by the facts.

12    Mr. Anderson lost --

13         THE COURT:  So how much money was reinvested into the

14    company in good faith?

15         MS. MITCHELL:  The majority of the money went into the

16    company.  This is a --

17         THE COURT:  How do I know that?  Tell me more about

18    that.

19         MS. MITCHELL:  Because this is a company that had

20    multiple employees, had office buildings, had -- this wasn't

21    something that Mr. Anderson was just running out of his home.

22    This was something where there were multiple employees who were

23    receiving paychecks.  A large majority of the investors had

24    children who were employees of Mr. Anderson and received a

25    paycheck from Mr. Anderson's companies because of the work that
```

1    they were doing.

2         **THE COURT:**  How many employees were being paid and

3    during what period of time?

4         **MS. MITCHELL:**  Between Imbee, Cosmic Toast, Fanlala...

5         (Defense counsel confers privately with the defendant.)

6         **MS. MITCHELL:**  37 employees.  Between 2010 to 2015,

7    Mr. Anderson had approximately 37 employees.

8         **THE COURT:**  So there was a business going through

9    2015?

10        **MS. MITCHELL:**  Yes, Your Honor.

11        **THE COURT:**  37 employees?

12        **MS. MITCHELL:**  I'm assuming there actually were more

13   than that at some point in time considering all the

14   subsidiaries, but at least 37 employees.

15     So this was a situation where it's not the money is going

16   all to Mr. Anderson.  It's going to keep the lights on, have --

17   there were facilities in place --

18        **THE COURT:**  What's your representation as to how much

19   of that money went into the company as opposed to --

20        **MS. MITCHELL:**  The bulk of the money went into the

21   company.

22        **THE COURT:**  "Bulk" meaning more than 50 percent?

23        **MS. MITCHELL:**  More than 50 percent.

24     Mr. Anderson, yes, drew a salary during the time he was

25   there.  As people do, when investors invest in companies, they

1   do take a percentage of the funds that come to have a salary

2   for himself.

3       But this isn't a case where he's had -- there are not

4   yachts somewhere that the Government can show existed.  There

5   are not yachts.  There are not, like, lavish vacation homes.

6   His son drove a Mercedes, but his son purchased that used from

7   a job that his son had held.

8       **THE COURT:**  So how much do you estimate of the moneys

9   that were raised, that were alleged to have been raised

10  unfairly, went to living expenses?

11      **MS. MITCHELL:**  The bulk of the money went to the

12  company.  I don't -- I have not -- I do not want to mislead

13  the Court in thinking I've done, like, some -- an extreme

14  financial calculation to say Mr. Anderson drew this much money

15  from -- he had a salary.  It was in the low six figures.  That

16  was what his salary was for some of the time.

17      But during that time, he would also forego taking money

18  from the companies in order to make sure that the employees got

19  paid.  The money was spent on the companies until the money ran

20  out.  That's --

21      **THE COURT:**  All right.  Does the Government have any

22  contrary evidence that the bulk of the money, other than the

23  salary of low six figures, went to Mr. Anderson?

24      **MR. HIGHSMITH:**  I think the defense is correct that

25  the majority -- more than 50 percent of the money went to --

over ten years, from 2010 through 2019, there was at least
$11 million that went in.  That sounds accurate to me.

We do know that he had a vacation house in Truckee.  He
had a very nice house in Walnut Creek with a swimming pool.  We
do know his children went to private school.  We do know -- I
don't want to make a big deal about the cars -- his son drove a
Mercedes.

I mean we do -- look, this is not -- she's right; this is
not a case with yachts, but it is a case where $11 million came
in and funded a nice lifestyle.

**MS. MITCHELL:**  And the house in Truckee had been
purchased before this began.  The son purchased his own car
with his own money.  And Mr. Anderson's home in -- that he had
in Walnut Creek was purchased before this began.  All of the
things that Mr. Anderson had were things he had before 2010.

He did not purchase a vacation home with the funds that he
gained here, and he lost his vacation home during this time.
He had been trying to save the company, took out a second
mortgage, and lost the home.

So this is -- again, Mr. Anderson strongly believed in
what he was doing with Imbee.  He strongly believed what he was
telling his investors he was doing.

He engaged in fraudulent action -- that he admitted -- and
he did so because he had thought that if he could have more
time, he could make these deals.  But unfortunately, the market

1    for Imbee, a very niche market, was not one that was able to be

2    sustained because the children that they were trying to target

3    did not want to be marketed to as tweens and teens.  They

4    wanted to use what everyone else was using.  They wanted to use

5    Facebook.  They did not want to be locked into a smaller,

6    for-children-only market.

7         And the partnerships that they were making with Disney and

8    Nickelodeon were not enough to sustain them because,

9    essentially, it came down to very small deals that they were

10   doing with these companies, and Disney and Nickelodeon had the

11   ability to put out their own product.

12        They -- the radio streaming product that they had with

13   Nabi was something that was there with the subscriptions.  They

14   just never got the subscription numbers that they needed to

15   have.  And their primary source of getting income through that,

16   the Nabi tablet, went out of business along with Fuhu.  It is a

17   tale that happens with many start-ups in this world that we're

18   in, where --

19        **THE COURT:**  But most start-ups then don't engage in

20   fraud to keep things afloat.

21        **MS. MITCHELL:**  Which Mr. Anderson recognizes was

22   conduct he should not have engaged in, and he is prepared to

23   accept punishment for that and --

24        **THE COURT:**  Why wasn't a lesson learned from the prior

25   conviction?

1              **MS. MITCHELL:**  Unfortunately, I think that this is a

2    situation where, again, including some of the statements made

3    by the psychologist, Mr. Anderson just did not want to let

4    people down, and he was trying to -- and made unfortunate

5    decisions in doing so -- trying to do everything he could to

6    follow through with his promises.  That led him to make

7    statements that were untrue.

8         And I want to clarify.  The Court says that this was an

9    elaborate scheme to defraud.  This was essentially a very basic

10   scheme to defraud.  This isn't something where Mr. Anderson was

11   completing a whole separate set of books that he was sending

12   off to people.  This isn't something where he was building a

13   complex world where he was deceiving individuals.  It was:  I

14   am taking a bank statement and Photoshopping a number and

15   changing a number on a bank statement and --

16             **THE COURT:**  Well, but it wasn't just --

17             **MS. MITCHELL:**  -- sending that to someone.

18             **THE COURT:**  My point, it wasn't one statement.  It

19   wasn't one document.  It's document after document after

20   document.

21             **MS. MITCHELL:**  But it is a very narrow -- it is

22   essentially a -- I have -- in this case, the proof that

23   the Government has given us and shown has been one email that

24   had a bank statement change, statements and email that said,

25   "We are making a deal with these other companies" that didn't

come to fruition and was not actually a negotiation at the time the email was sent; it is a contract with a forged signature on it.  That is the type of information that's going around here.

Mr. Anderson admits that it's wrong.  It was unlawful for him to engage in it.  But this is not a very complex, elaborate scheme by someone who was being a criminal mastermind with, like, a dastardly plan to enrich himself.  This is a desperate businessman who was trying very hard to keep an idea of a company going and pay back the investors that he had promised that he would make good on his investments.

And I want the Court to be aware of the fact that Mr. Anderson tried to make it right with these investors.  He made payments back to them.  He didn't take their payments and then keep his vacation home.  He lost his vacation home and made payments back.  Throughout the course of the time, even before the fraud was detected, he tried to make good on the investors' investments.

THE COURT:  All right.  The Government's response on the 3553(a) factors?

MR. HIGHSMITH:  There's a lot there.  I think -- I think this is an extraordinary case under 3553(a).  We have somebody who, in the prime of their business life -- this is not some young, youthful indiscretion.  This is somebody who had already been convicted of securities fraud in connection with managing a company; and he goes out and he lies to his

1   friends, his neighbors, his acquaintances in the prime of his

2   life.

3       He then goes out and he -- the idea that there's only a

4   few documents is not true.  He forges numerous fake contracts

5   to show people "Hey, look, I've got a $60 million deal.  I've

6   got a $26 million deal."

7       He forges these contracts repeatedly.  He uses the

8   signatures of executives.  He steals them off of -- off of

9   other documents, and he puts them on the purchase documents.

10   And he says, "Look, I've got a deal coming up.  Invest with

11   me," or, you know, "Don't go to the authorities."

12       You know, the idea that he has 37 employees gets him off

13   or reduces his sentence, I mean, Bernie Madoff had employees.

14   I mean, basically, that's not a -- that's not an excuse for

15   going to your friends and neighbors, asking them for money,

16   continually going back, going back, going back and lying to

17   them.

18       These are not sophisticated -- he didn't go to -- these

19   are not sophisticated investors.  You're going to hear from

20   some of the victims in the case, Your Honor.  These are people

21   who knew Mr. Anderson because they're from his community.

22   They're people who were taken by how charismatic he is, by how

23   savvy he is.  He was an engaging person.  The evidence in the

24   record is he's very engaging, very charismatic, and convinced

25   people to hand him their money and lied to them.

1        And he did this -- you know, this Court faces so many

2    people who have bad upbringings.  He had a good upbringing.  He

3    had a good family.  He has a supportive family.  He had a

4    supportive upbringing.  He had a good job.  He was in charge of

5    Quintus when he committed his first federal securities fraud

6    offense.

7        The circumstances -- and then the lack of acceptance, we

8    haven't gone into that.  He pled guilty to two counts out of

9    five.  In his guilty plea, he did not accept responsibility for

10   defrauding Tom Whalen.  He did not accept, in his guilty plea,

11   responsibility for defrauding his landlord.  He accepted

12   responsibility in his guilty plea for one person only, one

13   victim, which is an important victim, but for only one victim.

14       When you add all of the background of this case, even if

15   the Court cabins the loss amount, we have at least 40 people,

16   more, who lost $11 million because of Mr. Anderson, someone who

17   had already been convicted of an offense.  And now, you know,

18   when he pleads guilty on the eve of trial, he only admits to

19   two counts out of five.  He only -- he cabins his acceptance.

20       And then if you look at his PSR, his PSR has some pretty

21   remarkable -- a pretty remarkable lack of acceptance of

22   responsibility in his PSR.  He says, "I was trying to help my

23   community."  He says, "I want to help my community."

24       He preyed on his community.  He preyed on his neighbors.

25   He preyed on people who were supposedly his friends.  I mean,

it's heartbreaking hearing their stories, and the Court will

hear their stories.

He says at paragraph 86 (as read):

"It's important that I am a useful, accountable

neighbor and community member."

Well, he preyed on his community.  His community, they

lost their hard-earned savings.  You'll hear from victims about

how they took years and years to save money, and they lost it

with Alan Anderson.

**MS. MITCHELL:**  And, Your Honor, the fact that

the Government goes -- is trying to make an argument that

Mr. Anderson did not accept responsibility because he did not

in his factual statement address each and every individual, it

is not necessary in order for Mr. Anderson to accept

responsibility to, in his factual statement, admit all the

conduct that he did there because Mr. Anderson repeatedly and

throughout this process has acknowledged that he harmed all of

the investors.

In pleading guilty to just one count, essentially,

Mr. Anderson does not spare himself any of the punishment he is

going to receive.  He has conceded to -- and admits repeatedly

in the sentencing memoranda that we have done -- his conduct

that he has done, and he has also admitted the fact that he has

harmed his investors.  In his letter that he submitted to

the Court through his sentencing memo, he says, and I quote,

1   (as read):

2          "Many of these people were not just investors to

3       me, many were close friends, and this was my

4       responsibility, and I failed them.  For more than a

5       decade, not a day has gone by that I haven't thought

6       about those relationships and the people I let down."

7       He is not saying "an investor."  He's not trying to, like,

8   remove or downplay his involvement in this.  He has said that

9   he did this and that he understands that he has to admit that

10  what he was doing was to all of his investors.

11      He says, and I quote, (as read):

12         "I understand I must atone, pay a price, and

13      demonstrate a willing and commitment participation in

14      the reinstatement of trust."

15      He fully accepts responsibility for this, and it's,

16  I think, disingenuous for the Government to say because he did

17  not plead to all the counts, he is not in some way accepting

18  responsibility.  Mr. Anderson has accepted responsibility for

19  his conduct.  He immediately accepted responsibility for any of

20  the losses that the Government was able to substantiate through

21  either the discovery provided or subsequent statements from the

22  victims.

23      We're just hoping that what actually happens here in court

24  today is that the Court takes into consideration the totality

25  of everything that has gone on with Mr. Anderson and how he was

1    trying to support what he believed would be a viable business

2    plan, something that he himself was committed to.

3        He lost money himself in engaging in this business.  This

4    is not something where he was in here to solely enrich himself,

5    to take advantage of people that he considered to be friends.

6    He has lost business.  He has lost friendships.  He is in a

7    place now where he is going to have to suffer the consequences.

8    He is going to lose time being with grandchildren that have

9    just been born in the last month.

10       He is a person who has potential for rehabilitation and

11   realizes that what he did here was misguided in an attempt to

12   keep these companies going.  And it is for those reasons, I

13   think, that Probation even recognized that and made the

14   recommendation for the 42-month sentence that they made, a

15   below-guidelines recommendation there, taking into account all

16   the information they had.  Probation reviewed, saw what the

17   victims said, what the information was that was presented, and

18   they thought that Mr. Anderson was worthy of a downward

19   variance and recommended the 42 months.

20       Our recommendation of 36 months is not that much lower

21   than what Probation's recommending.  We're recommending a

22   sentence three times the sentence he got at his last sentence.

23   So an increase of punishment is warranted, and we are

24   recommending that.

25       For an individual like Mr. Anderson who is 62, going into

custody for that period of time at this point of his life is
going to mean that he is going to face significant difficulties
after he gets released, getting back to his life again, trying
to reestablish what's going on.

And one of the salient points that was demonstrated by
Mr. Anderson, even before he was -- investigation began in this
case, was he wanted to make it right for his investors.  And
for Mr. Anderson to be able to make it right for his investors,
he has to be able to start working again.

It will be extremely difficult for Mr. Anderson to make
back all the payments, make all of his investors whole, but he
is committed to that idea.  And it's not an idea that he's been
committed to solely because prosecution has begun in this case.
It is something that he did even before then.

THE COURT:  All right.  Let me, before I go any
further -- and I want to hear from the victims -- address the
specific objections to the PSR.

With respect to Objection Number 1, the factual
recitations in paragraphs 16 through 57, I'm going to overrule
those objections.  That is not to say, though, that I agree
necessarily with the Government's calculations because those
are statements in there that were made but they may not
constitute sufficient proof by a preponderance of the evidence,
especially with respect to the pre-September 2011.  But as far
as allowing those recitations to stay in the PSR, I'm going to

1    allow that.

2        With respect to Objection Number 2, the use of the word

3    "lavish lifestyle" I will strike.  I think that's a bit of an

4    overstatement, and so I'm going to sustain that objection.

5        With respect to Objection Number 3, the calculation, I'm

6    going to sustain the objection to the extent that I'm going to

7    come out with a guideline calculation loss at least -- putting

8    aside restitution for a moment -- that differs and given the --

9    if I use -- and I'm inclined to use -- the September 2011 date,

10   because that is the date by which I think there should have

11   been disclosure, whether or not there was a direct

12   misrepresentation or not or a direct omission about specific

13   transactions, there should have been disclosure about the

14   fraudulent nature of the fundraising scheme that was by then

15   evident.

16       Unless the Government has a different calculation, the

17   defendant's calculation is that pre-September of 2011, 1.316 is

18   sort of -- was invested before that date.  And according to my

19   math here, that would result in a $8.825 million loss.  And to

20   the extent that that is inconsistent with the loss calculations

21   on paragraph 64, I will sustain that objection.

22       But what's more important than the guideline calculation

23   that's contained there, the precise number, is the resulting

24   offense level adjustment.  And so instead of a plus 20, I think

25   it's a plus 18.  That would yield a Level 27, and that's for

 1    the reasons that we've discussed.

 2        I think the Government has met its burden of preponderance

 3    of the evidence, whether it's by specific misrepresentations or

 4    omissions as to any statements that were made with any degree

 5    of specificity or the more general failure to disclose a very

 6    material fact, and that is that fraud was being used to keep

 7    the company afloat.

 8        So that's my guideline calculations, but we still have to

 9    address the 3553(a).

10        And at this point, I'd like to hear from the victims who

11    have come.  I have read those that were -- the victim impact

12    statements, but I want to give people who have come here today

13    a chance to be heard.

14            **MR. HIGHSMITH:**  Thank you so much, Your Honor.

15        The first victim is Anthony Zuiker.

16            **THE COURT:**  All right.  Thank you.

17            **MR. ZUIKER:**  Good morning.

18            **THE COURT:**  Good morning.

19            **MR. ZUIKER:**  May I take this mask off to talk?

20            **THE COURT:**  Yes, you may.

21            **MR. ZUIKER:**  Thank you so much.

22            **THE COURT:**  And that's true with everybody.  If you

23    want to speak --

24            **MR. ZUIKER:**  Yes, absolutely.

25            **THE COURT:**  -- you may take your mask off.

1      Thank you.

2          **MR. ZUIKER:**  It's Anthony Zuiker.  Thanks very much.

3          **THE COURT:**  Okay.  Thank you, Mr. Zuiker.

4          **MR. ZUIKER:**  I have to apologize for shaking my head

5    back and forth back there.  Hearing a lot of this today and

6    living it is two different things.

7          I mean, I'll go on book to read what I've written; but

8    before I do that, I just have to say that at the end of the

9    day, when you are developing content, thinking you're talking

10   to Disney, thinking you're talking to Nickelodeon, trading on

11   people's names like Anthony Zuiker, the *CSI* guy, putting out

12   some content of your daughter, that kind of thing, it could

13   look like you're doing some things but you're really not.  It

14   really is an optic scam to make you look like you're growing

15   something when you're just really a front to be a fraud.

16         That's exactly what happened because I lived it for years

17   and didn't know it was going on until years later,

18   unfortunately.

19         So I'll go with my statement.

20         Dear Honorable Judge Chen, I'd like to start with this.

21   Alan K. Anderson ruined my life and almost ended my career.

22         The second thing I'd like to say is, quote, he

23   single-handedly cost me $400,000 in bogus investments and

24   lawyer fees to sue him for fraud.

25         The third thing I'd like to say is, quote, I wrote my

1  heart out for this man because I loved him like a father, and

2  he stabbed me in the heart with a dull butter knife and twisted

3  it 400,000 times.

4      Make no mistake, Your Honor, Alan K. Anderson is the most

5  undeserving human of freedom this Court of grace and reverence

6  will ever see.  Behind that snake-charmed smile and upbeat

7  personality is a stone-cold confidence man who preys on the

8  naivety of young people and pushes emotional levers to take

9  lint out of your pockets.  He's slick; he's calculated; he's a

10  bad egg.  And although he didn't murder anyone, he did try to

11  kill my spirit.  He ruined my trust in partnership.  He took my

12  innocence.

13      And although I have six television shows on the air and

14  I'm responsible for 5,000 employees that work for me, and

15  although I have three boys at home that need help with their

16  homework after school and a concerned wife afraid for my safety

17  in these proceedings, I am here in the flesh to make sure there

18  is no misunderstanding about who you're about to sentence:

19  Alan K. Anderson, a career confidence man whose only goal is to

20  suck you dry and throw you in the trash just like garbage.  The

21  only way I will sleep well at night is to put this societal

22  cancer in a cage and swallow the key.

23      My name is Anthony E. Zuiker.  I'm the creator of the TV

24  franchise *CSI: Crime Scene Investigation*.

25      I, unfortunately, was introduced to Alan K. Anderson by an

1    agent at the Creative Artists Agency named Andy Stabile in

2    2014.  At that time, I had an appetite to partner with a small

3    production company to launch my vision of, quote, gamified

4    narrative, a fashion-forward method of storytelling where

5    short- and full-length films embed interstitial gaming between

6    a story, on the phone, iPad, and laptops.  In other words, you

7    could watch an original movie or play the movie by having

8    gaming pit stops to accrue virtual currency.

9        This philosophy of micro charging would drive revenue in

10   new ways to monetize premium original content, a fog-cutting

11   vision that would change the industry.  I was hopeful

12   Mr. Anderson would champion this idea into the Promised Land,

13   and I was wrong.

14       At the time, Mr. Anderson was the CEO of a company called

15   Fanlala, where he worked intimately with his daughter, son, and

16   wife, who was an accountant.

17       The three projects I wrote for Mr. Anderson were

18   Mysteryopolis, Arion, and Retro Arcade for the Nabi tablet.

19   Nabi was a product made by Fuhu, which filed for bankruptcy,

20   eventually leading to its closure on January 6th, 2016.

21       I believe Mr. Anderson knew the company was going bankrupt

22   and attempted to introduce me to the developers of Nabi content

23   to convince me to invest in his company Fanlala.  What I would

24   find out later was Fanlala was just a front for Mr. Anderson to

25   run his Ponzi scheme to trick new investors into paying off

1    older investors to keep the charade going on as long as

2    possible; that is, until enough of us complained to the

3    authorities and the FBI got wind of it.

4        In 2014, Mr. Anderson attempted to sell me 2 percent of

5    Fanlala for around $73,000.  So I heard that number earlier.

6    It's the same story he told me.

7        He also tried to ask others to invest in 1 percent for

8    37,500.  My brother-in-law, Leonard Territo, did invest

9    temporarily.  When I explained to Mr. Anderson that he, quote,

10   had three young daughters and could not afford to lose the

11   money, Mr. Anderson voluntarily opted to return the money.  In

12   my opinion, this was the long con.

13       Several months later, Mr. Anderson explained that he

14   needed a million dollars from me to expand my film efforts into

15   profitability.  My immediate answer was to decline, but

16   I believe he refunded the small investment to my brother-in-law

17   to lure me into a bigger investment.

18       Little did I know, Alan K. Anderson, as I stated earlier,

19   is a career confidence man.  His reign of ripping off innocent

20   people began in 2002 with the litigation Number 17521.  I won't

21   go into it because we talked about it, which was the Securities

22   and Exchange fraud.

23       I will quote this from the article (as read):

24           "Anderson created three fake transactions that

25       ranged in value from 2 million to 7 million, for a

1    total of $13.7 million in non-existent sales."

2        That was all from Quintus.  But we all know that from

3    this Court, so I'll bypass that.

4        Back to me.  Not only is Mr. Anderson a financial

5    swindler, he is a charmer who preys on one's personal

6    insecurities.

7        In 2006, my biological father, Edward Allen Zuiker,

8    committed suicide.  Most of my childhood, my father and I were

9    estranged.  When I spoke about this traumatizing incident to

10   Mr. Anderson, he immediately took an interest in protecting me

11   and being a father figure to me in what I believe now was an

12   emotional manipulation to bilk me out of millions of dollars.

13       Also, I extended in good faith my A-list Hollywood

14   contacts to Mr. Anderson.  The biggest contact was

15   Oscar-winning actor Jamie Foxx.  Once Mr. Anderson was under

16   indictment, Mr. Foxx never spoke to me again, along with other

17   contacts.

18       Over the next ten years, I had to work tirelessly to earn

19   the trust back from my colleagues in the industry because of

20   the fraudulent position Mr. Anderson put me in.  Luckily, my

21   late mother, Diana Marie Zuiker, raised me to be a good man, to

22   be kind, to see the good in everyone, to respect the law.

23       To date, I've never been arrested.  I've never broken a

24   bone.  I've never thrown a punch.  She taught this only child

25   to work hard; to be the sugar, not the salt; to be honest, not

dishonest; take the harder road; take less money; no job is too small; never take shortcuts; and give your money and time to those at every turn.  Why?  You can't give it away.  It always comes back.

Thankfully, today I have the most successful show in history and more money than I can ever spend because I was one of the lucky ones.  I bounced back because my mother raised me to not be like the man next to me in this courtroom, Alan K. Anderson.

Alan, I -- I forgive you because I believe in showing mercy for those who destroyed the one life the good Lord built for you.  And to think, what if you just built an honest business?  You'd be sitting where I'm sitting, on top of the world instead of in a jail cell.  It's sad.

I feel bad for your kids.  Whether you get out of here or not, you've given them a death sentence with your unsavory actions.  Now they have been sidled with your fraudulent legacy.  Every time they apply for a job, meet a loved one, try to qualify for a loan, they're going to wear your black eye and that black eye of the accountant.

In closing, my plea to the Honorable Judge Edward Chen is this:  Mr. Anderson may be on trial, but there are others close to him that I believe were co-conspirators.  My hope is the FBI does their due diligence and casts a wider net.  I am certain this unscrupulous circus has many sticky-fingered clowns.

My ask is that the Government and the Department of
Justice demand discovery of all Mr. Anderson's accounting,
including his emails and texts and financial documentation
during these decades of scrutiny.

Several lessons from the Watergate scandal should be
echoed here.  Quote, follow the money.  It's not about the
crime; it's about the cover-up.  And I'm not a crook.

When I spoke to the FBI agent assigned to the case about
this matter, she explained to me that this case will come down
to whether or not Mr. Anderson is a bad businessman or a fraud.

My vote is pure and simple.  Mr. Anderson is a stone-cold,
bona fide, petrified, solidified, justified, career con man,
pure and simple.  Don't let him con you, Judge.  Beware.  Some
people will sell you a dream and deliver a nightmare.  I lived
in that darkness without a glimmer of hope.  This Court of the
Honorable Edward Chen is my only light, our only light, Judge.

Alan K. Anderson cost innocent people their net worth and
large sums of money in 2002, and did it again to countless
young people, including myself, in 2014.  Mark my word, he'll
do what he can to plea out, do his time, and defraud people
again.  The Court didn't learn a lesson in 2002, and now we're
all paying the price in 2014.  Please don't cast harm on the
next wave of victims only to be swallowed up by this tsunami of
scoundrel.

The United States has Alan K. Anderson in their

1  possession.  I mean, when I got the notice from the FBI, it

2  read "Two charges of fraud by wire, radio, or television."

3  It's like handing out speeding tickets at the Indy 500.  It's

4  the tip of a bottomless iceberg.  It's a scratch on the surface

5  of blasphemy.  It's a drop in the bucket that can fill every

6  ocean.  This can't be the charge, Judge.  It can't be.

7        And the irony is my show, *CSI*, is about one thing:

8  justice for victims.  I'm a victim, and I need justice.  And,

9  Your Honor, please excuse my language, but I'd like my fucking

10  money back.

11     I'll end this with my mother, who always taught me to say

12  "please" and "thank you."

13     Well, here it goes, Mom.

14     Please, Your Honor, give your gavel a nickname, "Max."

15  Thank you.

16          THE COURT:  Thank you, Mr. Zuiker.

17          MR. HIGHSMITH:  George Symons is the next victim,

18  Your Honor.

19          THE COURT:  All right.  Thank you.

20          MR. SYMONS:  It's "SIGH Mons," by the way.

21          THE COURT:  That's okay.  Thank you.

22          MR. SYMONS:  Good morning, sir.

23          THE COURT:  Good morning.  Thank you.

24          MR. SYMONS:  I'm going to take us back to 2008.

25          In February of 2008, I sort of -- my life took a little

bit of an unexpected turn.  My sister, who was the founder of
Industrious Kids, later called Imbee, died in a plane crash,
she and her young son, who was adopted.  Her daughter, who was
eight years old, luckily wasn't with them on that trip and is
with my mother and has been since then.

So in the wake of her passing, I became a co-trustee with
my mother of her estate and was asked to step into Imbee to try
to help get the company back on track so that it could continue
because, at the end of the day, it was important to her.
Right?  That's why she started it.  She self-funded it.  There
was no other money in it other than hers.

My initial interaction with Mr. Anderson was shortly after
that.  He had reached out to the company to discuss interest in
investing in it, maybe purchasing it, maybe licensing the
technology.

So when we talked after that, you know, those things
didn't make -- purchasing made a lot of sense to me; but
investing didn't solve the problem of how to keep the company
going forward, licensing didn't.  And as he and I talked,
realized he was looking for something to do.  He had a
background in this area, and we started talking about him
coming on as the CEO at that point in time.

After doing background checks, talking to people -- and,
yes, we -- actually, to be honest, we didn't -- until one of
the employees said "Did you Google him?" -- find out about the

1    previous conviction.

2        And I spoke to the estate attorney, a well-respected

3    attorney here in Embarcadero Square.  His comment to me was,

4    "When somebody has committed white-collar crime like this, they

5    almost never want anything to do with the authorities.  They

6    don't even speed anymore," was his statement.

7        I then talked to my mother because she's the co-trustee.

8    We'll get to why she didn't remember that later.  But went

9    ahead and hired Mr. Anderson as the CEO.  This gave me the

10   opportunity just to sit on the board, to get the company moving

11   forward.  And the company did make progress for the next

12   18 months.

13       When my mother got a new attorney and a new financial

14   manager in the mountains in Colorado and when they found out

15   about his background, she fired him, even though she didn't

16   actually have a role in the company.

17       The next step for me, unfortunately, was he sued me.

18   Mr. Anderson sued me for misrepresenting to him that the trust

19   would continue funding the company, which was completely

20   against why I hired him.  I hired him because he had VC

21   connections, because he was going to raise money, and because I

22   had told him an eight-year-old girl should not be investing in

23   a start-up.

24       So he did sue.  We went to medi- -- well, first thing I

25   have to figure out was did I have criminal liability in this.

And I met with a couple of lawyers, and they said "No.  It's civil," and we went to mediation.  The attorney -- sorry -- insurance company was involved for the company.  And, you know, the good news is they were willing to pay an amount to not go to court, et cetera.

As we finished that negotiation that night, Mr. Anderson asked for the IP for the company as well, one more request.  My mother didn't want to give it to him.  As far as I was concerned at this moment, the company had been killed.  There was no going forward.  I could not run the company.  I had a day job.  The employees were really beat down through this.  So at the end, I said, "We want to go home before midnight.  Let's agree to this and move forward."

Now since then, my mother -- and I won't go into the details; she's a bit of a person -- has not talked to me, and so we have not talked since then.  She was not happy about what happened.  She didn't remember the conversation about his background that we'd had before.  And that's where we are.

As I look beyond that, I wrote it off.  I didn't even know Imbee was still around.  And it wasn't until 2016 that I got a call from Mr. Anderson.

He told me the company is around; it's doing well; and he has an opportunity to sell it to Mattel and asked would I be willing to -- given my background is technology start-ups, I've sold them, I've bought them, I've done OEM deals, et cetera --

```
 1   would I give him advice, which I said "yes" because Imbee is

 2   what my sister wanted, you know, and so it was still going now,

 3   which was great.

 4       I then got a call a week later, give or take, saying, "One

 5   of my investors needs money badly.  Would you be interested in

 6   buying his shares?"

 7       I did my diligence at that point; right?  I went and

 8   downloaded the app.  I wanted to make sure it was real.  I

 9   questioned him about Mattel, how real it was.  He said it was

10   actually important that we get this done very quickly because

11   he is about to give Mattel a cap table and wanted me on that

12   cap table for the transaction.

13           THE COURT:  What is that?  Half table?

14           MR. SYMONS:  Cap.  Capitalization table.

15           THE COURT:  Oh, cap table.

16           MR. SYMONS:  Cap table, yes.

17       You know, it was all about Fuhu.  I just found out a

18   moment ago Fuhu was already bankrupt.  But Fuhu was the key for

19   that deal.  He ended up showing me a contract with Fuhu.

20       So at that point, you know, even though things are risky,

21   I went ahead and made the investment.  We started talking more.

22   He started telling me more about the company.

23       One of the things I heard earlier was the Government

24   doesn't have a lot of proof.  One of the reasons the Government

25   doesn't have a lot of proof is most things were done verbally.
```

1    Even often when I was told I would get something, we would

2    meet, he would show it to me on a laptop, I didn't get it.  I

3    did get a few pieces, which I turned over; but in general,

4    there was not a lot behind there in terms of actual written

5    material when I would ask for it.

6        As a matter of fact, I asked to get my shares -- right? --

7    because I was questioning many things.  I thought, well, if I

8    can get the shares, the certificates themselves, that tells me

9    there's a company behind it still.

10       And he said "No problem."  And it got delayed.  It got

11   delayed.  Then they were sent to the wrong place.  They were

12   sent to L.A. instead of the Bay Area.  And then he would have

13   to go down to L.A.  The bottom line is, after many, many

14   excuses, nothing happened.  And that was sort of the way things

15   did happen.

16       The next thing -- just to finish it out -- I had actually

17   made three tranches of investments totaling $108,000.  Over

18   probably six to seven months that happened.

19       Then, even though he continued to say, you know, deals are

20   imminent, et cetera -- and that did happen, and you've heard

21   some of the deal names; right?  They were all part of what was

22   being told to me.

23       He then said he needed a loan, and so that was the start

24   of loans.  And the loans started either because he needed to

25   make payroll -- right? -- and he was waiting -- I think the

very first loan, he was waiting for Mattel to make a payment on an invoice, and they just kept dragging out, dragging out, dragging out.  He needed the loan.

There were, you know, other things that happened.  The Franchise Tax Board went after him and froze his bank accounts.  He needed a loan to pay payroll.  The IRS went after him, froze his bank accounts.  He needed loans.  In almost every case, the statement was -- and you heard it different places earlier -- "I'll pay you back in a couple of weeks.  Don't worry about it."

Well, there were 14, 15 loans over a period of a couple years in this.  Nothing paid back.  Zero.

So I went and had an attorney draw up a consolidated loan agreement with a payment plan, which he agreed to.  This was June of 2019.  He never made -- well, sorry.  He once made a payment of $300 via Venmo.  That was the only payment I got throughout the entire process.

And, you know, at this point, really, I was clear I wasn't going to get paid.  I had conversation with him.  It was sort of interesting.  He didn't say it exactly as me, but he said, "If anybody sues me, I'm just going to declare bankruptcy."  So I tried to keep that from happening.

But the other point -- and probably it's the one that gets me even more -- is I think he used what he knows about my background to gain more sympathy.  So, for example, I'm a

cancer survivor, Stage 3 colon cancer back in 2003.  During

this time, he mentioned to me, oh, that he had cancer and he's

getting medicine for it.  I went through a divorce.  He

mentioned late in this process that he was separated; they were

going to get divorced.

Again, just to me, as I looked back on it, he was playing

back to the sympathies -- right? -- right from when, you know,

we've kept your sister's company going, to now cancer, to

divorce.  I just felt he very much took advantage to what was a

friendship as we had worked together, trying to help him with

the company, trying to make it be successful.

So that's probably sufficient in terms of all of it.  I

appreciate the time and the opportunity to talk to you today.

Thank you, Your Honor.

**THE COURT:**  All right.  Thank you, Mr. Symons.

Appreciate your appearing.

**MR. HIGHSMITH:**  And Thomas Whalen, Your Honor.

**THE COURT:**  Okay.

**MR. WHALEN:**  Say my name first?  Thomas A. Whalen.

**THE COURT:**  All right.  Thank you, Mr. Whalen.

**MR. WHALEN:**  And I have a few notes.  I wasn't

planning on talking today, so it's a little --

**THE COURT:**  Sure.

**MR. WHALEN:**  But I just want to talk about some

relationships and some experiences.

1    I met Alan through football, high school football.  His

2    son and my son both played football at De La Salle across

3    the Bay, and then later on, they both went to Oregon State

4    playing football.  His son played football for four years; mine

5    did for two.  But in that timeframe, we had become, in my

6    opinion, really fast friends, really great friends.

7    Two families together, we'd go out to dinner.  We'd go out

8    of the state and -- for football games and up and down the

9    state for state championship games and all that.  Really

10   developed a bond.

11   And he approached me in 2010 about this investment

12   opportunity that he had, and explained, with Fanlala, and I

13   invested a fair amount -- not a fair amount -- a small amount

14   of money.

15   And then he came by a little bit later and he says, "I

16   need, you know, a little more."  And then "Now, how about

17   making a loan to the company and I'll pay you back in 90 days?

18   And if I don't pay you back in 90 days, I'll pay you back in

19   stock."

20   I just watched what her eyes did and I just wasn't sure.

21        **THE COURT:**  She's getting it.  She'll let you know.

22        **MR. WHALEN:**  She's getting it?

23        **THE COURT:**  Yes

24        **MR. WHALEN:**  Okay.  I'm sorry.

25   And over the next ten years, I was making more investments

1    and more loans -- fewer loans, but more investments because of

2    the Mattel opportunities that were being spoken about and other

3    major investors.

4         And finally, I said, you know, "This is not really

5    going" -- "I'm not sure what's happening here.  I'd like to

6    have a little bit more information," and wanted some financial

7    documentation that never came out.

8         And -- excuse me -- ultimately, we ended up filing suit

9    with him.  And he said, "Can we go to mediation?"  And so we

10   agreed to go into mediation.  A mediation amount was negotiated

11   and filed, and the payoff date came and went, and he defaulted

12   on the mediation.  So we then spent more money on getting a

13   judgment against him.

14        And it was causing a lot of issues with my family.  My

15   wife lost faith in him before I did and was upset with me and

16   argued about "What are you doing?"  And I kept saying, "I think

17   it's going to work out."

18        And now she's still working because -- she's 75 years old;

19   and she kind of looks at him a little bit, looking at him from

20   the back of the courtroom, saying, you know, that was on him.

21        And my investment was $1,050,000 over the ten-year period,

22   and I just felt really, really betrayed.  I thought he was one

23   of my best friends, best family groupings; and he's just a big

24   disappointment and I resent the hell out of him.

25            THE COURT:  All right.  Thank you, Mr. Whalen.

1           **MR. WHALEN:**  I hope you give him what he deserves.

2           **THE COURT:**  Thank you.

3      I need to take a short break because I have to rearrange a

4   schedule that I had.  This is going longer than I thought.  So

5   we'll come back in ten minutes.  And I want to hear from the

6   other victims as well, and, of course, I want to give

7   Mr. Anderson a chance to allocute.

8           **MR. HIGHSMITH:**  Thank you, Your Honor.

9           **MS. MITCHELL:**  Thank you, Your Honor.

10          **THE CLERK:**  Court is in recess.

11                  (Recess taken at 10:51 a.m.)

12               (Proceedings resumed at 11:00 a.m.)

13          **THE COURT:**  All right.  You may be seated, everyone.

14     We may continue.

15          **MR. HIGHSMITH:**  Thank you, Your Honor.  We have one

16  more victim that would like to address the Court.

17          **THE COURT:**  All right.

18          **MS. WHALEN:**  Good morning.

19          **THE COURT:**  Good morning.

20          **MS. WHALEN:**  My name is Peggy Whalen.

21     And the only two things that I wanted to add to my

22  husband's talk is that my husband was not aware -- was not

23  aware that Alan had been in jail before for fraudulent

24  documentation, and -- or nor I wasn't aware of it either.  We

25  did not find out for probably three to four years before we

1    found that out.

2        And had we known that, I'm sure that my husband would not

3    have invested the amount of money that he did invest, or he

4    would have been a little bit more persistent on getting

5    documentation that he would ask for but never follow up

6    getting.

7        We knew several -- we still know several of the families

8    that are victims, and we -- several times we tried to get -- we

9    tried to get Alan to get us all together so we'd be on the same

10   page.  And he would constantly -- he would ask these -- each

11   individual family not to talk to anybody else.

12       And it just gave me the feeling that he was telling a

13   different story to every single investor and that once we would

14   get together and confer, that maybe we would have caught some

15   of the deceitful issues quicker.

16       This has taken a huge toll on our family, and I just

17   needed to share that.

18           **THE COURT:**  Thank you.

19           **MS. WHALEN:**  Thanks.

20           **THE COURT:**  Thank you, Ms. Whalen.

21       All right.  Are all of the -- those are all the victims

22   who will testify today?

23           **MR. HIGHSMITH:**  Yes, Your Honor.

24           **THE COURT:**  All right.  At this point, I would like to

25   give Mr. Anderson a chance to make any statement he would like

```
 1    to the Court.

 2         So, Mr. Anderson.

 3         THE DEFENDANT:  First to Your Honor, Prosecution,

 4    court staff, kind of my team, the Federal Defense Office, I'm

 5    very sorry.  These are valuable resources, and we're here today

 6    because of me, and there are others that could be receiving

 7    these government resources that are not.  I'm very sorry.

 8         Now I'd like to address directly to the victims, if you

 9    will.  Is that okay?

10         THE COURT:  Yes.  If you can speak -- get a little

11    closer to the mic maybe.

12         THE DEFENDANT:  I was going to --

13         THE COURT:  Oh, we still need to hear you, but you can

14    maybe hold the mic or whatever.

15         THE DEFENDANT:  Okay.

16         THE COURT:  You can lift the microphone if you want.

17         THE DEFENDANT:  So these are written statements, but

18    they're coming from how I feel, what I think.

19         For all of those who invested in me and invested in Imbee,

20    I stand before you with a pretty heavy heart right now.  It's

21    weighed down by guilt and by shame and truly overwhelming

22    regret.  There's not -- or, I don't have the words to truly

23    articulate how bad I feel.  But I feel compelled and I think

24    it's important to tell you really two things:  what was I

25    thinking and what was and what is in my heart.
```

1    As it relates to what was I thinking, when I was hired by

2    George Symons to come on as the CEO of Imbee, the focus was

3    true and the focus was honest.  The focus was to build

4    something for kids that they could truly enjoy, that they could

5    be safe.  And why is that?

6    Probably for the better 20-plus years, I was a youth

7    coach.  I did basketball, football, baseball.  That's my love.

8    My second love was technology.  The thought of combining those

9    two loves and doing something as a business, which I love, was

10   wonderful.  So the opportunity to create a children's Facebook,

11   it wasn't just a novel idea; it seemed quite appropriate.

12   Early in social media, myself and others who I spoke to

13   thought this could be very dangerous for children.  It turned

14   out to be true.  And so the whole focus was to build something

15   that kids would love, that parents thought that they could be

16   safe, and that they could really utilize and still do all the

17   things that, basically, their bigger brothers and sisters were

18   doing.

19   Initially and well into the company's existence, it was

20   working.  We did have a robust YouTube channel with millions of

21   views.  We did have relationships with young people in

22   Hollywood that would come to our offices often.  We did have --

23   every partnership that we talked about at some form was there.

24   Whether it was Fuhu or Disney, Nickelodeon, Cartoon Network,

25   they were there.  They were not not there.  So early on, it was

1    working.

2        But then it wasn't.  Larger companies become -- became

3    very aggressive and lax in who they would accept, which kind of

4    decimated our market.  Kids generally wanted to be like their

5    older siblings and didn't want to be part of a kids network.

6    And so any revenues we were starting to generate started to

7    drop off dramatically.

8        Here's where I messed up.  At that point, as opposed to

9    being honest, I was not.  At that point, as opposed to asking

10   for help -- I don't know what to do; our revenue is falling --

11   I did not.  At that point, I made horrific decisions to try to

12   buy time because I truly believed in what we were doing, truly

13   believed.  It wasn't passing.  I worked tirelessly to try to

14   find some method so that this company would not only stabilize,

15   but thrive.  I believed we had a service that should be

16   accounted to by children.

17       But I didn't have the courage to be honest.  I didn't

18   respect the deep relationships that had been developed.  I can

19   speak to every single personal relationship that has spoken up

20   here today and many, many more with authenticity and love; but

21   my mistake was not having courage, not being honest, and not

22   asking for help.  And myself and my family will pay a dear

23   price for that.

24       What's in my heart, for many of you, it was the small

25   interactions:  coffee, impromptu dinner, watching a football

1   game, watching a basketball game, talking about animation,

2   talking about our children, talking about our challenges,

3   talking about our wives, good, bad, or indifferent.  Whatever

4   the case may be, those small interactions were the tissue that

5   bound relationships.

6        There is not one time -- and I heard this up here -- that

7   I preyed on anyone's emotion.  My emotion and your emotion was

8   real.  My issues I were going through were real.  What I did

9   from a businessperson's standpoint was not to be honest about

10  the challenges that I had, but any relationship personally was

11  real.

12       I had conversations in great detail with Mr. Zuiker, who I

13  never thought that he thought of me as a father figure.  I -- I

14  didn't.  I just thought, what a great friend.  I didn't care he

15  was who he was.  He was a great friend, and he told me about

16  his sons, and I enjoyed that.

17       I spent countless hours with Tom Whalen, and I miss him

18  today because those drinks, those beers, the traveling to

19  Corvallis, Oregon, simple stuff, great stuff.

20       Mr. Symons was here, and we talked about everything from

21  health, true conversations; marriage, true conversations;

22  children, absolutely true.

23       But all of those incredibly valuable conversations and

24  meetings and dinners and all of that goes out the window when

25  you're dishonest, and all of that -- I don't want to use the

1  word "work," but all of the time goes out the window.  And I am

2  beyond sorry.  I don't have the words to talk about how sorry I

3  am.

4      I heard descriptions of me.  I will accept anyone's

5  opinion.  But in telling you what's in my heart, there's not a

6  day that's gone by that I haven't tried to figure out what

7  could I do, embarrassingly paying small payments but thinking

8  at least I'm demonstrating some degree of commitment.  There's

9  not a day that goes by that I don't regret decisions that I

10 made.

11     I will tell you, for years I've been in agony, absolute

12 agony, as I'm sure my actions have caused agony for others.

13 But as I spoke about those small interactions and they've been

14 ripped apart from both of us, I know I bear that responsibility

15 for ruining those relationships.

16     And it's not just one relationship.  It's the relationship

17 that maybe caused another relationship to fail.  There's

18 tethering to anything that I have caused.  And, again, I'm

19 deeply, deeply, deeply sorry.

20     But just please know there's not a day that's gone by that

21 I've not thought of many of you, wonderful conversations, great

22 cups of coffee, laughing and being jovial, talking about kids,

23 business, whatever the case may be.  And for years, it's just

24 painful to think about it.

25     I know you trusted me.  Not just a friend.  You trusted me

1   as someone that you believed in.  And I took that trust and I

2   was not honest back.  I wasn't.  I wish so bad I would have

3   said:  Hey, guess what?  Company failed.  Don't know what to

4   do.  Got any ideas?  Don't?  Let's lock it up.

5       That was the right decision.  I thought, these are people

6   that I care about, that I love, and I've got to find some way

7   to get their money back so that we can all do what we set out

8   to do.

9       Each of you believed in me somewhat.  Again, I hear about

10  the personal relationships, and they are true.  I don't have

11  any right to ask for your forgiveness, but I want you to know

12  how deeply sorry I am.  I think about our kids.  I think about

13  our conversations.  I think about the commitment that was

14  made -- forget about business -- the commitment of time to just

15  enjoy each other's company.

16      And just know, I'll spend really the rest of my life

17  trying to fix, trying to atone, not just be better, but

18  specific to individuals.

19      In closing, I remember so many times having conversations.

20  And I remember when one of you lost -- one of you lost your

21  mother and then I lost my mother and how appreciative I was for

22  the kind words that were given to me and, hopefully, I gave to

23  you.  That was the depth of the relationship.  At our most

24  challenging time -- and I loved my mother -- we were there for

25  each other.

1        And so this is not just about a business relationship.

2    This is about a deeply, deeply personal experience that we all

3    shared.  I'm very sorry.  I am very, very, very sorry.  I will

4    meet with anyone face-to-face and look you in the eye and tell

5    you I am sorry personally.  I'm very sorry.

6        Thank you, Your Honor.

7            **THE COURT:**  Thank you, Mr. Anderson.

8        Any final remarks?

9            **MR. HIGHSMITH:**  Your Honor, the Court just heard from

10   a master manipulator, someone who started lying, according to

11   the Court's order, September 2011 and who stole, according to

12   the Court's order, $8.825 million.

13       And the Court just heard the incredible eloquence, the

14   incredible charisma, the incredible emotional connection.

15   That's exactly how the defendant was able to conduct a fraud

16   over about eight years, is through that incredible personality.

17       And we've heard from the victims in this case about how

18   their lives were destroyed, how they believed in him, how he

19   mistrayed their trust and stole their money after having a

20   federal conviction for securities fraud.

21       So we stand by our recommendation of nine years in prison,

22   Your Honor.  This is an extraordinary case.

23           **THE COURT:**  All right.  Thank you.

24           **MS. MITCHELL:**  Your Honor, just in closing, I would

25   say that what the Court saw and what the Court can see from the

1  deep betrayal that the individuals who spoke to the Court have

2  felt is because of the level of commitment that Mr. Anderson

3  had in trying to make this company real because it was one that

4  he believed in, that the investors believed in, that everyone

5  thought was a good idea and was actually going to come to

6  fruition.

7      Unfortunately, it was a company that could not thrive, and

8  Mr. Anderson engaged in actions that he admits was deceitful in

9  trying to do so.  But he was not doing so for personal

10  enrichment; he was not doing so solely for personal gain.  His

11  actions here came from a place of misguided but true intentions

12  to try and make a company, a beneficial company for children

13  and to make his investors whole.

14      While he stands here regretting his actions that he made

15  and admitting that he engaged in wrongful conduct, we're asking

16  that the Court take into consideration the circumstances

17  surrounding the fraud and why Mr. Anderson took the actions

18  that he did.

19      And even if the Court doesn't agree that our

20  recommendation for a downward variance to 36 months is

21  appropriate, we'd ask the Court give true consideration to the

22  recommendation of Probation, who has had the ability to take a

23  look at all of the cases that come before the Court, and with

24  their recommendation of 42 months as a sentence for

25  Mr. Anderson.

1          **THE COURT:**  All right.  Any reason why sentence should

2     not be imposed?

3          **MR. HIGHSMITH:**  No, Your Honor.

4          **MS. MITCHELL:**  No, Your Honor.

5          **THE COURT:**  All right.  Just to reaffirm, first of

6     all, the guideline calculations with the adjustment of my

7     finding of an $8.825 million loss, the level increase under

8     Section 2B1.1(b) is 18 rather than 20 but, with the various

9     adjustments for role in the offense, the net level after

10    acceptance of responsibility is a Level 27.  We have a criminal

11    history category here of II, which yields an advisory guideline

12    range of 78 to 97 months.

13         Under the 3553(a) factors, I'm going to impose a sentence

14    of 88 months, which is slightly more than seven years.  I do so

15    for the following reasons.

16         First, when we look at the offense, as we've stated, this

17    was an egregious offense that was inflicted on multiple victims

18    over an extended course of time and, most disturbingly, those

19    whose trust and friendships were taken advantage of by

20    Mr. Anderson.  And although this perhaps was not as

21    sophisticated as some of the other schemes that I've seen, it's

22    quite sophisticated.  And the main point is not just its

23    sophistication, but its deliberateness, its calculatedness, and

24    the extension of time.  It wasn't a one-time deal or a moment's

25    sort of reflection or misjudgment, but an extended scheme to

1    defraud multiple people over multiple years.

2        Now, it could have been worse in the sense that I've seen

3    a number of schemes where the money is just simply used for

4    self-aggrandizement.  I've had cases where money was taken to

5    buy yachts in the Caribbean and houses in the Mediterranean and

6    this sort of thing.  It appears here that a substantial amount

7    of money, I'm told without dispute that the bulk of the money

8    did go in, in an attempt to save this enterprise, although some

9    of it obviously was used for salary and for personal benefit.

10   So it is not as egregious as some of the cases, and that

11   somewhat is a mitigating fact.  At least it shows it's not the

12   most aggravating kind of offense.  And yet we have a situation,

13   even if the intent was well intended, the bottom line is that

14   people were misled; people have lost life savings, a

15   substantial amount of their savings; and it has wreaked a great

16   amount of hardship on the victims who trusted and put their

17   trust in Mr. Anderson.

18       In terms of the personal characteristics, it is true that

19   he did not grow up under circumstances that I've seen many

20   defendants here, with a high childhood trauma index and

21   hardships; that he's educated; but most importantly, he had

22   been previously convicted of a very similar offense and was

23   given a fairly light sentence at the time.  And one would have

24   hoped that even with the pressures of trying to make an

25   enterprise in good faith survive, to use fraud again after a

federal conviction is egregious.

And so that makes, in a way, his criminal offense category, which is a Level II, somewhat an understatement because this is the same offense that was committed. If the prior offense were a drug offense or something else, maybe that would be an accurate indicator or a use of a prior conviction. But here, it's the same offense for which he was punished and yet engaged in it again. So in a certain sense, I'm not going to say it's technically understated, but that shows that the Criminal History Category II is rather light, in a sense, in a qualitative sense.

Countervailing that is the fact that the guidelines themselves with the financial loss calculations tend to be overstating. And this is generally true across the nation and is true as demonstrated by the JSIN numbers here, where the mean and median sentences for a Level 29, a higher level, is either 75 or 81 months, which is well below the 97 to 121 months' guideline range. And so under *Kimbrough*, I can give some discount to the range that is indicated here because, like drug offenses, it appears that there's a bit of an overstatement in the guideline range.

Nonetheless, because of the prior criminal history and the nature of the offense here, I think the guideline range is a fair reflection when all is said and done.

And as I've said, in terms of the personal

1   characteristics, there's not any extreme mitigating factor here

2   that can excuse or explain this conduct, and so I think it is

3   warranted to not vary downward from the guideline range.

4       The need for deterrence, the need to reflect the

5   seriousness of the crime, I think, are all covered by what I've

6   said, and the need to avoid unwarranted disparities.

7       I think JSIN numbers give some indication here that

8   although this may be above the median range if we use a

9   Level 27, it is not far out of that range; and in view of the

10  egregious nature of the circumstance of the prior conviction

11  and the taking advantage of the trust of friends, that staying

12  within the guidelines, even as I conclude they somewhat

13  overstate the judgment of the judiciary as a whole, I think is

14  appropriate in this case.  And a Level 88 is in the middle of

15  that guideline range and so squarely within at least what the

16  Sentencing Commission advises.

17      In terms of deterrence, Mr. Anderson is now 62.  If he

18  gets credit for good time, or good time credits, his sentence

19  will be still within the range of six to seven years net, it

20  seems to me, and he will at that point be in his late 60s.  And

21  I would hope that at this point, with then two convictions, two

22  federal fraud convictions, that that, along with his age at

23  that point, will be a sufficient deterrent in terms of conduct.

24      And in terms of general deterrence, this is a significant

25  sentence that will send a message to the public.

 1          And, finally, I recognize on the whole that there's been a

 2    lot of discussion about white-collar crimes and which way does

 3    that cut.  It is a very common, I think, experience to give

 4    white-collar defendants kind of a break.  I've seen so many

 5    situations where somebody comes in this Court and they have a

 6    family; they have certain -- they have a community that

 7    supports them; and sometimes it seems like an aberration and

 8    there's no violence, et cetera, et cetera.  So there's a

 9    tendency in some parts to not take white-collar crime as

10    serious as other kinds of crime, and I think that that is a

11    problem.

12          And this case illustrates that because here, this is not a

13    situation where I've seen so many defendants on gun offenses,

14    drug offenses, assault, other things, who come from truly

15    broken backgrounds, who come from horrendous circumstances.  It

16    does not excuse the behavior, but at least there's some

17    explanation.  And those that come here with the privilege of

18    education and security and lack of childhood trauma, in my

19    view, have no excuse.

20          And so I think it is important that white-collar offenses

21    be taken as serious as all other kinds of offenses and to make

22    our system more fair and more just and not a dual system of

23    justice, and that's why I'm not going to deviate from the

24    guideline range.  I'm going to give the middle of the range,

25    even though the guidelines themselves are high; but because of

1    the past offense, the past conviction and the egregious nature,

2    I think that a sentence of 88 months will fulfill the criteria

3    under 3553(a).  It is less than what the Government asked for;

4    it is more than what Probation recommends and more than

5    Mr. Anderson asked for; but I think it is well within the range

6    that reflects all of the competing factors under 3553(a).

7        Therefore, pursuant to the Sentencing Reform Act of 1984,

8    it is the judgment of this Court that Alan K. Anderson is

9    hereby committed to the custody of the Bureau of Prisons to be

10   imprisoned for a term of 88 months.  The term consists of

11   88 months on each of Counts Three and Four, all counts to be

12   served concurrently.

13       Upon release from imprisonment, the defendant shall be

14   placed on supervised release for a term of three years.  The

15   terms consists of terms of three years on each of Counts One

16   and Three, all such terms to run concurrently.

17       Within 72 hours of release from the custody of the

18   Bureau of Prisons, the defendant shall report in person to the

19   Probation Office in the district to which the defendant is

20   released.

21       While on supervised release, the defendant shall -- must

22   not commit another federal, state, or local crime; must not

23   unlawfully possess a controlled substance; must refrain from

24   any unlawful use of a controlled substance, except that a

25   mandatory drug testing provision is suspended.  He must make

restitution in accordance with 18 U.S.C., Sections 3663 and

3663(a) or any other statute authorizing restitution; must

cooperate in the collection of DNA; and must comply with the

following conditions.

As part of your supervised release, the standard

conditions which have been adopted by this Court and listed in

the attachment to the Presentence Report recommendation

identified as "the standard conditions of supervision" are

hereby imposed and incorporated into this sentence.

And I believe, Counsel, that -- Ms. Mitchell, that you've

gone over those standard conditions with --

**MS. MITCHELL:**  Yes, Your Honor.

**THE COURT:**  -- your client.

Okay.  And the following special conditions shall apply.

Number one, you must not maintain a position of fiduciary

capacity without the prior permission of the probation officer.

Two, you must not open any new lines of credit and/or

incur new debt without the prior permission of the probation

officer.

Three, you must provide the probation officer with any

access to any financial -- with access to any financial

information, including tax returns, and must authorize the

probation officer to conduct credit checks and obtain copies of

income tax returns.

Four, you must submit your person, residence, office,

vehicle, or any property under your control, including any

computers, cell phones and other electronic devices, to a

search.  Such a search must be conducted by a U.S. probation

officer at a reasonable time and in a reasonable manner based

upon a reasonable suspicion of contraband or evidence of a

violation of a condition of release.  Failure to submit to such

a search may be grounds for revocation.  You must warn any

residents that the premises may be subject to searches.

It is further ordered that the defendant shall pay to the

United States a special assessment of $200.  Payment shall be

made to the Clerk of the U.S. District Court, 450 Golden Gate,

Box 36060, San Francisco, California 94102 or via the Pay.gov

online payment system.

During imprisonment, payment of criminal monetary

penalties are due at a rate of not less than $25 per quarter,

and payment shall be made through the Bureau of Prisons Inmate

Financial Responsibility Program.

The Court finds that the defendant does not have the

ability to pay the fine and orders it waived.

It is further ordered that the defendant shall pay

restitution in an amount to be determined.

And in connection with that, I would like to set a further

briefing on restitution, and I'd like the parties to meet and

confer, based on the criteria that I've set forth, setting the

September 2011 date as the date from which the Government, by a

1   preponderance of the evidence, has found fraud.  And that fraud

2   would reach anybody, even if there was no specific document

3   sent or specific affirmative representation, either verbally or

4   written, but based on the failure to disclose, as I've

5   mentioned earlier.

6        So I'm going to use that date as the cutoff date or as the

7   benchmark date, and restitution will be based on that point.

8   That may mean that some victims, for some of their losses

9   early -- in the investments early on, may not be entitled to

10  restitution but investments thereafter would be.  So it can

11  vary from investor to investor.  But it's not by investor; it's

12  by date.

13       So I'd like the parties to meet and confer and see if you

14  can stipulate to an amount.  If not, we'll hear the dispute.

15  But we should set a date for restitution.  And at that point,

16  once the restitution date is set, I will enunciate the payment

17  rate, which is standard here in terms of the $25 per quarter,

18  et cetera, et cetera.  So I'm going to not recite that part of

19  the judgment yet until we get a restitution amount.  So we

20  should set a date for a restitution hearing.

21       How much time do you think you need to --

22       **MR. HIGHSMITH:**  I'm optimistic we can stipulate, but

23  how about 30 days?

24       **THE COURT:**  Okay.  Does that sound reasonable,

25  Ms. Mitchell?

 1            **MS. MITCHELL:**  Yes, Your Honor.

 2            **THE COURT:**  30 days from now.

 3            **THE CLERK:**  You're unavailable on the 17th, so let me

 4    keep looking.

 5            **THE COURT:**  How about on the 10th?  That's a little

 6    short.  That's 28 days.

 7            **THE CLERK:**  October 10th?

 8            **THE COURT:**  Yes.  We've got a long calendar but --

 9            **THE WITNESS:**  Uh-huh.

10            **THE COURT:**  -- we can set it at 9 o'clock.

11       All right.  And if you can stipulate, then we can take

12    that off calendar and I can -- well, we still might have to

13    have the hearing because I think I have to put that on the

14    record.

15            **MR. HIGHSMITH:**  I think we could put it into -- bake

16    it into the stipulation, the language -- the Court's language,

17    but I'll defer to Probation on that.

18            **THE COURT:**  All right.  Probation?

19            **MS. MOY:**  Yes, Your Honor.  If the order contains the

20    restitution amount to each victim and the payment language as

21    outlined in the PSR, then the amended judgment can be issued

22    based on that.

23            **THE COURT:**  All right.  Okay.  So we may or may not

24    have a hearing.  If you can reach a stipulation, we'll take it

25    off calendar.  If not, if there's something still at issue,

```
 1    we'll decide it at that point.
 2             MR. HIGHSMITH:  Thank you, Your Honor.
 3             MS. MITCHELL:  Yes, Your Honor.
 4             THE COURT:  All right.  Is there a motion to
 5    dismiss -- do we need to dismiss other counts?
 6             MR. HIGHSMITH:  We do.  Move to dismiss all remaining
 7    counts, Your Honor.
 8             THE COURT:  All right.  The remaining counts are
 9    hereby dismissed.
10        And I guess that will conclude our proceeding.
11        I want to thank those in attendance today, including the
12    victims.  The Court is appreciative of your comments and
13    recognizes the hardships that you've suffered.
14        Mr. Anderson, I never wish ill on anyone.  And you
15    obviously are a person with tremendous talent, and it's
16    unfortunate that your talent wasn't used in a successful
17    venture that I think you honestly tried to endeavor, at least
18    at the beginning.
19        But I hope at this point you have learned your lesson and
20    that your apology and what you've said to the victims is indeed
21    heartfelt and that you will find some way to find some kind
22    of -- whether it's in terms of apology or something else, to
23    find some way to make peace with yourself and those who you've
24    harmed.
25             MS. MOY:  Your Honor, two logistical matters.
```

1          One, I just wanted to clarify that Your Honor does wish

2     for an amended PSR for the stricken sentence agreement.

3               **THE COURT:**  Yes.

4          **MS. MOY:**  Okay.  And then the second thing is, are we

5     having a self-surrender date for Mr. Anderson?

6          **MS. MITCHELL:**  Yes, Your Honor.  As far as -- for the

7     purposes of appeal, Mr. Anderson, of course, would lodge an

8     objection to the sentence based off of procedural and

9     substantive reasonableness.

10         We would be requesting a self-surrender date approximately

11    six months out.  Mr. Anderson, as the Court is aware, just had

12    his second grandchild yesterday, and the child presently is in

13    the NICU, has some substantial developmental issues that the

14    family is working through.

15         So that he could be there with his children while they are

16    starting their journey as parents with a particularly

17    troublesome journey, we're asking that the Court afford

18    Mr. Anderson some time to get situated and get his family

19    situated.

20              **THE COURT:**  All right.  Government?

21         **MR. HIGHSMITH:**  We oppose that, Your Honor.  This case

22    has dragged on for very long.  The fraud dragged on from

23    September 2011 all the way to 2019.  The litigation leading up

24    has lasted, from indictment to sentencing, three years.  We

25    continued sentencing numerous times.  I think the standard

1    self-report date is fair, given all the circumstances of the

2    case.

3              THE COURT:  What is standard, in your view?

4              MR. HIGHSMITH:  Well, each court is actually

5    different.  I've had some very tight turnarounds in other

6    courtrooms.  I would -- I mean, three months seems very

7    reasonable, Your Honor.  Three months seems eminently

8    reasonable to handle issues with the grandchildren.  And in

9    light of what other defendants get, more than that seems

10   unreasonable.

11             THE COURT:  All right.  Ms. Mitchell?

12             MS. MITCHELL:  Your Honor, it's just the family is

13   going to be going through a very tough time in the next couple

14   of months.  Mr. Anderson really would like to be there for his

15   son to be able to provide some support.

16             THE COURT:  All right.  I'm going to choose a

17   sentencing date after the holidays, in early January so that he

18   will have more than three months and an opportunity to be with

19   his family during the holidays, both holidays.

20        But this case has lingered a long time.  It's a 2021 case,

21   and here we are three years, almost four years later.  So I'm

22   going to set a date January -- after the New Year, January 6,

23   so he can be with his family through the New Years and through

24   that week.

25             MS. MITCHELL:  Understood, Your Honor.

1       **THE COURT:**  All right?

2       **MR. HIGHSMITH:**  Thank you, Your Honor.

3       **THE COURT:**  All right.  Thank you.

4       **THE CLERK:**  Court is adjourned.

5           (Proceedings adjourned at 11:41 a.m.)

6                   ---o0o---

7

8               **CERTIFICATE OF REPORTER**

9       I certify that the foregoing is a correct transcript

10  from the record of proceedings in the above-entitled matter.

11

12  DATE:  Wednesday, January 1, 2025

13

14

15

16

17  _____

18       Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

19       CSR No. 7445, Official United States Reporter

20

21

22

23

24

25